ACCEPTED
15-25-00104-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
11/7/2025 1:28 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00104-CV**

_____

IN THE COURT OF APPEALS FOR
THE FIFTEENTH JUDICIAL DISTRICT
AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
11/7/2025 3:56:31 PM
CHRISTOPHER A. PRINE
Clerk

_____

PUBLIC UTILITY COMMISSION OF TEXAS, *et.al,*

*Appellants,*

v.

CITY OF FULSHEAR, TEXAS

*Appellee.*

_____

On Appeal From the 53rd District Court of Travis County, Texas
Cause No. D-1-GN-24-004710

_____

**BRIEF OF APPELLEE
CITY OF FULSHEAR**

_____

C. Joe Freeland
State Bar Number 07417500
**MATHEWS & FREELAND, L.L.P.**
2105 E. MLK, Jr., Blvd
Austin, Texas  78702
Tel.   (512) 404-7800
Fax.   (512) 703-2785

ATTORNEYS FOR APPELLANT
CITY OF TYLER

## IDENTITY OF PARTIES AND COUNSEL

The Identity of Parties and Counsel included in the Appellant Brief of the Public Utility Commission is accurate

# TABLE OF CONTENTS

Identity of Parties and Counsel ...................................................................... ii

Table of Contents ......................................................................................... iii

Index of Authorities .......................................................................................v

Glossary of Acronyms and Technical Terms ......................................... vii

Statement of the Case.................................................................................. viii

Statement Regarding Citations ................................................................. viii

Issue Presented ........................................................................................... viii

Statement of Facts ...........................................................................................1

    A.    Introduction ...................................................................................1

    B.    Background .....................................................................................1

    C.    NFBWA's Decision .......................................................................6

    D.    Fulshear's Appeal.........................................................................6

    E.    Appeal to District Court ...............................................................8

Standard of Review ........................................................................................9

Summary of the Argument..............................................................................11

Argument.........................................................................................................13

    A.    The Commission's conclusion that Fulshear is receiving water service is arbitrary and capricious because it treats similarly situated GRP Participants differently .......................................................................................13

    B.    The Commission's conclusion that Fulshear is receiving water service is arbitrary and capricious because NFBWA "committed" facilities and lines to serving Fulshear. .......................................................................21

C.     The Commission's conclusion that Fulshear is receiving water service is arbitrary and capricious because NFBWA is providing Fulshear with groundwater. ........................................................................................26

D.     Other Issues ................................................................................31

Prayer ................................................................................................32

# INDEX OF AUTHORITIES

## CASES

*Cadena Commercial USA Corp. v. Tex. Alcoholic Beverage Comm'n,*
518 S.W.3d 318 (Tex. 2017) ........................................................................11

*City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179 (Tex. 1994)..........11

*City of Waco v. Tex. Comm'n on Env. Qual.*,
346 S.W.3d 781  (Tex. App. – Austin 2011),.............................................12

*Oncor Elec. Delivery Co. LLC v. Giovanni Homes Corp., No. 03-23-00322-CV,*
*2025 WL 1547257 (Tex. App.—Austin May 30, 2025, pet. filed)*..................22

*Oncor Elec. Delivery Co. LLC v. Pub. Util. Comm'n of Tex.*,
406 S.W.3d 253 (Tex. App.—Austin 2013, no pet.)....................................23

*Pub. Util. Com. v. S. Plains Elec. Coop., Inc.*,
635 S.W.2d 954 (Tex. App.—Austin 1982, writ ref'd n.r.e.).......................23

*Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*,
53 S.W.3d 310 (Tex. 2001) .......................................................................22

*Pub. Util. Comm'n of Tex. v. Gulf States Utilities Co.*,
809 S.W.2d 201 (Tex. 1991) ....................................................................12

*S. Tex. Water Co. v. Bieri*, 247 S.W.2d 268 (Tex. App.—Galveston 1952,
writ ref'd n.r.e.)......................................................................................31

*Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454
(Tex. 1997), as supplemented on denial of reh'g (Oct. 9, 1997) ...................18

*Tex. Comm'n on Env. Quality v. Maverick Cnty,*
628 S.W3d 497, 502 (Tex. App. – Austin 2019).........................................10

*Tex. Dep't of Ins. v. State Farm Lloyds ,*
260 S.W.3d 233 (Tex. App. – Austin 2008).................................................11

*Texas Water Comm'n v. City of Fort Worth*,
875 S.W.2d 332 (Tex. App.—Austin 1994, writ denied) ............................21

*Tracfone Wireless, Inc. v. Comm'n on State Emergency Communs.*,
397 S.W.3d 173 (Tex. 2013) ........................................................................19

## STATUTES

Tex. Gov't Code § 2001.060 .............................................................................11

Tex. Gov't Code § 2001.174 .............................................................................10

Tex. Gov't Code § 2001.175 .............................................................................10

Tex. Spec. Dist. Code § 8813.008. ...................................................................18

Tex. Spec. Dist. Code § 8834.212(b) ...............................................................18

Tex. Water Code § 11.021 ................................................................................31

Tex. Water Code § 12.013 ................................................................................34

Tex. Water Code § 13.001 ................................................................................32

Tex. Water Code § 13.002(21) .............................................................. 20, 21, 24

Tex. Water Code § 13.043(f) .............................................................. 21, 27, 32, 34

Tex. Water Code § 13.250 ................................................................................20

## OTHER AUTHORITIES

*Merriam-Webster.com Dictionary*, https://www.merriam-
webster.com/dictionary/committed accessed 3 Nov. 2025 .................................24

# GLOSSARY OF ACRONYMS AND TECHNICAL TERMS

| | |
|---|---|
| ALJ | Administrative Law Judge |
| APA | Administrative Procedure Act, Texas Government Code Chapter 2001 (Tex. Gov't Code §§ 2001.001-.902) |
| Chapter 13 | Texas Water Code, Chapter 13 (Tex. Water Code §§ 13.001-.515) |
| FBSD | Fort Bend Subsidence District |
| Fulshear | City of Fulshear, Texas |
| GRP | Groundwater Reduction Plan |
| GRP Fee | Rate charged by NFBWA to groundwater wells owners for groundwater pumped pursuant to permits issued to NFBWA |
| GRP Participants | Participants in NFBWA's GRP |
| NFBWA | North Fort Bend NFBWA |
| PFD | Proposal for Decision |
| PUC or Commission | Public Utility Commission of Texas |
| SOAH | State Office of Administrative Hearings |
| Surface Water Fee | Rate charged by NFBWA to users of NFBWA-supplied surface water |

**STATEMENT OF THE CASE**

The Statements of the Case contained in the Appellants' Briefs are accurate.

**STATEMENT REGARDING CITATIONS**

In this brief, Fulshear will use the same citation references as the Commission. Citations to the Clerk's Record will be: CR at [page number]. Citations to the Administrative Record, which were admitted into evidence in the Reporter's Record will be: RR, AR [item number] at [page number]. Citations to items contained in the Commission's Appendix will be: PUC Tab [item number]:

**ISSUE PRESENTED**

Fulshear agrees with the Issue Presented in the PUC's Appellant Brief:

Was the Commission's conclusion that it lacked jurisdiction over Fulshear's complaint because Fulshear does not receive water service from the NFBWA arbitrary and capricious?

**STATEMENT OF FACTS**

## A.     Introduction

This case was heard by the Commission based on an agreed record submitted by the parties, consisting of Stipulations and the documents that were received into evidence. AR 64 (PUC Tab 4).

## B.     Background

Fulshear is a home-rule municipality and "retail public utility" providing potable water to more than 21,000 users in Fort Bend County. Historically, Fulshear, and all of its neighboring water utilities, provided service using only groundwater. The overuse of groundwater throughout Fort Bend County caused subsidence. To mitigate subsidence, the Legislature created the Fort Bend Subsidence District ("FBSD"), which by rule has required that Fulshear and its water using neighbors to reduce their reliance on groundwater. All non-exempt groundwater well owners within FBSD's boundaries must obtain permits from FBSD (AR 95), and by January 1, 2027, these well owners are required to reduce pumping such that groundwater makes up no more than 40% of a well owner's total water use (a 60% reduction in groundwater use). AR 105 at 6. To obtain compliance with its reduction requirement, FBSD's rules allow it to assess a "disincentive fee" (penalty) against well owners that fail to meet the reduction requirement. AR 95.

1

The subsidence district, however, allows groups of groundwater users to form regional entities to allow the group to collectively comply with the reduction requirement through the use of an approved Groundwater Reduction Plan ("GRP"), implemented by the regional entity ("GRP entity"). AR 95 at 10-11. The ability to comply collectively allows to group to meet the requirement more efficiently, both physically and economically. AR 108 at 1-2.

To collectively achieve compliance, the GRP entity has to acquire a surface water supply and then build a water delivery system capable of delivering sufficient surface water to the participants such that, collectively, the participants' groundwater use is no more than 40% of total water use. *Id.* "Collective compliance" is only achieved by NFBWA by supplying non-groundwater to the GRP Participants collectively. Thus, some participants of the GRP entity might continue pumping more than 40% of their total use (usually members located further from the surface water supply), so long as other participants pump less than 40%, (usually members located closer to the source). *Id.* If the group of participants operating under a GRP collectively fails to meet the reduction requirement, FBSD will assess the "disincentive fee" against the GRP entity and not against the individual participants in the GRP. AR 95 at 16; AR 96 at 2 (PUC Tab 7).

To cost effectively meet FBSD's reduction requirements, Fulshear and its neighbors turned to the Texas Legislature for the creation of a GRP entity – the North

2

Fort Bend Water Authority (the "NFBWA"), a conservation and reclamation district created pursuant to Article XVI, Section 59 of the Texas Constitution. Additionally, NFBWA is a retail public utility because it maintains and controls facilities for providing potable water service for compensation and is a political subdivision. AR 64, Stipulation Nos. 2 & 4.

After creation, NFBWA adopted an official Groundwater Reduction Plan ("GRP"), its comprehensive plan for providing and funding alternative water supplies. AR 94. Thereafter, NFBWA set about the enormously expensive task of acquiring treated surface water from the City of Houston and constructing infrastructure to convey the treated surface water from Houston's water treatment plants located in Harris County to Fort Bend County – the expense of which to be paid by all of the groundwater users within the boundaries of NFBWA (the "GRP Participants") collectively. AR 94 at 1-4 and 33-34. Under NFBWA's GRP, surface water would be delivered first to the members of the GRP Participants located closer to Houston's water treatment plant, and the GRP required that those GRP Participants meet their water needs with 100% surface water, and then extended the infrastructure further westward connecting to the other GRP Participants, as the lines were completed, ultimately to go as far as Fulshear, which is located on the western boundary of NFBWA. AR 94 at 15-20. Under the GRP, NFBWA anticipates that it will have to supply Fulshear with surface water to be able to meet the 2027

groundwater reduction requirement. AR 94 at 20. Additionally, since subsidence occurs near the source of pumping, NFBWA needs to extend its surface water system throughout its boundaries to keep excessive subsidence from occurring in areas without access to groundwater.

The GRP also requires that NFBWA be the permittee on all groundwater wells within the authority that are permitted by FBSD "to enable the greatest flexibility in operation and to ensure that the required groundwater reduction is achieved for the Authority as a whole." AR 94 at 28. As noted by NFBWA, such an arrangement provides "the greatest flexibility in operation *of the Authority's surface water and groundwater production capacity*." AR 94 at 29 (emphasis added). This demonstrates that NFBWA considers groundwater capacity to be its capacity, and that, through its control of all GRP Participant well permits and of the decision as to who gets surface water, NFBWA ultimately controls production from the GRP Participant wells.

To pay for the cost of purchasing treated surface water from Houston and transporting the water to the GRP Participants, NFBWA developed a rate structure for all GRP Participants based on the amount of water used by a GRP Participant regardless of the source of the water. The "GRP Fee," which is charged to the participants based on the amount of groundwater they use, and the "Surface Water Fee," which is based on the amount of surface water they use. AR 64, Stipulation

4

Nos. 8 & 9; AR 93 at 5-6 (PUC Tab 6); AR 99 at 203. NFBWA determines the amount of the GRP Fee and Surface Water Fee using the American Water Works Association Manual M-1 (M-1 Manual), which means that NFBWA takes its estimated total costs (debt service, reserves, and operating costs) and divides that by the estimated total amount of water (surface and groundwater) used by the GRP Participants to establish the Surface Water Fee. AR 64, Stipulation No. 10; AR 97 at 4-8, 12-25. NFBWA then sets the GRP Fee at the Surface Water Fee minus an amount ($.35 per thousand gallons), which is intended to reflect average operating costs per gallon borne by well owners, which is a cost that the surface water users do not have. *Id.* As clearly stated in the GRP, NFBWA's fee structure is designed so that "***customers connected to the transmission system and those relying on their own groundwater wells will effectively pay the same rate for water***." AR 94 at 33 (emphasis added). In other words, NFBWA designed the Surface Water Fee and the GRP Fee so that NFBWA effectively charges the same rate to all GRP Participants because they effectively receive the same service. The rate structure also protects NFBWA's investment in its surface water system because if the GRP Fee was less than the Surface Water Fee, GRP Participants would continue to use groundwater rather than surface water.

Initially, all GRP Participants were charged only the GRP Fee, and NFBWA used the revenues from the GRP Fee to secure the contract with Houston and begin

5

funding the construction of the transmission system. AR 94 at 33.  As NFBWA began delivering surface water to some GRP Participants, those participants began paying the Surface Water Fee. Even now, the majority of NFBWA's revenues come from the GRP Fee, the vast majority of which are used to fund the surface water system. AR 98 at 8. For the calendar year 2021, NFBWA collected approximately $33.149 million in revenues from GRP Fees, and only $25.756 million from in Surface Water Fees, and paid more than $47.9 million to fund the surface water system (Debt Service - $33 million, Depreciation - $8.8 million, O&M - $2.5 million, Purchased Water - $3.6 million). AR 103 at 15; AR 108 at 3.

## C.    NFBWA's Decision

On December 16, 2021, NFBWA's board of directors adopted an amended rate order setting the Surface Water Fee at $4.90 per each thousand gallons of surface water received and the GRP Fee at $4.55 per each thousand gallons pumped. AR 93 at 5.  The $0.35 difference reflects the unit cost for producing groundwater, as determined by NFBWA in 2008.  AR 94 at 33.

## D.    Fulshear's Appeal

On March 16, 2022, Fulshear filed a petition appealing the "GRP Fee." AR 1. Fulshear's petition was filed pursuant to Texas Water Code § 13.043(f):

> A retail public utility that receives water or sewer service from another retail public utility or political subdivision of the state, including an affected count, may appeal to the utility commission a decision of the

6

provider of water or sewer service affecting the amount paid for water or sewer service.

The Commission divided the appeal into two phases, with the first phase to determine whether the Commission has jurisdiction to hear the appeal, and the second phase to review the merits of the appeal. The Commission referred Phase One to SOAH.

On June 23, 2023, the SOAH ALJ filed a proposal for decision granting NFBWA's motion to dismiss finding that the Commission lacked jurisdiction because Fulshear did not receive surface water from NFBWA. The Commission, however, overturned the ALJ's decision with regard to jurisdiction under Texas Water Code § 13.043(f) on the basis that the ALJ applied the wrong legal analysis and remanded the matter back to SOAH. AR 58.

On remand, the SOAH ALJ tried the matter through briefing based on stipulated facts and evidence. On April 4, 2024, the ALJ entered a proposal for decision on remand again recommending dismissal for lack of jurisdiction. AR 74 (PUC Tab 3). The basis for the ALJ's recommendation was that Fulshear does not receive "water service" from NFBWA because: (1) Fulshear does not receive actual water from NFBWA; (2) none of NFBWA's facilities or lines are committed to serving Fulshear; and (3) the GRP Fee (unlike NFBWA's Surface Water Fee) is a "regulatory fee" paid to NFBWA to allow Fulshear to achieve compliance with FBSD's groundwater reductions requirements. AR 74.

7

Regarding the last basis, the ALJ based her conclusion on an assumption that the GRP Fee is the same as the FBSD's disincentive fee. Both Fulshear and NFBWA filed exceptions noting that the GRP Fee is not the same as the FBSD's disincentive fee. On May 20, 2024, the ALJ filed an exceptions letter changing her assumption in the narrative that the GRP Fee is equivalent of the Subsidence District's disincentive fee and amending Finding of Fact No. 5, but not otherwise changing her analysis or her conclusion that the GRP Fee is a "regulatory fee," as opposed to a rate for water service. AR 85.

On May 23, 2024, the Commission entered its final order in this proceeding. AR 86 (PUC Tab 2). In the Order, the Commission modified the PFD to make non-substantive changes, and modified Finding of Fact No. 5, but made no reference to the ALJ's modification. In the Order, the Commission agreed that it lacks jurisdiction to hear the appeal because "Fulshear does not receive water service from NFBWA under Texas Water Code § 13.043(f)." AR 86 at 3.

E. **Appeal to District Court**

On July 31, 2024, Fulshear filed a petition for judicial review of the PUC's final order, challenging the Commission's conclusion that Fulshear does not receive water service from NFBWA and the PUC's dismissal of its appeal for lack of jurisdiction under Texas Water Code § 13.043(f). Following briefing and a hearing on the merits, the district court found that the Commission's conclusion that Fulshear

8

does not receive water service from NFBWA was arbitrary and capricious and reversed the PUC's final order and remanded the matter to the agency for further proceedings. The district court found that the Commission's conclusion had no rational connection to the facts in the record and that Fulshear did receive water from NFBWA based on (1) Fulshear's status as a collective member ("GRP Participant") of a group that receives water from NFBWA, (2) NFBWA's construction of, and Fulshear's payment for, facilities that will eventually provide surface water to Fulshear, and (3) NFBWA's complete control, as permittee, of Fulshear's ability to produce groundwater from Fulshear's wells, including the requirement that Fulshear pay NFBWA for the groundwater at effectively the same amount as the surface water provided by NFBWA to other GRP Participants.

## STANDARD OF REVIEW

This appeal is governed by the Administrative Procedure Act ("APA"), Texas Government Code §§ 2001.001-.903. Accordingly, this Court "shall reverse or remand the case for further proceedings if substantial rights of [Plaintiff] have been prejudiced because the administrative findings, inferences, conclusions, or decisions [of the Commission] are:

    (A)    in violation of constitutional or statutory provision;
    (B)    in excess of [the Commission's] statutory authority;
    (C)    made through unlawful procedure;
    (D)    affected by other error of law;
    (E)    not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

9

> (F)     arbitrary and capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code § 2001.174(2)(A-F).

A substantial evidence review of an agency's final decision involves the following two component inquiries:

> (1)     whether the agency made findings of underlying facts that logically support the ultimate facts and legal conclusions establishing the legal authority for the agency's decision or action and, in turn,
> (2)     whether the findings of underlying fact are reasonably supported by the evidence.

*Tex. Comm'n on Env. Quality v. Maverick Cnty*, 628 S.W.3d 497, 502 (Tex. App.—Austin 2019), *rev'd and remanded on other grounds*, 642 S.W.3d 537 (Tex. 2022).

The Third Court has observed that the first inquiry may entail questions of law, while the second inquiry is highly deferential to the agency's determination. *Id.* There is an initial presumption of substantial evidence, and the evidence may preponderate against the agency's decision and need only be such that a "reasonable mind" might accept as adequate to support a finding of fact. *Id.* at 503. The reviewing court must consider only the record upon which the decision is based, as delineated by statute. Tex. Gov't Code §§ 2001.175; 2001.060.

Even if supported by substantial evidence, however, an agency order may be arbitrary and capricious if a denial of due process has prejudiced the litigant's rights, or if the agency has improperly based its decision on non-statutory criteria or failed to consider relevant factors. *Tex. Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d

10

233, 245 (Tex. App.—Austin 2008); *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 184 (Tex. 1994).

Additionally, an administrative agency acts "arbitrarily and unlawfully" if it treats similarly situated persons differently without an articulated and reasonable justification. *Cadena Commercial USA Corp. v. Tex. Alcoholic Beverage Comm'n,* 518 S.W.3d 318, 335 (Tex. 2017). Administrative agencies must observe the "rudiments of fair play." *Id.*

Finally, an agency acts arbitrarily if it reaches a completely unreasonable result after considering relevant factors, fails to make a connection between its decision and the factors made relevant to that decision by applicable statutes, or if otherwise there does not appear a rational connection between the facts and the decision. *See Pub. Util. Comm'n of Tex. v. Gulf States Utilities Co.*, 809 S.W.2d 201, 211–12 (Tex. 1991); *City of Waco v. Tex. Comm'n on Env. Qual.*, 346 S.W.3d 781 (Tex. App.—Austin 2011), *rev'd on other grounds*, 413 S.W.3d 409 (Tex. 2012).

## SUMMARY OF THE ARGUMENT

The Commission incorrectly determined that that it lacked jurisdiction to hear Fulshear's appeal of NFBWA's rates under Texas Water Code § 13.043(f) based on a finding that Fulshear does not "receive water service" from NFBW. The Commission's decision is arbitrary and capricious because it treats similarly situated

11

GRP Participants differently and is contrary to the evidence in the record that shows Fulshear "receives water service" from NFBWA. The uncontroverted evidence in the record shows the following:

NFBWA's fees were created to reflect that the provision of water (surface or groundwater) to any GRP Participant is the provision of water to all GRP Participants. NFBWA was created to provide all of the GRP Participants with a source of water other than groundwater for the purpose of allowing all of the GRP Participants to collective comply with the requirements of FBSD that by 2027 the GRP Participants' collective pumping is no more than 40% of the GRP Participants' collective use of water. As a GRP Participant, Fulshear receives water service from NFBWA in the same manner as all the other GRP Participants. This is shown by the fact that fees charged by NFBWA are designed so that all GRP Participants (regardless of water source) "effectively pay the same rate for water." The Commission's conclusion that GRP Participants that only receive groundwater do not receive water service from NFBWA (as opposed to those that receive surface water) is arbitrary and capricious because it treats similarly situated persons differently without an articulated and reasonable justification. The fact that Fulshear does not receive actual surface water from NFBWA is not a sufficient justification because Fulshear pays for that surface water regardless of whether it receives such water.

Fulshear receives water service from NFBWA because Fulshear is paying for NFBWA to construct surface water supply infrastructure that is designed to eventually provide Fulshear with surface water. The fact that Fulshear does not yet receive surface water is merely a product of its relative distance from NFBWA's surface water source and does not change the fact that Fulshear is paying for surface water supply infrastructure. In other words, by requiring Fulshear to pay for the construction of the facilities and water lines, NFBWA has committed a portion of those facilities and lines to serving Fulshear, which is providing water service as defined by the Texas Water Code.

Finally, Fulshear receives water service from NFBWA because NFBWA controls Fulshear's access to its groundwater by virtue of being the permittee for Fulshear's wells. Fulshear cannot produce groundwater from its wells without paying NFBWA for the use of its permits. The definition of water service is not limited to the ownership of the water, but includes charges associated with the furnishing of the water.

**ARGUMENT**

A. **The Commission's conclusion that Fulshear is receiving water service is arbitrary and capricious because it treats similarly situated GRP Participants differently**

All GRP Participants are similarly situated, both those receiving groundwater and those receiving surface water. If the Commission has jurisdiction to hear an

appeal from a GRP Participant paying the Surface Water Fee, it has the jurisdiction to hear an appeal from a GRP Participant paying the GRP Fee. The Commission's conclusion to treat differently those paying the GRP Fee, such as Fulshear, is arbitrary, and the Commission's conclusion must be reversed.

NFBWA and the Commission argue that the "service" provided to Fulshear is "collective compliance" with FBSD's groundwater reduction requirements – not "water service." This argument conveniently overlooks the simple fact that the only way in which NFBWA provides "collective compliance" is by providing the GRP Participants with an alternative source of potable water. In other words – "collective compliance" = provision of surface water. According to NFBWA's web site and its rate expert, "the primary reason the Authority was created was to facilitate compliance with the Fort Bend Subsidence District's groundwater reduction mandates by creating a viable single entity to acquire, develop and deliver a long term supply of potable surface water to water users within the Authority's boundaries." AR 97 at 10. NFBWA collectively provides surface water to the GRP Participants, and under NFBWA's financing scheme set out clearly in NFBWA's GRP (AR 94 at 33), all GRP Participants collectively pay NFBWA to acquire long-term surface water supplies and to construct a surface water delivery system to deliver surface water to the GRP Participants as a group. As clearly stated in the GRP, NFBWA's fees are structured so that all GRP Participants "***effectively pay the***

***same rate for the same amount of water***." *Id.* (emphasis added). The difference between the two charges ($0.35/thousand gallons) is designed to approximate the cost of producing 1,000 gallons of groundwater, thus ostensibly equalizing the costs paid among GRP Participants for water provided by NFBWA. *Id.*

It is also undisputed that NFBWA uses the revenues from the GRP Fee (as well as revenues from the Surface Water Fee) to fund the construction of its surface water delivery system that will eventually connect to Fulshear and to purchase treated water from the City of Houston. As expressly noted in the GRP, revenues from the GRP Fee "are an essential component of the infrastructure and operations funding." AR 94 at 29. As stipulated by the parties and explained by NFBWA's rate expert, NFBWA determined the amount of the Surface Water Fee, using the American Water Works Association Manual M-1 (M-1 Manual), by taking its estimated total costs (debt service, reserves, and operating costs) and dividing by the estimated total amount of water (surface and groundwater) used by the GRP Participants to establish the Surface Water Fee, and then subtracting $0.35 to set the GRP Fee to offset well operation costs paid by members not yet connected to surface water. AR 64, Stipulation No. 10; AR 97. By assigning the same costs to the determination of both fees, NFBWA is providing the same service to all GRP Participants, both groundwater and surface water GRP Participants. AR 108 at 2.

Critically, both the Commission and NFBWA seem to argue that the Commission would have jurisdiction under Texas Water Code § 13.043(f) to review the Surface Water Fee. The Commission states that a GRP Participant paying the Surface Water Fee "can appeal the rates it paid for water service to the Commission." Appellant Brief of Commission at 32. NFBWA states that those GRP Participants that receive surface water receive "water service" from NFBWA in addition to collective compliance. Appellant Brief of NFBWA at 44. If those entities paying the Surface Water Fee are "receiving water service" from NFBWA, then those entities paying the GRP Fee are also "receiving water service" from NFBWA—they are receiving the same service. Thus, the Commission's order holding that Fulshear is not receiving water service from NFBWA is arbitrary because it treats similarly situated persons (those paying the GRP Fee and those paying the Surface Water Fee) differently without a reasonable basis for the different treatment.

The fact that Fulshear does not receive actual surface water is not a reasonable basis to justify treating Fulshear differently. The GRP Fee, like the Surface Water Fee, is a cost-of-service rate set by NFBWA to recover the cost of collectively providing the GRP Participants with water. While NFBWA provides some other services, the costs of those services are insignificant when compared to the enormous cost of building and operating the surface water delivery system. AR 103 at 15; AR 108 at 2-3. It could only be reasonable to treat those paying the GRP Fee differently

if the difference between the GRP Fee and the Surface Water Fee fees approximated the difference in cost of operating existing groundwater wells and building infrastructure to supply surface water. This is not the case. NFBWA's own rate study shows that the cost of furnishing surface water far exceeds $0.35 per thousand gallons, and is in fact greater than $4.00 per thousand gallons. AR 97. Nothing in the record contradicts this fact. The difference between the two fees was designed to make the costs equal by crediting those paying the GRP Fee for the cost of producing the groundwater, not the cost of furnishing surface water. AR 94 at 33

Additionally, Appellants assert that the GRP Fee is simply a fee to discourage groundwater pumping or fee like those charged by groundwater conservation districts on well operators (like FBSD's "disincentive fee"). NFBWA lacks the statutory authority to charge a fee that is not cost based. FBSD's authority to charge the disincentive fee comes directly from its statute: " [FBSD] may establish a disincentive permit fee to serve as a regulatory tool by creating a disincentive to continued overreliance on groundwater." Tex. Spec. Dist. Code § 8834.212(b). NFBWA lacks such statutory authorization. Instead, NFBWA's enabling statute limits it to charging fees as "necessary to pay for the cost of accomplishing the purposes of [NFBWA]. Tex. Spec. Dist. Code § 8813.008.

Additionally, any attempt by NFBWA to recover more than its costs through the GRP Fee, would transform that fee into a tax and not a regulatory fee. *See Tex.*

17

*Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 461 (Tex. 1997), as supplemented on denial of reh'g (Oct. 9, 1997) ("The critical issue is whether the assessment is intended to raise revenue in excess of that reasonably needed for regulation.") The Legislature, however, has not clearly granted NFBWA the power to tax (as it has FBSD). *See Tracfone Wireless, Inc. v. Comm'n on State Emergency Communs.*, 397 S.W.3d 173, 182 (Tex. 2013) ("The reach of an ambiguous tax statute must be construed strictly against the taxing authority and liberally for the taxpayer")

This means that NFBWA lacks the authority to impose a disincentive fee not tied to costs. Properly interpreted, however, the GRP Fee is a regulatory fee because it raises revenues necessary to cover the cost of the service provided by NFBWA, which is an alternative source of water – "water service."

In its brief in this Court, NFBWA now appears to argue that the Commission would not have jurisdiction over any of NFBWA's fees, including the Surface Water Fee, because NFBWA owes no duty under Texas Water Code Chapter 13 to provide any GRP Participant with water—surface or ground.  Brief of Appellant NFBWA at 44.  This issue was not addressed by either the Commission or the District Court, and raises issues of significant concern regarding the Commission's jurisdiction that should be presented to the Commission before any judicial review.

Fulshear admits that applying the definition of "service" from Texas Water Code § 13.002(21) to the term "water service" as used in § 13.042(f) raises some interesting issues regarding statutory construction. Section 13.043(f) has long been viewed as the source of the Commission's authority to review "wholesale rates," that is rates charged by retail public utilities or political subdivisions to retail public utility buyers who resell the water to consumers. The potential incompatibility between the term "water service" in § 13.043(f) and a strict definition of "service" from § 13.002(21) comes from the fact that *no retail public utility or political subdivision has a "duty" to provide "wholesale" service under Chapter 13.* The only provision in Chapter 13 that imposes a "duty" to provide service of any kind is Texas Water Code § 13.250, which imposes a duty on retail public utilities that possess or are required to possess a certificate of convenience and necessity ("CCN") to serve every retail consumer within their CCN areas. As Fulshear pointed out in its motion for rehearing, in the context of Texas Water Code § 13.043(f), "water service" should not be so narrowly interpreted to only include services furnished in the performance of a provider's duties under Chapter 13.

An additional complication comes from the fact that the definition of "service" in § 13.002(21) applies only to "retail public utilities," while "water service" in § 13.043(f) applies to both "retail public utilities" as well as "political subdivisions of the state." Thus, if "water service" in § 13.043(f) is controlled by

19

the definition of "service" in § 13.002(21), and that definition is limited to the provision of *retail service* by *retail public utilities*, then the Commission has no jurisdiction to review wholesale rates, particularly rates charged by political subdivisions, such as NFBWA. Such an interpretation would effectively render § 13.043(f) meaningless.

Such a narrow interpretation would also call into question prior Commission decisions addressing the scope of § 13.043(f), such as *Texas Water Comm'n v. City of Fort Worth*, 875 S.W.2d 332 (Tex. App.—Austin 1994, writ denied), where the Commission concluded it had the jurisdiction under § 13.043(f) to hear the appeal of a wholesale sewer rate charged by contract by one municipality to another municipality. In that case, the seller had no duty under Chapter 13 to provide sewer service to the buyer, but the Commission concluded that it had jurisdiction to hear the appeal. Also, when the Supreme Court reviewed similar language regarding electric utilities and held that wholesale electric transmission service fell within the definition of "service" without identifying where the statute set out a "duty" to provide such service. *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 317 (Tex. 2001); *see also Oncor Elec. Delivery Co. LLC v. Giovanni Homes Corp., No. 03-23-00322-CV, 2025 WL 1547257, at \*10 (Tex. App.—Austin May 30, 2025, pet. filed)*.

Given that the Commission did not address this issue in its order and that a decision on this issue could undermine established Commission precedent, the Court—before it determines that the Commission lacked jurisdiction because NFBWA lacked a "duty" under Chapter 13 to provide any of the GRP Participants—you should remand the matter to the Commission to address the issue directly. The Commission needs to provide its interpretation of the scope of § 13.043(f) before the Court weighs in. *Pub. Util. Com. v. S. Plains Elec. Coop., Inc.*, 635 S.W.2d 954, 957 (Tex. App.—Austin 1982, writ ref'd n.r.e.)("In those instances where revision of an administrative order requires a reconsideration of matters that are committed by law to the initial decision of the agency, a court should remand the cause to the agency.") This Court also cannot uphold the Commission's decision on this basis, because without an explanation of the basis for the change in its interpretation, the Commission's order would also be arbitrary and capricious. *Oncor Elec. Delivery Co. LLC v. Pub. Util. Comm'n of Tex.*, 406 S.W.3d 253, 267 (Tex. App.—Austin 2013, no pet.) ("an agency must explain its reasoning when it departs from prior norms").

**B.     The Commission's conclusion that Fulshear is receiving water service is arbitrary and capricious because NFBWA "committed" facilities and lines to serving Fulshear.**

The uncontroverted facts also show that NFBWA planned, designed, built, and is continuing to build facilities expressly large enough to have capacity to serve

Fulshear with surface water once connected, and that Fulshear has paid, and continues to pay, its share of the costs of the construction of these facilities through the GRP Fee. NFBWA's construction and commitment of new water infrastructure specifically to serve Fulshear is the provision of "water service."

The Water Code, specifically Texas Water Code § 13.002(21), defines "service" as including "any act performed, anything furnished or supplied, and any facilities or lines committed or used by a retail public utility." As recognized by the Commission in its order remanding the first PFD, "there is sufficient guidance from the Water Code's **broad** definition of the term service alone for the ALJ to determine whether Fulshear is receiving water service from the water authority." AR 58 at 4. As demonstrated below, NFBWA has undertaken the obligation to provide water to Fulshear; NFBWA has "facilities and lines committed or used" to provide potable water specifically to Fulshear; and Fulshear has paid NFBWA for committing its facilities and lines. As such, Fulshear is "receiving water service" from NFBW, and the Commission has jurisdiction to consider Fulshear's appeal.

The Water Code does not define "committed," but the dictionary defines the term as "having made a pledge or commitment." *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/committed accessed 3 Nov. 2025. Through the GRP and its rate structure, NFBWA has made a commitment to provide Fulshear with surface water once the system reaches Fulshear; NFBWA has reserved

22

capacity in its existing and future facilities to provide the surface water to Fulshear; and NFBWA has received millions of dollars in payment from Fulshear in return for making this commitment. Fulshear is "receiving water service" from NFBWA.

Fulshear's argument is based on the facts in the record that are clear and uncontested. Through the planning performed for the GRP, NFBWA determined that, by 2055, it will need to deliver surface water to the vast majority of the GRP Participants, including Fulshear. AR 94 at 17-22. As admitted by NFBWA in a discovery response, "***NFBWA's transmission pipelines will be sized and constructed to meet the projected its 2055 demands***" (AR 99 at 4) which includes Fulshear's projected demands. Additionally, as stated in the GRP:

> Pipelines were sized to have capacity to provide water to meet the 2013 and 2025 conversion requirements. The ultimate water demands through 2055 were used to avoid paralleling existing pipelines at a later date.
>
> AR 94 at 21.

Once Fulshear begins receiving surface water from the system, NFBWA has admitted that the following components of its surface water supply system are expected to be used to provide water to Fulshear:

1. **Existing:**
   - Over 50 miles of 8-inch to 48-inch surface water transmission line
   - 40 MGD Bellaire Pump Station
   - Luce Bayou Interbasin Transfer Project (a regional project that the Water Authority is a partner consisting of a pump station, 3 miles of dual 96-inch line and 23 miles of canal)

23

**Under design or construction:**
- Northeast Water Purification Plant Expansion (a regional project that the Water Authority is a partner in that will increase this plant's capacity from 80 MGD to 400 MGD)
- Surface Water Supply Project (a regional project that the Water Authority is partnering with West Harris County Regional Water Authority on consisting of over 54 miles of 42-inch and 96-inch water line and two pump stations)
- ½ mile of 30-inch, 2 miles of 16-inch, 1.5 miles of 36-inch waterline for NFBWA's internal transmission system

**Future:**
- Approximately 26 miles of 12-inch to 60-inch waterline for the Water Authority's internal transmission system.

AR 99 at 5-6.

These facts conclusively show that NFBWA planned, designed, and built its *existing water infrastructure* to have sufficient capacity to serve Fulshear once the system is extended far enough to reach Fulshear. It is also clear that from the inception of NFBWA, Fulshear has been paying its share of the costs of the construction of this infrastructure through its payment of the GRP Fee, which will also fund NFBWA's extension of the last portion of the system needed to connect Fulshear. Clearly, NFBWA has facilities "committed" to provide water service to Fulshear.

The Appellants appear to confuse the commitment of the facilities to serve with actual service using the facilities. This argument is based on the affidavit of Matthew Froelich who testified that none of NFBWA's facilities are *currently* being used to provide water to Fulshear and that none of NFBWA's facilities were designed *solely* for the purpose of serving Fulshear. Appellants' argument

misunderstands the statute, which says, "any facilities committed *or* used." Tex. Water Code § 13.043(f) (emphasis added). Under general rules of statutory construction, the word "committed" must mean something different than "used." In this context, "committed" means reserved for future use. This makes sense given that in the wholesale water context—the supplier typically has to spend lots of time and money to construct a water supply before any water is ever delivered, and the financing of the supply project can only come from the purchasers who have to start paying long before water is delivered. As shown in Table 13 of the GRP, NFBWA anticipated that it would start construction in 2009 while only charging the GRP Fee, and not actually begin delivering surface water until 2013. The fact that NFBWA's facilities are not being "used" today to serve Fulshear is just a symptom of Fulshear's relative distance from NFBWA's surface water supply and does not mean that facilities are not "committed" to providing service to Fulshear in the future.

Appellants also conclude that a "future obligation" to pay for lines to be used in the future is too attenuated to constitute water service. This conclusion is not supported by the undisputed facts. Fulshear **is obligated and is, today, paying** for its share of NFBWA's facilities through payments of the GRP Fee. Fulshear has paid NFBWA millions of dollars for the construction of these facilities. Fulshear's obligation to pay for NFBWA's Fulshear-committed facilities is not in the future— it is today. The only attenuation here is the actual date when, not if, NFBWA's

25

surface water system connects to Fulshear and deliveries of surface water commence.

Fulshear is "receiving water service" from NFBWA through the fact that NFBWA has constructed, and is constructing, facilities and lines for the purpose of providing service to Fulshear . Moreover, Fulshear is currently paying NFBWA for its pro rata share of all of NFBWA's lines and facilities, even though Fulshear does not yet receive water through the under-construction surface water system. The Commission therefore has jurisdiction under Texas Water Code § 13.042(f) to hear Fulshear's appeal of NFBWA's decision to increase the amount paid by Fulshear for that service.

**C.  The Commission's conclusion that Fulshear is receiving water service is arbitrary and capricious because NFBWA is providing Fulshear with groundwater.**

Fulshear has always asserted that it receives water service from NFBWA in the form of access to its groundwater. Fulshear obtains all of its drinking water from groundwater wells permitted to and controlled by NFBWA.  To obtain legal access to the water from these wells, Fulshear pays NFBWA $4.55 per thousand gallons for all water pumped from the wells.

The undisputed evidence in the record demonstrates NFBWA controls and manages Fulshear's groundwater wells.  NFBWA holds the permits for the wells, and as such is the only entity authorized to withdraw groundwater from the wells.

26

AR 64. Additionally, because NFBWA controls the decision as to whether, and when, it will provide surface water to Fulshear, it also controls the decision of what water source (groundwater or surface water) Fulshear must use,. As clearly stated in its Groundwater Reduction Plan, NFBWA views groundwater produced by the GRP Participants to be part of NFBWA's water supply and subject to its control:

> **6.2 Permit Aggregation**
>
> It is the intent of the Authority that FBSD permitted wells operated within the Authority will be associated with the Authority to enable the greatest flexibility in operation and to ensure that the required groundwater reduction is achieved for the Authority as a whole. This is consistent with the Authority's plan that some districts will be over-converted while others will not be connected to the surface water delivery system. Currently, it is estimated that the Authority would be named as a 'co-permittee' beginning with the September 2011 permit renewals. Permits for wells will be associated with both the current owner as well as the Authority **to provide the greatest flexibility in operation of the Authority's surface water and groundwater production capacity**.

AR 94 at 28-29 (emphasis added).

NFBWA's rate expert clearly thought he was setting rates for water service when he developed the GRP Fee and the Surface Water Fee to be equivalent. In the rate study, he explains that NFBWA charges two types of rates. "The first type is the groundwater reduction plan fee ("GRP Fee") *for water and pumpage*, and the second is a charge for surface water delivered to the member." AR 97 at 22 (emphasis added).

NFBWA's decision on December 16, 2021 to increase the GRP Fee therefore affected the amount Fulshear pays for the potable water service provided by NFBWA. The Commission has jurisdiction to review NFBWA's decision, and it erroneously concluded otherwise.

Appellants argue that Fulshear does not receive groundwater from NFBWA because Fulshear, not NFBWA, owns and operates the wells. The fact that Fulshear continues to own and operate the wells, subject to NFBWA's control over production, is irrelevant for purposes of the Commission's jurisdiction. Fulshear's continued receipt of groundwater is conditioned by NFBWA on Fulshear's continued payment of the GRP Fee to NFBWA. Fulshear is paying NFBWA $4.55 per thousand gallons to be able to use water produced from the wells. In addition, NFBWA "pays" Fulshear to operate the wells through the $0.35 per thousand gallon difference between the GRP Fee and the Surface Water Fee.

Appellants point to the fact that Fulshear owns the groundwater as conclusively proving that NFBWA is not providing water service. This argument fails to recognize that ownership of groundwater is not definitive when determining whether water service is being furnished. Generally speaking, surface water in Texas belongs to the State of Texas, and the right to use the State's water is authorized by the State through a permitting process implemented by the Texas Commission on Environmental Quality. *S. Tex. Water Co. v. Bieri*, 247 S.W.2d 268,

28

272 (Tex. App.—Galveston 1952, writ ref'd n.r.e.); Tex. Water Code §§ 11.021-022. Here, the corpus of the surface water provided by NFBWA to GRP Participants is "owned" by the State of Texas – the users of the water, including NFBWA, only have an usufructuary right to the water. Providing water service, therefore, does not mean conveying title to the water, it means conveying the right to use the water.

NFBWA argues that its status as the permittee for Fulshear's wells is irrelevant to whether Fulshear receives water service from NFBWA because it is designated as the permittee merely as a "regulatory tracking tool." NFBWA knows that this understates the reason why it is the permittee. In its brief, NFBWA states: "As 'permittee,' NFBWA is responsible for assuring that its GRP Participants are collectively meeting FBSD's groundwater reduction requirements." Appellant Brief of NFBWA at 6. Also, the FBSD rules prohibit the operation of a non-exempt well without a permit, and that acceptance of a permit is an "acknowledgement" and "agreement to comply with all the terms, provisions, conditions, limitations, and restrictions" in the permit and FBSD rules. AR 95, Rule 5.a. & j. NFBWA is the permittee because that designation allows it to control the GRP Participants access to groundwater and serves as the leverage allowing it to charge fees. In other words, Fulshear cannot access the groundwater that it owns beyond what is allowed by NFBWA because of its commitment to the GRP.

29

Finally, the Commission's jurisdiction is not limited to situations where the provider controls every aspect of the service as suggested by Appellants. NFBWA's management and control of Fulshear's water supplies is an "act performed" or a "thing furnished or supplied" by NFBWA that is used by Fulshear in performance of its duties under Chapter 13 as a retail public utility. The purpose of Chapter 13 is to regulate *retail* water utility rates and act as substitution for competition. Tex. Water Code § 13.001. The purpose of § 13.042(f) is to promote the Commission's statutory obligation to ensure that retail rates and services are "just and reasonable to consumer" by allowing the Commission to review wholesale rates charged to retail water utilities for services addressed in retail rates. . *Id.* The statute refers to "water service" not just to "water." Fulshear must pay NFBWA for its groundwater through the GRP Fee, and those costs have to be passed on to Fulshear's retail customers. If the Commission cannot review the GRP Fee, then there is no external check on NFBWA's charges—counter to the purpose of the statute.

Fulshear appealed the GRP Fee primarily because of the $0.35 differential between the GRP Fee and the Surface Water Fee, which is supposed to reflect the cost of well operation. AR 1 at 2-3. This differential has not been changed since 2008, despite significant increases in the cost of well operation. Because of this, Fulshear believes that those GRP Participants paying the GRP Fee are subsidizing the participants paying the Surface Water Fee. In other words, those paying the GRP

30

Fee are paying more for water than those paying the Surface Water Fee. If the Commission were to review NFBWA's fees and determine that the $0.35 differential is discriminatory and set new rates, the GRP Fee would be reduced, which would affect the amount paid by Fulshear for groundwater and the amount paid by Fulshear customers for their retail water service.

## D. Other Issues

Appellants argue that Fulshear's lack of protest regarding the Commission's conclusions regarding the applicability of Texas Water Code § 12.013 should somehow be held as a waiver by Fulshear regarding the issue of whether NFBWA is "furnishing" water to Fulshear. This argument fails because Fulshear never asserted that the Commission has jurisdiction under Texas Water Code § 12.013, and because that provision is not applicable for other reasons.

Fulshear's petition asserts no basis for the Commission's jurisdiction other than Texas Water Code § 13.043(f). AR 1 & AR 6. Nowhere in Fulshear's petition and supplemental petition to the Commission did Fulshear assert § 12.013 as a basis for the Commission's jurisdiction. Fulshear did not raise § 12.013 in its List of Issues (AR 12), nor did Fulshear present a direct case on the issue. The issue on remand was limited to the Commission's jurisdiction under § 13.043(f).

Additionally, with regard to municipalities such as Fulshear, the Commission's jurisdiction under Texas Water Code § 12.013 is limited to situations

31

where the municipality furnishes water to another political subdivision on a wholesale bases. Tex. Water Code § 12.013(d). Since Fulshear is not furnishing water to NFBWA but rather the other way around, the Commission does not have jurisdiction under § 12.013. Additionally, the Commission provided no explanation or facts demonstrating that NFBWA's furnishing of water had anything to do with a "purpose mention in Chapter 11 or 12 of [the Texas Water Code]." Tex. Water Code § 12.013(a).

## PRAYER

Fulshear demonstrated that the Commission's conclusion in its Final Order that Fulshear is not receiving water service from NFBWA is arbitrary and capricious: (1) because the conclusion treats similarly situated rate payers differently; and (2) because the substantial evidence in the record clearly demonstrates that Fulshear is receiving water service based on the lines and facilities that NFBWA has committed to serving Fulshear in the future and based on NFBWA's control over Fulshear's access to its groundwater.

This Court should affirm the District Court's order, hold that the Commission has jurisdiction to hear Fulshear's appeal under Texas Water Code § 13.043(f), and remand the matter to the Commission for further proceedings.

Respectfully submitted,


/s/ C. Joe Freeland
C. Joe Freeland
State Bar No. 07417500

**MATHEWS & FREELAND, LLP**
2105 East MLK, Jr. Blvd
Austin, Texas 78702
Telephone: (512) 404-7800
Facsimile: (512) 703-2785
jfreeland@mandf.com
**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF COMPLIANCE

I, C. Joe Freeland, attorney for Appellee, the City of Fulshear, certify that this document was generated by a computer using Microsoft Word 365, which indicated that the word count of the document is 7690 words per Tex. R. App. P. 9.4(i)(3).


/s/ C. Joe Freeland
C. Joe Freeland

**CERTIFICATE OF SERVICE**

I hereby certify that I have served or will serve the following a true and correct copy of the foregoing document via the Court's electronic case filing system and electronic mail on the 7th day of November, 2025:

/s/ C. Joe Freeland
C. Joe Freeland


Jordan Pratt
OFFICE OF THE ATTORNEY GENERAL
OF TEXAS – ENVIRONMENTAL
PROTECTION DIVISION
P.O. Box 12548 (MC-066)
Austin, Texas 78711-2548
Jordan.Pratt@oag.texas.gov
**ATTORNEYS FOR DEFENDANT
PUBLIC UTILITY COMMISSION
OF TEXAS**

Andrew S. "Drew" Miller
Daniela de Souza
KEMP SMITH LLP
2905 San Gabriel St, Suite 205
Austin, Texas 78705
Drew.Miller@kempsmith.com
Daniela.Desouza@kempsmith.com
**ATTORNEYS FOR
INTERVENOR NORTH FORT
BEND WATER AUTHORITY**

# INDEX TO APPENDIX

**Tab 1**      NFBWA Groundwater Reduction Plan (Excerpts) (AR 94)

**Tab 2**      Fort Bend Subsidence District Rules (Excerpts) (AR 95)

**Tab 3**      NFBWA Rate Study and Long-Term Financial Forecast (AR 97)

**Tab 4**      NFBWA Response to Fulshear's Second RFI (AR 99)

**Tab 5**      NFBWA Response to Fulshear's First RFI (AR 98)

**Tab 6**      NFBWA Financial Report 12-31-2021 (AR 103)

**Tab 7**      Affidavit of Nelisa Heddin (AR 108)

**Tab 8**      Order Remanding Proceeding (AR 58)

# Tab 1

NFBWA Groundwater Reduction Plan (Excerpts) (AR 94)

# North Fort Bend

# Water Authority



## Groundwater Reduction Plan

**March 2008**





# Contents

**Section 1 Executive Summary**.................................................................................................1

**Section 2 Introduction** ...........................................................................................................2

    **2.1**   Creation of the Authority ..........................................................................................3
    **2.2**   GRP Plan Participants................................................................................................3

**Section 3 Population and Water Demands** ..........................................................................5

    **3.1**   Population Projection Methodology ..........................................................................5
    **3.2**   Estimate Population in the Authority from 1990 to Present.......................................7
    **3.3**   Develop High Level Forecast of Authority-Wide Population .....................................7
    **3.4**   Develop Grid-Level Forecast of Authority Population ..............................................9
    **3.5**   Development of Per Capita Water Demands..............................................................9
    **3.6**   Demands for Contract Participants...........................................................................10
    **3.7**   Distribution of Water Demands through Planning Horizon ......................................11

**Section 4 Water Supply** .......................................................................................................14

    **4.1**   Water Supply Sources...............................................................................................14
    **4.2**   Availability of COH Water.......................................................................................14
        **4.2.1**   2013 Conversion ..........................................................................................15
        **4.2.2**   2025 Conversion ..........................................................................................16
    **4.3**   COH Contract Provisions..........................................................................................16

**Section 5 Infrastructure Requirements** ...........................................................................17

    **5.1**   Surface Water Delivery Capacity .............................................................................17
        **5.1.1**   2013 Conversion Strategy.............................................................................21
        **5.1.2**   2025 Conversion Strategy.............................................................................21
    **5.2**   Sizing of Transmission Pipelines..............................................................................21
    **5.3**   Sizing of Plant Facilities..........................................................................................22
    **5.4**   Costs of Facilities....................................................................................................23
    **5.5**   Operation and Maintenance Costs ...........................................................................24
    **5.6**   Anticipated Construction Schedule ..........................................................................25

**Section 6 Groundwater Reduction Plan Management**.....................................................26

    **6.1**   General Powers of the Authority ..............................................................................26
    **6.2**   Permit Aggregation..................................................................................................28
    **6.3**   Monthly Groundwater Pumpage Reports .................................................................29
    **6.4**   Flow Monitoring of Surface Water...........................................................................29

**Section 7 Other Considerations** .........................................................................................30

    **7.1**   Water Conservation .................................................................................................30

**7.2**  Reclaimed Water Reuse........................................................................................30

**7.3**  Early or Over Conversion.....................................................................................31

**Section 8 Financing Mechanism ........................................................................33**

**8.1**  Authority Powers ..................................................................................................33

**8.2**  Financial Plans.....................................................................................................33

**Section 9 Summary ..............................................................................................35**

**List of Tables**

Table 1 – Water Demand for Contract Participants

Table 2 – Authority Projected Population and Demand

Table 3 – Projected Water Demand for Undeveloped Areas

Table 4 – Total Projected Water Demand for the Authority

Table 5 – Surface Water Facility Design Requirements

Table 6 – Surface Water Preliminary Conversion Schedule

Table 7 – Incremental and Total Facility Expansion Schedule for Total Water Plant Capacity

Table 8 – Schedule of Facility Expansion and Capital Costs

Table 9 – Preliminary Treated Water Reservation Schedule

Table 10 – Preliminary Schedule for Major Construction Tasks

Table 11 – Impact of Over-Conversion Strategies

Table 12 – Impact of Over-Conversion Strategies Without the Development of George Ranch

Table 13 – Estimated Water Rates

**List of Figures**

Figure 1 – FBSD Regulatory Areas

Figure 2 – Population Forecast for the Authority

Figure 3 – Authority Water Demand and Minimum Regulatory Conversion Requirement through Planning Period

Figure 4 – Groundwater Pumpage Data for Fifteen Fort Bend County Districts

Figure 5 – Compliance Assurance Factor Relating to Various Supply Capacities

**List of Exhibits**

Exhibit 1 – NFBWA Territory, Utility Districts and Municipalities

Exhibit 2 – Areas Unusable for Residential Development

Exhibit 3 – Water Demand by Grid Cell for 2005

Exhibit 4 – Water Demand by Grid Cell for 2015

Exhibit 5 – Water Demand by Grid Cell for 2025

Exhibit 6 – Water Demand by Grid Cell for 2055

Exhibit 7 – Undeveloped Areas not within Existing MUD

Exhibit 8 – 2013 Surface Water Delivery System

Exhibit 9 – 2025 Surface Water Delivery System

Exhibit 10 – WHCRWA Pipeline Corridor

Exhibit 11 – Conceptual Pump Station Site Plan

**List of Appendices**

Appendix A – List of GRP Participants

Appendix B – Fort Bend MUD No. 25 Exclusion

Appendix C – George Foundation Contract

Appendix D – Potential Source Water Study

Appendix E – Alternative Analysis

Appendix F – City of Houston and WHCRWA Correspondence and Contracts

Appendix G – Groundwater Reduction Plan Fee

Appendix H – Draft Water Conservation Plan

# Section 1
# Executive Summary

The North Fort Bend Water Authority (the Authority) is a governmental entity created by Senate Bill 1798 of the 79th Texas Legislature. The primary mission of the Authority is to develop a strategy to comply with regulations set forth by the Fort Bend Subsidence District (FBSD). These regulations require water users within the Authority's territory and subject to FBSD's disincentive fee to limit groundwater pumpage to a percentage of their total water demand beginning in 2013. The water supply exceeding this amount must come from an alternative supply. Typically, this supply is surface water, although reclaimed water reuse and conservation are other options to reduce groundwater demand.

The following milestones are significant to the Authority's master plan for surface water conversion:

- 2008 – Receive FBSD certification of Groundwater Reduction Plan (GRP)

- 2013 – Meet 30 percent reduction in groundwater use

- 2025 – Meet 60 percent reduction in groundwater use

The Authority has identified the City of Houston (COH) as the preferred source of water for long-term surface water supply. The COH has raw water available in the Trinity and San Jacinto River basins that can be treated by three water purification plants and then conveyed through the existing COH water transmission and distribution system and future infrastructure to meet the Authority's long-term demands. The initial supply of treated surface water used to meet the Authority's demands through 2024 will be received in the vicinity of Bellaire Boulevard and South Dairy Ashford Street near the western perimeter of the COH water system. Beginning in 2025, this supply will be supplemented with treated COH water delivered by way of a pipeline with capacity shared between the Authority and the West Harris County Regional Water Authority (WHCRWA). The Authority will participate in this project to provide a treated water supply originating from the northern side of the Authority's boundary.

The Authority's water transmission system will be expanded from the 2013 service area which is intended to meet surface water supply requirements through the end of 2024, to a larger system capable of meeting the more stringent subsidence regulation and increased demands of the Authority out to the year 2055. Pump station facilities will be phased in as necessary over the life of the transmission system.

The Authority anticipates that reclaimed water use and early or over conversion will generate credits that may be used to offset the total amount of surface water required to achieve compliance. The Authority may use these credits to meet regulatory requirements in years of higher than anticipated demand or to adjust the second phase of surface water conversion as the system becomes operational.

TCB | AECOM

# Section 2
# Introduction

Fort Bend Subsidence District (FBSD) regulations drive the need and schedule for conversion of the Authority to surface water. In the 2003 District Regulatory Plan (DRP), the FBSD has divided Fort Bend County into three distinct areas with separate conversion goals and requirements. These areas are shown in *Figure 1*.

**Figure 1**
**FBSD Regulatory Areas**



As shown in *Figure 1*, the entirety of the Authority is located within Regulatory Area A. Permitted groundwater users within Regulatory Area A are required to have a certified Groundwater Reduction Plan (GRP) before permits are renewed in 2008 in anticipation of regulations requiring the reduction of groundwater use starting in 2013. Beginning in 2013, groundwater use will be limited to 70% of the permittee's total water demand. This amount will decrease to 40% beginning in 2025.

There are currently no regulations on groundwater use in Area B, except that groundwater produced within this area cannot be imported into Area A as an alternative source of water to fulfill conversion requirements. Additionally, groundwater users in Area A may also be considered exempt from regulation if they meet one of the following criteria:

1. Water is used for irrigation of agricultural crops.

2. The permittee has a total water demand of 10.0 million gallons per year or less. However, if an alternative water supply is available at the site, the permittee may be required to convert unless they are in compliance with a GRP.

3. The permittee meets requirements for exemption based on economic hardship.

Barring these exemptions, all permitted well operators are required to follow the regulations set forth for Area A.

## 2.1      Creation of the Authority

The Authority was created by the 79th Texas Legislature through the passage of Senate Bill 1798 in May 2005 in response to the need to reduce ground water use described above. The objectives of the Authority are to reach compliance with FBSD's groundwater reduction initiative and to develop a long term plan for surface water delivery to its customers.

The Authority currently encompasses 44 utility districts and the City of Fulshear as well as other private well owners within its jurisdictional boundary (see *Exhibit 1*). A list of included participants can be found in *Appendix A*. Although originally included in the Authority boundary, FB MUD 25 requested and was excluded (see *Appendix B*). The Authority has the power to raise funds through various means including groundwater pumpage fees and the selling of bonds.

## 2.2      GRP Plan Participants

Participants in the Authority's GRP include two types of water users. The first group includes the owners of wells subject to FBSD's disincentive fee within the boundary of the Authority, shown in *Figure 1* and listed in *Appendix A*.

The second type of participant is included in the GRP by contract. The George Foundation has reached an agreement with the Authority to include portions of The George Ranch in the Authority's GRP. A copy of the agreement between the Authority and the George Foundation can be found in *Appendix C*. Other entities may also choose to contract with the Authority. However, the George Foundation is the only existing contract participant.

The George Foundation will pay groundwater pumpage fees as if they were within the Authority boundary. In turn, the Authority will convert within its boundary in excess of the required amount in order to meet the conversion requirements of contract participants.

The Authority has coordinated with the FBSD to amend the expiration date for all existing non-exempt well permits for permittees participating in the Authority's GRP to a single permit expiration date of September 2008. It is the intent of the Authority to comply with all regulations and obtain a certified GRP in advance of that deadline.

## 2.3 Planning for Surface Water Conversion

Extensive planning has been performed in an effort to create this GRP. Previous planning efforts included the Potential Water Source Study, and the Alternative Analysis of alternative surface water sources and delivery options. These studies were prepared to guide the Authority's decision in selecting a preferred strategy. *Appendix D* includes the Potential Water Source Study completed by the Authority's consultants to identify viable sources of water for meeting conversion requirements. The Alternative Analysis of various delivery strategies is included in *Appendix E* of this GRP. This document presents detailed information regarding the development of population and water demand projections throughout the planning period as well as the development of capital and operation and maintenance costs for the selected alternative which is incorporated into this GRP.

# Section 3
# Population and Water Demands

## 3.1 Population Projection Methodology

An accurate estimate of future population is an essential component of the overall planning efforts to adequately anticipate future demand for water. Past forecasts of future population for Fort Bend County have consistently underestimated the population growth. Therefore, high priority was placed on identifying and evaluating multiple sources of information and data available to accurately forecast population in the Authority.

Potential sources of population projections and projection methodologies were investigated to evaluate their advantages, disadvantages and usefulness to the Authority. Sources of population data and/or projections that were identified utilize data from the 2000 Census and include:

- UH Center for Public Policy - UH Houston Economic Multi-Sector (HEMS) Model

- UH Center for Public Policy - Small Area Model-Houston

- Population and Survey Analysis (PASA)

- Municipal Information Services (MIS)

- Houston-Galveston Area Council (H-GAC)

- American METRO/STUDY Corporation

- Texas State Data Center, and

- Texas Water Development Board (TWDB)

The above sources of data were evaluated to determine which source would be best suited for use in developing population forecasts for the Authority. For each data source, the length of forecast and overall detail of the data available were considered in selecting the preferred data source for developing the population forecasts for the Authority.

Each of the above data sources tended to aggregate population geographically at different grid sizes and arrangements. For example, depending on the date source, population forecast may be aggregated for an entire county, incorporated area (towns and cities), groups of census tracts (analysis zones), individual census tracts, or even smaller areas, such as a residential subdivision or a cell within a grid of cells. Developing a GRP requires that not only the overall population and water demands for a given area be estimated but that the location of that water demand be identified as accurately as possible. For this reason, a data source that provides population forecasting for the Authority area at a smaller, discrete level of detail is more useful in developing the GRP.

The FBSD regulations require that a GRP be developed for a period not less than the year 2030. However, the availability of a population forecast beyond the 2030 timeframe is advantageous to assist in the overall planning of the facilities required to implement a GRP. For example, each phase of conversion (i.e., 2013 and 2025) will include facilities that will be constructed at a size to accommodate future water demands well beyond the demand estimated for that particular phase

Water demands are generated based on the projected populations provided by a given fore-casting model and the estimated per capita water use developed for a given area. Per capita water demands vary depending on the types of development forecast for a given area (i.e., single-family residential, multi-family residential, commercial). Therefore, a population data source that provides sufficient detail to estimate subsets of population such as single-family and multi-family populations, and/or a forecast of employment in addition to population is also valuable in developing a comprehensive GRP.

Municipal Information Services (MIS) is recognized in the region as an expert in collecting and evaluating financial and demographic data for special districts in the Houston region and publishes the "Guide to Houston Area Municipal Utility Districts." In its work, MIS utilizes tax role data, current aerial photography, official statements related to sales of bonds, 911 (emergency services) information, and other sources of data. MIS has more than 25 years of experience with clients including forecasting population through the anticipated life of the development to complete build-out. In addition, MIS was well-suited to develop an estimate of existing population and short-term forecast of population to approximately 2010 based on their database and hands-on knowledge of existing developments and the development trends in the Authority area. For these reasons, MIS was selected to provide a forecast of total population for the Authority.

After considering the information and forecasts available from the potential sources, the detailed land use data and computer modeling capabilities provided by the Houston-Galveston Area Council (H-GAC) were determined to best satisfy the need for a projection that forecasts where development is most likely to occur within a larger area. The H-GAC land use model uses numerous economic variables to estimate the relative 'attractiveness' of 1,000' x 1,000' grid cells compared to other cells. More attractive cells receive a greater proportion of forecast total population than less attractive cells receive. The two forecasts are used together in the methodology described in the following paragraphs.

Only in the process of understanding the data and forecasts available could a complete methodology be developed to project population within the NFBWA. Major steps within the methodology include:

1. Estimate population in the Authority from 1990 to present to develop baseline estimates of population growth.

2. Develop high level forecast of Authority-wide population.

3. Develop grid-level forecast of Authority population.

The following sections provide additional information for each of these steps in the methodology.

**3.2      Estimate Population in the Authority from 1990 to Present**

New Municipal Utility Districts (MUD) were identified and current MUD information was obtained to update MIS' MUD database.  Data typically consists of counts of lots and housing units and does not address population directly.  2000 Census data was used to determine "Occupancy Rate" and "Population per Occupied Unit" for each of the sixteen census tracts entirely or partially within the boundaries of the Authority.  Occupancy rates vary from approximately 80% to more than 99%.  Population per occupied unit varies between 2.7 and 3.5 people/unit.

The estimated population within the Authority from 1990 to present was calculated based on estimates of single- and multi-family housing units multiplied by corresponding factors for "Occupancy Rate" and "Population per Occupied Unit."  The population in the Authority is estimated to have been 107,000 in 2005.

**3.3      Develop High Level Forecast of Authority-Wide Population**

Based on MIS years of experience analyzing and developing similar projections, it was determined that MUD information, on-site inspection of current development, and housing market conditions would be used to develop a short-term forecast through 2010 of residential lots and housing units.  Based on this information, estimates of population were developed by applying the occupancy rate and persons per occupied unit factors obtained from the 2000 Census.  This forecast projects the population to grow from approximately 107,000 in 2005 to 160,000 in 2010.

Being confident that a land-use based model is the preferred method to forecast long-term population, it was necessary to compare H-GAC's estimated 2010 population to MIS' estimated 2010 population in the Authority.  H-GAC's population is based on grid cells to spatially distribute population over the entire area.  Based on summing the populations of grid cells within the Authority, H-GAC's estimate of the Authority's population in 2010 is approximately 40% less than MIS' estimated population of 160,000.  This disparity did not diminish the value of H-GAC's forecast because a land use model attempts to accurately represent the relative "attractiveness" of an area with respect to other areas based on factors such as proximity to transportation and likelihood of flooding.  Therefore, a method was needed to take advantage of the benefits of H-GAC's forecast while adjusting the forecast upward to eliminate the difference in the starting 2010 population.

Of several methods considered, the concept of "capture rate" was chosen because it is consistent with the common idea that some areas develop before other areas because they are more attractive.  Therefore, attractive areas capture a greater proportion of the population moving in than do less attractive areas of the County.  By comparing the estimated populations within the Authority territory and Fort Bend County since 1990, the Authority's capture rate (i.e., the population that moves into the Authority territory as a percentage of the population moving into the County) has increased from approximately 18% from 1990 to 1995 to more than 50% from 2000 to 2005.  An obvious limitation on the ability of the Authority to continue to capture 50% of the population moving into the County is that the Authority territory fills up.  Therefore, the capture rate must decrease as attractive space available to

absorb population decreases and decreasing capture rate was the method developed to utilize H-GAC's forecast.

Beginning in 2010, future population within the Authority was estimated assuming that the Authority's capture rate decreases to 95% of the capture rate of the previous five-year period. Using this method the projected population within the Authority is approximately 205,000 in 2015: 289,000 in 2025: and 365,000 in 2035 – the end of H-GAC's forecast.

Adequate water supply planning relies on forecasts of 50 years or more: therefore, the population forecast had to be extended from 2035 to at least 2050 or beyond. It was determined to continue the forecast at 10-year intervals to 2045 and 2055. Analysis of H-GAC's forecast indicates that the population over five-year periods increases at a predictable rate. Therefore, this predictable trend as well as the TWDB projections of population were used to extend the forecast assuming that the percent increase in population during each five-year period is 88% of the previous five-year period. The projected population within the Authority is approximately 429,000 in 2045 and 481,000 in 2055.

*Figure 2* shows the historic and projected growth of the Authority from 1995 through the year 2055.

**Figure 2**
**Population Forecast for the Authority**



**3.4      Develop Grid-Level Forecast of Authority Population**

The H-GAC grid cell population was used as the basis or starting point to forecast population at the grid level.  H-GAC's population for grid cells within the Authority had already been found to be significantly less than the Authority's estimate of existing population.  However there is value of a land use model in representing the "attractiveness" of an area relative to other areas.  The process to adjust H-GAC grid cell population so that the total matches the Authority estimate simply requires multiplying H-GAC's population for each cell by the ratio of the Authority's estimate to H-GAC's total.

The process described above was limited by a "population cap" placing a maximum on the population that could be assigned to a cell based on population density (people per useable acre).  Applying a population cap required a determination of 1) the maximum population density to allow and 2) useable area for each cell.

The maximum population density (people per useable acre) was determined by analyzing the densities of built-out developments within the Authority.  The criterion used to categorize a development as built-out is that the number of houses be at least 95% of the number of residential lots in the development.  Seventeen developments meet this criterion and were found to have an average population density of approximately ten people per useable acre.

The useable area was determined using the Authority's geographic information system (GIS) to analyze land use.  Useable area excludes floodways, electric power and petro-chemical transmission corridors, transportation rights-of-way, and school and other governmental entity property (See *Exhibit 2*).

Once the population density factor was determined and the usable area for each cell was obtained using GIS, the adjusted population for each grid cell is the smaller of the population cap or the projected population.  If the projected population exceeded the population cap, the population in excess of the cap was added to the adjacent cell to the southwest.  This process began at the most northeasterly cell in the Authority and continued until the population remained under the cap.  If the southern or southwesterly edge of the Authority was reached and there was still population in excess of the cap, then the excess was added to the next cell at the northeasterly edge of the Authority not already processed.  This procedure was re-peated for projected populations in 2015, 2025, 2035, 2045, and 2055.  The changes in population between 2005 and 2055 are shown in *Exhibits 3* through 6.

**3.5      Development of Per Capita Water Demands**

Two approaches were taken to investigate per capita water demand in the Authority.  The first approach was at the MUD level and is based on dividing metered groundwater pumpage for the MUD by the MUD's estimated population.  To the extent possible, this effort also made use of responses received to the Authority's questionnaire to check population (indi-rectly based on connection data), pumpage, and interconnections to other Districts to discover possible import/export of water that would otherwise skew the pumpage informa-tion.  Due to limitations on availability and quality of data, per capita demand based on MUD information was only estimated for 2005.  Note that 2005 was a dry year for which pumpage in most MUDs was higher than average.

The results of this effort revealed variations in per capita demand from approximately 100 gallons per capita per day (gpcd) for older development without amenity lakes and significant lawn or esplanade irrigation to approximately 240-gpcd in newer developments with amenity lakes and/or irrigation of large green spaces. The average demand for eighteen MUDs, weighted based on estimated population, was found to be 210-gpcd.

The second approach was at the Authority level and is based on dividing groundwater pumpage reported to the Subsidence District by the estimated population within the Authority. This calculation was made for each year from 1990 to 2005. The first observation is that data for population and pumpage show similar patterns of increase over this period. The similar patterns confirm the strong, direct relationship between population and water demand. In addition, the largest deviations from the pattern are increased pumpage in the dry years of 1999, 2000, and 2005. Decreased pumpage in wet years does not stand out as clearly, but 1997 and 2004 are notable.

After dividing pumpage by population for each year, a trend of increasing per capita water use is evident. This trend is attributed to the movement toward larger, master-planned communities with amenity lakes and significant irrigation of esplanades and green spaces. Because the upward slope of the trend appears to be skewed by the recent dry years (1999, 2000, 2005), the data were divided into three components for further analysis. Without recent wet or dry years, the four most recent "average years" (1998, 2001, 2002, 2003) have an average of approximately 170-gpcd with only a slight upward trend. Analysis of average years was limited to these four years because recent history is more representative of current conditions in the Authority than are earlier data.

Based on the trend for the average years, lines with the same slope were fit to the wet years and dry years. These lines provide a range of per capita water demand applicable to the Authority depending on rainfall. The average water demand in the Authority is approximately 170-gpcd and the water demand in a dry year is expected to be approximately 210-gpcd.

## 3.6      Demands for Contract Participants

In addition to the demands summarized in the sections above, water demands were also considered for participants outside of the Authority boundary. Other entities may participate in the Authority's Groundwater Reduction Plan (GRP) through contract. These contract participants will pay the same rates as rates paid by districts within the Authority in exchange for inclusion in the Authority's GRP. The Authority will then over-convert areas within the Authority boundary to meet the groundwater reduction requirements of the contract participants' groundwater withdrawals outside the Authority boundary up to the contract cap amounts.

Interest was expressed by The George Foundation to participate in the Authority's GRP through contract. The George Foundation owns over 21,000 acres of undeveloped land south of the Brazos River and southeast of Richmond making it the most significant contract participant. Forecast demands for the George Ranch property were provided by The George Foundation reflecting a projected development schedule. The George Foundation water demands are listed in *Table 1*. There is enough extra capacity in the phasing of the Author-

ity's facilities to account for the lower demands in the near future. Consequently the Authority modified these original demands as shown below for planning purposes.

**Table 1**
**Water Demand for Contract Participants**

| Contract Participant | Projected Water Demand (mgd) | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | 2015 | 2025 | 2035 | 2045 | 2055 |
| George Ranch [1] | 6.0 | 8.0 | 14.0 | 15.0 | 15.0 | 15.0 |
| Modified George Ranch | 0.0 | 0.0 | 10.0 | 15.0 | 15.0 | 15.0 |
| Total Contract Participant Demand | 6.0 | 8.0 | 10.0 | 15.0 | 15.0 | 15.0 |

[1] Source: The George Foundation

## 3.7 Distribution of Water Demands through Planning Horizon

Per capita water demands were developed that allowed the application of these values to the population projections to determine total estimated water demand for the Authority, as shown in *Table 2*. *Figure 3* illustrates the growth in water demand for the Authority through 2055 as well as the required alternative water use based on the conversion requirements of FBSD regulations.

**Table 2**
**Authority Projected Population and Demand**

| Year | Population | Authority (mgd) | George Ranch (mgd) | Total Demand (mgd) |
|---|---|---|---|---|
| 2005 | 107,000 | -- | 0.0 | -- |
| 2013 | 173,300 | 36.4 | 0.0 | 36.4 |
| 2015 | 205,000 | 40.6 | 0.0 | 40.6 |
| 2025 | 289,000 | 58.0 | 10.0 | 68.0 |
| 2035 | 365,000 | 73.9 | 15.0 | 88.9 |
| 2045 | 429,000 | 87.8 | 15.0 | 102.8 |
| 2055 | 481,000 | 100.9 | 15.0 | 115.9 |

Authority demand projections based on a 210 gpcd rate.

FBSD regulations create two distinct planning horizons for surface water conversion in Fort Bend County. The first phase of conversion begins in 2013 and requires regulated groundwater users to convert at least 30% of their total water demand to an alternative water supply. The second and final phase starts in 2025 and requires conversion of at least 60% of the total water demand to an alternative water supply or supplies. For purposes of this study, the second phase conversion requirement (60%) is continued through the end of the study period in 2055.

**Figure 3**
**Authority Water Demand and Minimum Regulatory Conversion**
**Requirement through Planning Period**



*Exhibits 3, 4, 5, and 6* illustrate the spatial distribution, by 23-acre grid cell, of estimated water demand in 2005, 2015, 2025, and 2055, respectively. The growth in population, and therefore the corresponding increase in water demand, generally increases most significantly in the southwestern portions of the Authority.

The single largest component of demand in the Authority is existing utility districts. A large portion of the Fort Bend County water demand, particularly in later years, is associated with regions that are primarily undeveloped and outside existing utility districts. These portions of the Authority were divided into fourteen areas shown in *Exhibit 7*. Demand for these areas was forecast separately and is summarized in *Table 3*.

**Table 3**
**Projected Water Demand for Undeveloped Areas**

| Undeveloped Area | Projected Water Demand (mgd) | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | 2015 | 2025 | 2035 | 2045 | 2055 |
| Central Area 1 | 0.14 | 0.21 | 0.29 | 0.71 | 2.37 | 3.59 |
| Central Area 2 | 0.04 | 0.14 | 0.49 | 0.78 | 1.71 | 2.51 |
| Central Area 3 | 0.02 | 0.15 | 0.18 | 0.32 | 1.05 | 1.58 |
| East Area 1 | 0.17 | 0.20 | 0.23 | 0.30 | 0.32 | 0.32 |
| East Area 2 | 0.12 | 0.24 | 0.50 | 0.58 | 0.69 | 1.12 |
| East Area 3 | 0.08 | 0.55 | 1.04 | 1.27 | 3.46 | 4.05 |
| North Area 1 | 0.13 | 0.22 | 0.27 | 0.32 | 0.52 | 0.73 |
| Northwest Area 1 | 0.03 | 0.15 | 0.29 | 0.31 | 0.42 | 0.52 |
| Northwest Area 2 | 0.22 | 0.37 | 0.82 | 1.15 | 2.14 | 3.00 |
| South Area 1 | 0.17 | 0.17 | 0.22 | 0.24 | 0.91 | 2.60 |
| Southeast Area 1 | 1.30 | 1.82 | 2.14 | 2.41 | 2.87 | 2.87 |
| Southwest Area 1 | 0.44 | 0.85 | 1.88 | 2.64 | 2.91 | 3.88 |
| West Area 1 | 0.02 | 0.08 | 0.19 | 0.45 | 0.51 | 0.70 |
| West Area 2 | 0.00 | 0.01 | 0.16 | 0.45 | 2.04 | 3.41 |
| **Total** | **2.88** | **5.16** | **8.68** | **11.92** | **21.91** | **30.89** |

It was also assumed that the unincorporated demands include water usage by private well owners. These include water usage by golf courses, home owners' associations, and other non-exempt well usage that is not included in the municipal demands specifically identified here.

Finally, *Table 4* summarizes all of the demand identified above to provide the total water demand for the Authority.

**Table 4**
**Total Projected Water Demand for the Authority**

| Demand Type | Projected Water Demand (mgd) | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | 2015 | 2025 | 2035 | 2045 | 2055 |
| NFBWA Utility Districts | 33.5 | 35.5 | 49.3 | 62.0 | 65.9 | 70.0 |
| NFBWA Undeveloped Areas | 2.9 | 5.2 | 8.7 | 11.92 | 21.9 | 30.9 |
| George Ranch | 0.0 | 0.0 | 10.0 | 15.0 | 15.0 | 15.0 |
| **Total** | 36.4 | 40.7 | 68 | 88.9 | 102.8 | 115.9 |

# Section 4
# Water Supply

## 4.1 Water Supply Sources

In 2006, the NFBWA studied possible water supply options (*Source Supply Study*, BGE/TCB in *Appendix D*). The Study included the following major tasks:

1. Review of available information, models, reports & TCEQ data to identify potential water supply entities.

2. Evaluation of identified water supply entities to determine available water.

3. Evaluation of potential water rights acquisitions including reliability.

A number of entities were identified as potential providers of surface water to meet the Authority's needs. In alphabetical order, those entities are:

Brazos River Authority (BRA)

Chocolate Bayou Water Company (CBWC)

City of Houston (COH)

City of Missouri City (COMC)

City of Sugar Land (COSL)

Coastal Water Authority (CWA)

Gulf Coast Water Authority (GCWA)

Texas Genco

TXU Power (TXU)

West Harris County Regional Water Authority (WHCRWA)

Further review and study reduced the list of possible providers to the COH and the BRA. Using these two potential water supply sources, the NFBWA studied various alternatives (*Alternative Analysis*, BGE/TCB in Appendix E). The report recommended that the Authority move forward with contracting water from the COH.

## 4.2 Availability of COH Water

Water from the COH is projected to be available in sufficient quantities to meet the regulatory requirements of the Authority throughout the planning horizon. However, the existing infrastructure to deliver this water is generally not available at a capacity and location sufficient to facilitate conversion. Therefore, obtaining sufficient supply for each of the two phases of conversion outlined in this GRP will likely require additional infrastructure to deliver the required volume of water from the COH to the Authority.

TCB|AECOM

The firm yield surface water supply for the COH is identified in the 2006 Region H Regional Water Plan (RWP) as 1,217,348 acre-feet per year. This firm yield supply represents the volume of water available under drought of record conditions at the end of the RWP planning horizon (year 2060). Over 80 percent of this water originates in the Trinity River basin as reservoir supply from Lake Livingston or as run-of-river supplies along the lower stretch of the Trinity River. These water supplies are made available to the COH through the Coastal Water Authority (CWA) Main Canal that conveys water to treatment facilities in Harris County. The remaining supply originates in the San Jacinto River basin with the majority of that water originating from Lake Houston and a smaller share coming out of the COH water right for Lake Conroe.

The COH operates three water purification plants, the East Water Purification Plant (EWPP), the Southeast Water Purification Plant (SEWPP), and the North East Water Purification Plant (NEWPP). The EWPP began operation in 1954 and currently has the largest capacity of the three facilities at 350 mgd. The EWPP receives water primarily from the CWA Main Canal but currently blends this supply with a small amount of water from Lake Houston. The SEWPP relies solely on Trinity River water from the Main Canal and is linked to a major portion of the COH water transmission system along with the EWPP. The SEWPP currently has a capacity of 200 mgd. The NEWPP is supplied entirely from Lake Houston and can only provide a limited amount of water to most areas served by the COH treated water transmission system. Although the current capacity of the plant is 80 mgd, only about 12 mgd of water is available to the system served by the EWPP and SEWPP because the majority of the capacity in the NEWPP is currently contracted to or is planned for use by the NHCRWA and WHCRWA.

The WHCRWA currently receives water from the COH by way of the City's Jersey Village Pump Station. This supply will eventually become inadequate to supply the entire WHCRWA surface water demand. At that time, the WHCRWA will augment their surface water supply with water conveyed through a future pipeline from the COH's water purification plants. This future pipeline is currently identified as the source of treated COH water for the Authority beginning in 2025.

### 4.2.1    *2013 Conversion*

The Authority plans to purchase surface water from the COH to serve their demands through the first conversion period of 2013 to 2024. Water will be supplied from the vicinity of the intersection of Bellaire Boulevard and South Dairy Ashford Street (See *Exhibit 8*). The COH has indicated that the infrastructure in place to convey water to this location is sufficient to provide for the Authority's demands until the beginning of the second conversion phase in 2025.

Water received at the above location is, at this time, treated at the COH EWPP and conveyed through the COH transmission system. The Authority will store and repump water received and convey it into the Authority.

### *4.2.2      2025 Conversion*

The amount of water required by the Authority for surface water conversion beyond the year 2025 exceeds the capacity of the COH's existing system to convey that quantity of water to the Bellaire Boulevard location.  The Authority plans to receive additional COH treated water from a second take point that extends from a proposed shared water supply line across the COH that will be built and operated jointly with the West Harris County Regional Water Authority (WHCRWA).

The Authority will take water at a point north of the Authority's boundary near the intersection of Clay and Peek Roads (See *Exhibit 9*) and conveyed into the Authority.  Either at the take point or within the Authority's territory, the water must be stored and the pressure boosted for delivery to the Authority's water transmission system.  This supply will augment water from the earlier take point established to supply 2013 to 2024 demands and provide dual supply points.

### 4.3      COH Contract Provisions

The COH, by letter dated July 6, 2007, has agreed to supply water to the Authority (see *Appendix F*).  Initially the COH agreed to supply water to the Authority under the terms of the existing contract between the City and the WHCRWA.  Now, however, the Authority is pursuing a separate contract with the City.  A draft contract was submitted to the COH in December 2007 and the City and the Authority are currently negotiating and plan to execute an agreement by mid 2008.  NFBWA and WHCRWA have agreed to work together and are negotiating a separate contract to address how they can share facilities to reduce costs for both parties.

The Authority will participate with the WHCRWA for construction, operation, and maintenance of jointly shared facilities that are beneficial to both parties.  The Authority plans to participate in the WHCRWA pipeline to bring water from the COH across town to the north of the Authority.  This pipeline will provide the water for the Authority's second take point in 2025 (see *Exhibit 10*).

# Section 5
# Infrastructure Requirements

## 5.1       Surface Water Delivery Capacity

Three factors were considered when determining the necessary capacity of the Authority's surface water transmission system.  The first and most critical factor was the total water demand throughout the planning period.  Secondly, the regulated use of groundwater directly affects the amount of surface water required for delivery to converted areas and these regulated levels are set by FBSD.

However, a third component that is vital to the sizing of the surface water delivery system is the seasonal variation of demand throughout the year.  *Figure 4* provides a compilation of groundwater pumpage data on a per connection basis for fifteen MUDs in Fort Bend County. *Figure 4* illustrates that there are periods of time when the use of the various entities is less than the average day amount required to meet conversion goals.  During these times, the surface water delivered and used will be less than the amount required to meet conversion goals on an annual basis.  This means that a surface water delivery system must be sized to meet the 2025 and beyond conversion requirements by either converting more than 60% of the district demand, by increasing the peak delivery rate above the average day rate required to meet the goal for conversion, or a combination of both.

**Figure 4**
**Groundwater Pumpage Data for Fifteen Fort Bend County Districts**



Consideration was given to this issue and it was recognized that two solutions exist. One solution would be to lay additional lines to convert more districts to compensate for this problem. Alternatively, the pipe system and plant facilities could be oversized to provide for a higher level of peak demand. The term 'compliance assurance factor' is used in this study to define the peak capacity rate at which surface water must be provided to those entities receiving surface water to ensure an annual use of 60% (starting in 2025) surface water in the Authority. It is not a peaking factor in the traditional sense of increasing the average day demand to a peak day or peak hour demand. MUD will continue to use their existing wells and storage facilities to meet peak day and peak hour water demands.

*Figure 5* further illustrates the relationship between peaking ('compliance assurance factor') and the percentage of annual demand that can be supplied. The data for this Figure is derived from the information shown above in *Figure 4*. However, *Figure 5* demonstrates how much of a district's water demand could be met by building a surface water supply system with various compliance assurance factors incorporated. This Figure illustrates that supplying water at a rate of average day demand, or a factor of 1.0, would give a district the ability to receive only 80% of their demand from surface water.

**Figure 5**
**Compliance Assurance Factor Relating to Various Supply Capacities**



It was decided to apply a compliance assurance factor of 1.3 to the pipe system, which means that the system could supply approximately 90% of districts' total annual water demand with surface water. This determination represents an economical compromise between the need for additional pipelines and the option of over-sizing facilities to provide greater peaking capacity. *Table 5* provides the surface water design requirements with this factor included.

**Table 5**
**Surface Water Facility Design Requirements**

| Demand Type | Projected Water Demand (mgd) | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | 2015 | 2025 | 2035 | 2045 | 2055 |
| Total Demand | 36.4 | 40.7 | 68 | 88.9 | 102.8 | 115.9 |
| Required Conversion | 10.9 | 12.2 | 40.8 | 53.3 | 61.7 | 69.5 |
| Compliance Assurance Factor (30%) | 3.3 | 3.7 | 12.2 | 16.0 | 18.5 | 20.9 |
| **Total Surface Water Design Demand** | **14.2** | **15.9** | **53.0** | **69.3** | **80.2** | **90.4** |

Districts were selected for conversion in each of the two conversion phases in order to meet the required conversion levels for each phase. The compliance assurance factor discussed above and resulting percent conversion was considered throughout this process. The districts selected for conversion in each of the two phases can be seen in *Exhibits 8* and *9. Table 6* provides a preliminary overview of the customers currently planned to be converted to surface water in each phase of conversion, as well as the level of conversion as a percentage of total projected annual demand. As the new districts are created, they may be added to the 2013 or 2025 conversion period depending on their location which may in turn affect others.

It should be noted that this level of conversion (90%) is greater than the overall requirement for the Authority. However, this level of over-conversion allows the Authority to meet the requirement for conversion by serving fewer districts at less cost while some districts remain unconverted. The use of over-conversion in excess of the levels required by FBSD is considered in *Section 7.3*.

**Table 6 – Surface Water Preliminary Conversion Schedule**

| Demand Center | | Conversion Phase and Rate | |
|---|---|---|---|
| | | 2013-2025 | 2025-2055 |
| **Member Districts / Municipalities** | BIG OAKS MUD | 90% | 90% |
| | CINCO MUDs | | 90% |
| | CINCO SOUTHWEST MUDs | | 90% |
| | CORNERSTONES MUD | | 90% |
| | FBC FWSD 2 | 90% | 90% |
| | FBC MUD 2 | 90% | 90% |
| | FBC MUD 30 | 90% | 90% |
| | FBC MUD 34 | 90% | 90% |
| | FBC MUD 35 | 90% | 90% |
| | FBC MUD 37 | | 90% |
| | FBC MUD 41 | 90% | 90% |
| | FBC MUD 50 | 90% | 90% |
| | FBC MUD 51 | | |
| | FBC MUD 52 | | |
| | FBC MUD 53 | | 90% |
| | FBC MUD 57 | | 90% |
| | FBC MUD 58 | | 90% |
| | FBC MUD 93 | 90% | 90% |
| | FBC MUD 118 | 90% | 90% |
| | FBC MUD 119 | 90% | 90% |
| | FBC MUDs 122, 123 | 90% | 90% |
| | FBC MUD 124 | | 90% |
| | FBC MUD 130 | | 90% |
| | FBC MUD 132 | 90% | 90% |
| | FBC MUD 133 | 90% | 90% |
| | FBC MUD 134 | 90% | 90% |
| | FBC MUD 142 | 90% | 90% |
| | FBC MUD 146 | 90% | 90% |
| | FBC MUD 151 | | 90% |
| | FBC MUD 161 | | 90% |
| | FBC MUD 185 | | 90% |
| | FULSHEAR, FBC MUDs 169-173 | | 90% |
| | GRAND LAKES MUDs | 90% | 90% |
| | GRAND MISSION MUDs, FBC MUDs 143, 165 | 90% | 90% |
| | H-FBC MUDs 1, 5 | | 90% |
| | KINGSBRIDGE MUD | 90% | 90% |
| | NORTH MISSION GLEN MUD | 90% | 90% |
| | WILLOW POINT MUD | | 90% |
| **Undeveloped Areas** | C1 | | |
| | C2 | | 90% |
| | C3 | | 90% |
| | E1 | | |
| | E2 | | 90% |
| | E3 | | 90% |
| | N1 | | |
| | NW1 | | |
| | NW2 | | |
| | S1 | | 90% |
| | SE1 | | |
| | SW1 | | |
| | W1 | | |
| | W2 | | |
| **Contract** | George Ranch | | |

### 5.1.1    2013 Conversion Strategy

The first phase of conversion requires that 30% of the total water demand for the Authority be substituted by an alternative to groundwater.  It was assumed that facilities constructed during this phase would be sized to accommodate 30% of the year 2025 water demand.  In addition, it was also assumed that the districts selected for conversion would receive 90% of their total annual water supply from the Authority, as determined above.  Districts were added to the conversion strategy until 90% of their total water demand equaled the required conversion rate of 30% of the Authority's total demand.

Consideration was given for the location of water supply points and for minimizing initial pipeline lengths.  Priority for conversion was also given to existing water districts.  It was assumed that water would only be provided to existing districts for the 2013 Phase Conversion and demands in undeveloped areas were not considered for conversion during this phase.  Water was supplied to all known water plants within each converted MUD or Master MUD.  Interconnections between districts were not utilized to deliver water in this plan.

### 5.1.2    2025 Conversion Strategy

The second phase of conversion is based on future water needs through the year 2055.  For purposes of this study, facilities were assumed to be sized to accommodate delivery of 60% of the year 2055 demand throughout the year.  Again, it was assumed that the districts that would be connected to the conversion system would receive 90% of their total annual water supply and an adequate number of districts were connected to the surface water system until the required overall conversion rate was reached for the Authority as a whole.

Similar to the 2013 conversion system, priority for conversion was given to existing districts in the Authority.  However, based on the significant increase in required conversion (60%) for the 2025 phase, surface water was supplied to undeveloped areas in order to reach the overall conversion goals for the Authority after all existing districts were converted.

### 5.2    Sizing of Transmission Pipelines

Pipelines were sized to have capacity to provide water to meet the 2013 and 2025 conversion requirements.  The ultimate water demands through 2055 were used to avoid paralleling existing pipelines at a later date.  This results in some pipes with extra capacity in early phases of conversion.  However, this extra capacity may be viewed as a factor of safety or as a mechanism to achieve early and over-conversion for the Authority.  Pipes were laid out to follow existing roads and drainage corridors, where feasible.  In undeveloped areas, pipes were laid out following county roads or existing property lines where feasible (*Exhibits 8* and *9*).  Loops were also added to increase the overall reliability and redundancy of the system.

A compliance assurance factor of 1.3, identified in Section 5.1, was used to model the average day system demand for each district.  It was assumed that all demand above this level will be met using the district's groundwater wells, storage, and booster pump facilities.  Transmission pipes were conservatively sized such that resulting head losses were no more

than 2 ft per 1,000 feet of pipe and velocities in the pipe were not greater than 5 feet per second.

Surface water was supplied to all water plants within the MUD or Master MUD.  The assumption was made that individual districts would provide water throughout their service areas utilizing their internal distribution systems.  System interconnects were not utilized for water distribution in this study but may be utilized in future study and detailed design.  Utilizing existing interconnects during the winter (low demand) months may provide additional conversion area at minimum capital expense.  Elevation data obtained from Fort Bend County LIDAR was used to determine ground elevations for input to the hydraulic model.  Tank elevations of 25 feet were added at each end point to determine residual pressure at the tops of the tanks. A minimum residual pressure of 10 psi at the tops of the tanks was used as a guideline for system sizing.  Transmission pipes were first sized for the 2025 system (2055 demand) and then the system was scaled back to meet the needs of the 2013 (2024 demand) system.

### 5.3      Sizing of Plant Facilities

For planning purposes, booster pumps at plant facilities were generally phased in 10 mgd increments and sized to deliver a firm capacity adequate to meet the Authority's surface water demand with the compliance assurance factor applied.  An exception to this is the sizing for ground storage facilities which are phased in 5 mgd modules and sized to one-half of the firm pumping capacity.  The Authority anticipates the construction of facilities to meet 2020 needs to begin in 2010 and to be in operation by 2013.  A second phase of plant facilities will expand capacity to carry through to the year 2025 when the second stage of conversion begins.  *Table 7* outlines the projected expansion schedule for plant facilities.

**Table 7**

**Incremental and Total Facility Expansion Schedule for Total Water Plant Capacity**

| Component | Incremental / Total Capacity | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | 2020 | 2025 | 2035 | 2040 | 2050 |
| Booster Pumps* (total mgd) | 30 / **30** | 10 / **40** | 40 / **80** | 10 / **90** | 10 / **100** | 10 / **110** |
| Clearwell Storage (mg) | 10 / **10** | 5 / **15** | 15 / **30** | 5 / **35** | 5 / **40** | 5 / **45** |

*Assumes one backup pump

## 5.4    Costs of Facilities

Aerial photography was used to determine the relative degree of development along transmission main corridors. Sections of pipe in heavily developed areas were considered to require urban construction methods and pipelines in minimally developed areas were assumed to use less costly methods. Pipeline costs were determined from a review of recent bid tab information for urban or rural construction as well as planning numbers developed for the Region H planning process. The proper cost was applied to each pipe section recommended in the various alternatives. Easement widths varied from 20 feet for pipelines up to 36 inches, 30 feet for pipes up to 72 inches and 40 feet for larger pipelines. An easement cost of $1 per square foot was used for all pipe segments.

In addition, a cost of $200,000 was included for costs associated with the connection of the Authority's transmission system to each plant facility. Connection costs include costs associated with flow meters, control valves, and modifications to disinfection systems of each plant. As plants are connected, the connection cost was added to the economic analysis in the appropriate year.

An effort was also made to identify special pipe segments that would result in added construction cost. It was assumed that crossings of major state-maintained highway rights-of-way, drainage features, and pipeline easements would require special construction methods, such as extensive trenchless construction. Locations where the line layout intersected a road, ditch or pipeline easement were identified using GIS. Aerial photography was used to estimate the length of the pipe in each easement that would require special construction methods. Once the lengths of the special pipe segments had been estimated for the entire transmission system, the cost was calculated using an average unit cost per linear foot based on a review of recent bid tabs provided by the NHCRWA and WHCRWA.

Costs for the booster pump stations were assembled from various sources including review of regional planning numbers and WHCRWA bid tabs. Included in the capital costs is a provision for standby power, which may be a second electric power feed or backup generators, estimated at 13.5% of the ultimate construction cost for the facility. Half of the standby power cost was assigned to the initial construction and the rest was spread throughout the expansion phasing.

Costs for ground storage tanks were determined by obtaining vendor quotes and review of recent bid tabs for the WHCRWA. The concrete tanks were assumed to be built in 5 MG units.

The estimated amount of land required was determined from a conceptual layout plan of facilities including buffer areas as well as a review of other planning references. Land costs were determined by identifying available large parcels of land from aerial photo and reviewing property values from information obtained from the Fort Bend and Harris County Appraisal Districts. A conceptual pump station site plan was developed as part of the planning and is included as *Exhibit 11*.

Costs were adjusted to present value using the Engineering News Record (ENR) cost index when appropriate. Project costs include standby power, permitting, land, a contingency amount of 20%, and a factor of 15% of the total construction cost of the facilities for engineering, legal and administrative fees.

*Table 8* summarizes the development of infrastructure for the two phases as well as today's capital costs of the system including purchased COH water costs and infrastructure. The 2013 system data is associated with the system shown in *Exhibit 8* and the 2025 system data is associated with the system shown in *Exhibit 9*. Additional information regarding the development of capital costs can be found in the *Alternative Analysis* contained within *Appendix E*.

**Table 8 – Schedule of Facility Expansion and Capital Costs**

| Conversion Phase | Pipeline Length (Miles) | Pump Station [1] Booster Pumps (MGD) | Pump Station [1] Clearwell Storage (MG) | Today's Cost[2] ($ millions) |
|---|---|---|---|---|
| 2013 | 37.8 | 40 | 15 | $337 |
| 2025 | 94.2 | 110 | 45 | $588 |

[1] Represents ultimate required capacity for each phase of development, i.e. 2013 booster pump capacity is the capacity required through the year 2024. Includes COH payments for purchased water and infrastructure.

## 5.5 Operation and Maintenance Costs

In addition to the capital costs identified above, the cost of facility operation and maintenance have been considered. This includes the cost of raw and treated water purchased from the COH, the operation of the Authority, the power needed to operate the Authority's plant facilities, and the cost to maintain Authority facilities.

The cost of treated water from the COH is a function of growth in the Authority's demands and the capacity reservation schedule for obtaining water. *Table 9* below outlines the treated water capacity reservations projected for the Authority through 2050. This includes water obtained directly from the COH system as well as water received through participation with the WHCRWA.

**Table 9**

**Preliminary Treated Water Reservation Schedule**

| Year | Additional Treated Water Reservation (mgd) | Total Treated Water Reservation (mgd) |
|------|--------------------------------------------|----------------------------------------|
| 2008 |       | 19.5 |
| 2015 | +7.5  | 27.0 |
| 2020 | +36.7 | 63.7 |
| 2025 | +6.2  | 69.9 |
| 2040 | +5.4  | 75.3 |

Additional information regarding the development of operation and maintenance costs can be found in the *Alternative Analysis* contained within *Appendix E*.

## 5.6 Anticipated Construction Schedule

The cost factors described in *Section 5.4* were analyzed to determine the total cost of the project and to schedule the costs associated with infrastructure upgrades as time progresses. *Table 10* provides a general schedule for major tasks over the planning period and describes the objective of each phase of construction. The Authority is currently conducting a pipeline routing and pump station siting study to identify the final pipeline routes and pump station locations. Easement acquisition for some pipeline segments will begin in 2008.

**Table 10**

**Preliminary Schedule for Major Construction Tasks**

| Task | Begin | End |
|------|-------|-----|
| Routing Studies and Pump Station Siting | 2007 | 2009 |
| Easement / Land Acquisition | 2008 | |
| Design and Construct Pump Station at COH Take Point | 2009 | 2012 |
| Design and Construct 2013 System | 2009 | 2012 |
| Design and Construct Pump Station at WHCRWA Take Point | 2018 | 2024 |
| Design and Construct 2025 System | 2018 | 2024 |

# Section 6
# Groundwater Reduction Plan Management

## 6.1        General Powers of the Authority

The general powers of the Authority are outlined in Subchapter C, Section 8813.101 of Senate Bill 1798 of the 79th Texas Legislature.  In this section, the Authority is granted the following powers:

1) *provide for the conservation, preservation, protection, recharge, and prevention of waste of groundwater, and for the reduction of groundwater withdrawals as necessary to develop, implement, or enforce a groundwater reduction plan, in a manner consistent with the purposes of Section 59, Article XVI, Texas Constitution, and facilitate compliance with Fort Bend Subsidence District or Harris-Galveston Coastal Subsidence District, as applicable, rules, orders, regulations, or requirements;*

2) *acquire or develop surface water and groundwater supplies from sources inside or outside the boundaries of the authority, conserve, store, transport, treat, purify, distribute, sell, and deliver water to or among persons inside and outside the boundaries of the authority, and allocate water among persons participating in the authority's groundwater reduction plan whether they are located inside or outside the authority's boundaries;*

3) *enter into contracts with persons inside or outside the authority on terms and conditions the board considers desirable, fair, and advantageous for the performance of its rights, powers, and authority under this chapter;*

4) *coordinate water services provided inside, outside, or into the authority;*

5) *provide wholesale and retail water services to any users or customers within the authority's boundaries without being required to execute contracts with those users or customers;*

6) *adopt policies establishing whether, when, and the manner in which the authority uses requests for proposals in obtaining services, including professional services;*

7) *determine whether to adopt administrative policies in addition to those required by Section 49.199, Water Code*

Section 8813.102 authorizes the Authority to adopt and enforce rules to reach its goals.

Additionally, Section 8813.103 describes specific mechanisms through which the Authority may fund its efforts through fees, rates, and charges:

a) *The authority may establish fees, user fees, rates, and charges and classifications of payers of fees and rates as necessary to enable the authority to fulfill the authority's*

*purposes and regulatory functions provided by this chapter. The authority may im-
pose fees, user fees, rates, and charges on any person within the authority.*

b) *The authority may charge the owner of a well located within the authority's bounda-
ries a fee or user fee according to the amount of water pumped from the well. If
ownership of a well changes, both the prior and subsequent well owners are liable to
the authority, jointly and severally, for all fees and user fees imposed by the authority
under this subsection, and any related penalties and interest, for water pumped from
that well before the change in well ownership.*

c) *The board shall make reasonable efforts to send districts and municipalities written
notice of the date, time, and location of the meeting at which the board intends to
adopt a proposed charge under Subsection (b) and the amount of the proposed
charge. The board's failure to comply with this subsection does not invalidate a
charge adopted by the board under Subsection (b).*

d) *For wells located in Harris County or Fort Bend County, the board shall exempt from
the charge under Subsection (b) classes of wells that are not subject to any ground-
water reduction requirement imposed by the Harris-Galveston Coastal Subsidence
District or the Fort Bend Subsidence District, as applicable. If any of those classes of
wells become subject to a groundwater reduction requirement imposed by the appli-
cable subsidence district, the authority may impose the charge under Subsection (b)
on those classes. The board by rule may exempt any other classes of wells from the
charge under Subsection (b). The board may not apply the charge under Subsection
(b) to a well:*

    (1) *with a casing diameter of less than five inches that serves only a single-family
dwelling; or*

    (2) *regulated under Chapter 27, Water Code.*

e) *For purposes of Subsection (d), a well is subject to a groundwater reduction require-
ment if the applicable subsidence district has adopted or adopts a requirement or rule
that groundwater withdrawals from the well, or from the well and other wells collec-
tively, be reduced, including a groundwater reduction that is not required until a
future date.*

f) *The authority may establish fees, user fees, rates, and charges that are sufficient to:*

    (1) *achieve water conservation;*

    (2) *prevent waste of water;*

    (3) *serve as a disincentive to pumping groundwater;*

    (4) *develop, implement, or enforce a groundwater reduction plan;*

    (5) *accomplish the purposes of this chapter, including making available alterna-
tive water supplies;*

(6) *enable the authority to meet operation and maintenance expenses;*

(7) *pay the principal of and interest on notes, bonds, and other obligations issued in connection with the exercise of the authority 's general powers and duties; and*

(8) *satisfy all rate covenants relating to the issuance of notes, bonds, and other obligations.*

g) *The authority may charge rates established by the authority for water purchased from the authority.*

h) *The authority may impose fees, user fees, or charges for the importation of water into the authority's boundaries from a source located outside the authority's boundaries.*

Currently the Authority has adopted Groundwater Reduction Plan Fee Order (Rate Order). The original fee, $0.19 per 1,000 gallons, was adopted in October 2005. The rate has since been increased to $0.30 per 1,000 gallons. Copies of the rate order can be found in *Appendix G*.

Section 8813.116 also provides for the Authority's acceptance of money through gift or grant from FBSD.

Sections 8813.104 and 8813.113 specifically grant the Authority power to purchase water from another entity and sell or reuse water or any byproduct of operation, respectively.

Approval for the Authority to acquire, construct, and operate a water system is outlined in Section 8813.112. Section 8813.114 allows the Authority to enter into contract with a person for the sake of receiving professional, construction, or operational services and may also contract for water.

Sections 8813.110 and 8813.111 grant the Authority the ability to produce water supply or drought contingency plans and groundwater reduction plans, respectively. This allows the Authority to meet State and local regulatory agency requirements that require these documents.

The Authority is granted the power of eminent domain in Section 8813.119. This power extends to the acquisition of land and easements through condemnation. This power also extends outside of the Authority for purposes of pumping, storing, treating, or transporting water.

## 6.2     Permit Aggregation

It is the intent of the Authority that FBSD permitted wells operated within the Authority will be associated with the Authority to enable the greatest flexibility in operation and to ensure that the required groundwater reduction is achieved for the Authority as a whole. This is consistent with the Authority's plan that some districts will be over-converted while others will not be connected to the surface water delivery system. Currently, it is estimated that the Authority would be named as a 'co-permittee' beginning with the September 2011 permit

renewals. Permits for wells will be associated with both the current owner as well as the Authority to provide the greatest flexibility in operation of the Authority's surface water and groundwater production capacity.

**6.3        Monthly Groundwater Pumpage Reports**

The Authority will monitor groundwater pumpage on a monthly basis. The Rate Order requires a monthly self-reporting system of groundwater pumpage by each well owner. This activity will be essential for monitoring compliance with the GRP and to allow corrective action to be taken as early as possible. This information is also essential to the business operations of the Authority as pumpage fees are an essential component of the infrastructure and operations funding. By monitoring pumpage in this way, the Authority will have the opportunity to fully monitor its performance.

Monthly groundwater monitoring will be streamlined with the use of an online data collection system, called 'PRO' for Pumpage Reports Online. Well permit holders will be able to enter information regarding monthly pumpage online and provide the Authority with a database of pumpage information that will improve the ease with which reports may be generated for the Authority and FBSD.

**6.4        Flow Monitoring of Surface Water**

Surface water will be metered at the Authority's take points with the COH and WHCRWA to establish the volume of water entering the Authority's system. This will be a requirement of the Authority's contracts with the respective water providers. Additionally, water consumption by individual districts will be metered for use in billing the individual utilities for water usage. All of these measurements will aid in determining the Authority's compliance with FBSD regulation as well as the accountability of water within the transmission system.

# Section 7
# Other Considerations

## 7.1      Water Conservation

Water conservation is aimed at reducing long-term water demands.  The Authority has produced a Water Conservation Plan to address the opportunities within the Authority to reduce overall demand.  A copy of the draft plan is provided in *Appendix H*.

The Authority is pursuing several opportunities for acquiring conversion credits through water conservation initiatives and sees this as an opportunity to secure a sound groundwater reduction schedule by allowing for unanticipated pumping during dry years as well as a way of reducing per capita demands through education.

Currently, none of these water conservation measures are factored into the GRP as a way of meeting FBSD regulation and serve only as a "buffer" or margin of safety in the overall plan for conversion.  As the 2025 conversion phase approaches, additional knowledge and experience may encourage the Authority to factor these credits into the timing of the next phase of surface water conversion.

## 7.2      Reclaimed Water Reuse

The Authority has studied the potential to use reclaimed water to meet non-potable demands, such as landscape irrigation.  The use of this water already has an intrinsic advantage to the reuser because of reduced costs associated with lower groundwater pumpage fees and reduced well O&M.  Additionally, the Authority has moved to further encourage reuse through an incentive of $0.39 per 1,000 gallons of reuse.  This rate was set after reviewing previous reuse studies and analyzing the costs of various reuse incentives.

Although the use of reclaimed water represents an opportunity for the Authority to reduce their surface water demands, this is not included as part of the Authority's GRP.  Surface water delivery systems were sized and water supplies were planned without assuming any demand reduction through reclaimed water reuse.  While the reuse of wastewater provides many benefits including conserving water and reducing potable demands, there is neither certainty as to the acceptability of this practice to the general public, nor that reuse projects will continue to be implemented in the future.  Therefore, reuse was not included in developing projected surface water needs which results in a conservative estimate of the surface water needs for the Authority.  Any reclaimed water reuse program initiated in the Authority will generate over-conversion credits under the program sponsored by FBSD.  These credits will be accumulated and used during years of unexpectedly high demand or to adjust the conversion schedule as the second phase of conversion approaches.  More detailed plans for these credits will be made as the surface water delivery system comes online and more is known about its operation and the growth trends within the Authority.

## 7.3      Early or Over Conversion

Over-conversion involves the acquisition of conversion credits from the FBSD through the conversion of water demand in excess of the required minimum conversion level.  In effect, these credits can be used in exchange for surface water conversion at a later time.  One gallon of over-conversion credit earned in one year can then be used in lieu of one gallon of surface water conversion in a subsequent year.  By acquiring significant over-conversion credits, it may be possible to delay the second phase of conversion in 2025 by some period of time. This analysis examines over-conversion strategies and estimates their impact on the cost of water.  Two strategies were considered that require minimal additional infrastructure; both strategies assume surface water delivery starting in 2013.

Strategy 1 limits the amount of over-conversion by limiting the number of districts converted in the surface water conversion plan and limiting the amount of water introduced to the system to the amount contracted from the COH. This strategy uses excess capacity that already exists in the planned system to provide water to districts at a conversion rate greater than 90%.  Therefore, the water demand that could be converted in any year is the smallest of 100% of the connected districts demands or the amount of water contracted from the COH. This level of over-conversion will require the least adjustment to capital or operational plans and, therefore, represents a base case that could easily be implemented with no change except the cost of additional pumping.

Strategy 2 considers the addition of more pipelines to serve additional districts.  In this strategy, districts were added to the conversion schedule until 90% of all district demands exceeded the 2013 water purchase.  It was found that the connection to the Cinco MUD 1 East and West water plants, in addition to the districts planned for connection in 2013, would provide more than sufficient capacity to carry out this strategy.  This scenario is only limited by the amount of water contracted from the COH.  This strategy has a higher capital cost because it requires the installation of nearly 28,000 feet of additional pipelines to connect to the Cinco MUD 1 water plants.

The two over-conversion strategies were evaluated using the same demand projections used throughout this report to determine their impact on delaying the need for converting to 60% surface water in 2025.  *Table 11* shows the results of this analysis and indicates the time in years that the 2025 conversion could be delayed as a result of over-conversion credits.

**Table 11**
**Impact of Over-Conversion Strategies**

| Strategy | Description | Years Delayed |
|:---:|:---:|:---:|
| 1 | Currently planned districts | 1 |
| 2 | Connection to Cinco MUD 1 water plants | 4 |

These two strategies take advantage of minor changes that could be incorporated into the Authority's GRP that may positively impact the conversion schedule.  Much of this potential

exists because of excess capacity provided in early phases of construction in anticipation of future demands.

Another factor that may delay the need for conversion is the development schedule for the George Foundation properties. If development proceeds at a rate slower than that projected by The George Foundation, the additional capacity planned to meet the needs of this contract participant may instead be used to produce over-conversion credits within the Authority. The analysis for Strategies 1 and 2 was repeated assuming that the George Ranch would not develop and the additional capacity would be used, where possible, to meet additional demands within the Authority.

These Strategies were called Strategies 1A and 2A, which correspond to Strategies 1 and 2, respectively. *Table 12* shows the result of this analysis. Based on this analysis, Strategy 2A would be capable of delaying the 2025 conversion beyond 2030. However, the Subsidence District's current Over-Conversion Credit Policy indicates that "over-conversion credits will not be honored or accepted by the District … on or after January 1, 2030," meaning that Strategy 2A is only capable of delaying the second phase of conversion through the year 2030 under the current regulations.

**Table 12**
**Impact of Over-Conversion Strategies Without the Development of George Ranch**

| Strategy | Description | Years Delayed |
|:---:|:---:|:---:|
| 1A | Currently planned districts | 2 |
| 2A | Connection to Cinco MUD 1 water plants and additional districts | 5+ |

The potential for early conversion is another possibility the Authority faces. The delivery of surface water before the 2013 deadline for conversion will allow the Authority to acquire FBSD credits for each gallon of surface water delivered to customers. The possibility of over-conversion will be dependent upon the construction schedule for water supply infra-structure and may account for substantial credits.

Another option for over-conversion lies in the water system interconnects between districts. These interconnects may allow surface water, in some limited amount, to reach districts that have not yet been connected directly through the Authority's system. Opportunities for conversion through existing interconnects will be examined further as the beginning of surface water delivery approaches.

# Section 8
# Financing Mechanism

## 8.1 Authority Powers

Senate Bill 1798 provides that the Authority may issue bonds or notes payable from tolls, charges, rates, fees, user fees, and special assessments imposed by the Authority, the sale of water, grants or gifts, operation of the Authority's facilities, or contracts to outside parties.

The Authority has a fee structure in place to receive payment based on production from non-exempt wells within the Authority boundary and other contract GRP participants (see *Appendix G*). This fee is based on pumped groundwater reported directly to the Authority and checked against pumpage reported to FBSD. This pumpage fee was initially set at $0.19 per 1,000 gallons, but was increased to $0.30 per 1,000 gallons on January 1, 2008.

Once surface water delivery commences, the Authority will also receive payment from its customers in return for surface water supplied to those customers connected to the transmission system. When surface water is introduced to the Authority, it is intended that the rate for surface water will cost $0.35 per 1,000 gallons more than the rate for groundwater at present value. This difference in rates is intended to offset the cost of well operation. In this way customers connected to the transmission system and those relying on their own groundwater wells will effectively pay the same rate for water.

## 8.2 Financial Plans

The authority will sell bonds to finance construction. Groundwater pumpage fees and surface water rates will pay the debt service, O&M costs, and any other Authority expenses. As indicated above, the current rate for groundwater is $0.30 per 1,000 gallons. *Table 13* shows the preliminary plan for financing the cost of surface water infrastructure and water through the year 2030, including preliminary rates for surface and ground water.

**Table 13**

**Estimated Water Rates**

| | Revenue, Cash Flow, and Cash Balance | | | | | | |
| | Sources | | Revenue ($M) | | | | | |
| Year | Cost of Surface Water ($ / 1000) | Cost of Ground Water ($ / 1000) | Surface Water | Ground Water | TOTAL ANNUAL REVENUE from Sale of Water | TOTAL ANNUAL COST | Revenue Less Expenses | Cash Balance |
|---|---|---|---|---|---|---|---|---|
| 2007 | | $0.19 | | $1.45 | $1.45 | $1.00 | $0.45 | $0.45 |
| 2008 | | $0.30 | | $2.47 | $2.47 | $1.00 | $1.47 | $1.92 |
| 2009 | | $0.50 | | $4.42 | $4.42 | $6.31 | ($1.89) | $0.08 |
| 2010 | | $0.80 | | $7.57 | $7.57 | $6.81 | $0.77 | $0.84 |
| 2011 | | $1.10 | | $11.10 | $11.10 | $6.81 | $4.29 | $5.15 |
| 2012 | | $1.30 | | $13.92 | $13.92 | $17.68 | ($3.76) | $1.49 |
| 2013 | $1.95 | $1.60 | $6.63 | $12.69 | $19.32 | $20.74 | ($1.42) | $0.10 |
| 2014 | $2.15 | $1.80 | $7.71 | $15.06 | $22.76 | $20.85 | $1.92 | $2.02 |
| 2015 | $2.30 | $1.95 | $8.67 | $17.16 | $25.83 | $25.64 | $0.20 | $2.26 |
| 2016 | $2.30 | $1.95 | $9.04 | $17.88 | $26.92 | $26.89 | $0.03 | $2.33 |
| 2017 | $2.30 | $1.95 | $9.40 | $18.60 | $28.00 | $26.98 | $1.02 | $3.40 |
| 2018 | $2.30 | $1.95 | $9.77 | $19.32 | $29.09 | $28.49 | $0.61 | $4.07 |
| 2019 | $2.30 | $1.95 | $10.13 | $20.04 | $30.18 | $28.70 | $1.47 | $5.62 |
| 2020 | $2.30 | $1.95 | $10.50 | $20.77 | $31.26 | $29.24 | $2.02 | $7.76 |
| 2021 | $2.60 | $2.25 | $12.85 | $25.94 | $38.79 | $38.59 | $0.20 | $8.11 |
| 2022 | $2.60 | $2.25 | $13.83 | $27.93 | $41.76 | $38.81 | $2.95 | $11.22 |
| 2023 | $2.60 | $2.25 | $14.81 | $29.91 | $44.72 | $39.68 | $5.05 | $16.49 |
| 2024 | $2.75 | $2.40 | $16.71 | $34.02 | $50.73 | $54.71 | ($3.98) | $12.85 |
| 2025 | $2.75 | $2.40 | $35.49 | $20.65 | $56.14 | $60.47 | ($4.33) | $8.77 |
| 2026 | $2.70 | $2.35 | $36.19 | $21.00 | $57.19 | $60.83 | ($3.63) | $5.31 |
| 2027 | $2.65 | $2.30 | $36.85 | $21.32 | $58.17 | $61.19 | ($3.02) | $2.40 |
| 2028 | $2.65 | $2.30 | $38.17 | $22.09 | $60.26 | $61.54 | ($1.29) | $1.16 |
| 2029 | $2.65 | $2.30 | $39.49 | $22.85 | $62.34 | $61.90 | $0.44 | $1.63 |
| 2030 | $2.65 | $2.30 | $40.82 | $23.62 | $64.43 | $63.53 | $0.91 | $2.57 |

# Section 9
# Summary

This GRP summarizes the approach through which the Authority will meet FBSD regulatory requirements. The area served by the Authority is expected to undergo substantial growth over the planning period. As these water demands develop over time, the Authority is committed to adjusting its strategy to meet the regulations set forth by FBSD. This process will be a dynamic process that will evolve over the course of the first conversion phase in order to meet the emerging demands that will confront the Authority in 2025.

The Authority is in the process of securing a long-term supply of water adequate for meeting projected demands based on an agreement with the City of Houston. The Authority is also working with the WHCRWA to share facilities where possible to save costs for both parties. The GRP outlines the proposed infrastructure to deliver the required volumes of surface water for the two phases of conversion beginning in 2013 and 2025.

The Authority has considered the variation in seasonal demands in outlining its plans for surface water delivery and will have the capacity to provide water at a maximum rate of 1.3 times average daily demand to connected districts. In this way, 90% of the connected customers' annual water demand can be met. This level of conversion will allow FBSD regulations to be met by providing surface water to only some districts while others continue using groundwater exclusively. This is essential to the Authority's plan to provide contractual GRP inclusion to customers that are well outside of the Authority's boundary, such as the George Ranch.

Extensive planning for the 2013 system has already been completed. This system will receive water from the COH by way of a proposed pump station in the vicinity of Bellaire Boulevard and South Dairy Ashford Street where it will be boosted into the Authority's transmission system. This will carry water through a looped system of pipelines in the southeast corner of the Authority and to the vicinity of SH 99 and FM 1093.

The second phase of the system will add a connection to a joint project by the Authority and the WHCRWA to deliver water from north of the Authority's boundary. This second COH supply will augment the initial COH supply point and allow for the connection of the North and northeast portions of the Authority by 2025.

The Authority will finance construction through bond sales. Debt service will be repaid through rates for surface water and groundwater use within the Authority and by contract GRP participants. The Authority has also considered alternative means for reaching its conversion goals. Reclaimed water reuse, conservation, and early or over conversion credits have been considered. It is the intent of the Authority to pursue and provide incentives for these strategies for use in meeting conversion requirements in years of high demand or to potentially delay the second phase of conversion. However, these options are not considered within this GRP but will continue to be evaluated as alternatives as the Authority begins surface water conversion in 2013.

# Tab 2

Fort Bend Subsidence District Rules (Excerpts) (AR 95)

# Fort Bend Subsidence District

# Rules

Amended 2019

# FORT BEND SUBSIDENCE DISTRICT

# TABLE OF CONTENTS

**SECTION 1.  DEFINITIONS AND CONCEPTS** .....................................................1
RULE 1.1  DEFINITIONS OF TERMS ................................................................ 1
RULE 1.2  PURPOSE OF RULES................................................................. 5
RULE 1.3  USE AND EFFECT OF RULES.................................................. 5
RULE 1.4  AMENDING OF RULES .............................................................. 5
RULE 1.5  HEADINGS AND CAPTIONS ................................................... 5
RULE 1.6  CONSTRUCTION ........................................................................ 5
RULE 1.7  METHODS OF SERVICE UNDER THE RULES................... 5
RULE 1.8  SEVERABILITY .......................................................................... 6

**SECTION 2.  BOARD** ......................................................................................**6**
RULE 2.1  PURPOSE OF BOARD ............................................................... 6
RULE 2.2  BOARD STRUCTURE, OFFICERS ......................................... 6
RULE 2.3  MEETINGS .................................................................................. 6
RULE 2.4  COMMITTEES ............................................................................ 7
RULE 2.5  EX PARTE COMMUNICATIONS ............................................ 7
RULE 2.6  RULES OF PROCEDURE, CONDUCT, AND DECORUM AT
MEETINGS OF THE BOARD OF DIRECTORS ...................... 7

**SECTION 3.  GENERAL MANAGER**...........................................................**8**
RULE 3.1  GENERAL MANAGER .............................................................. 8
RULE 3.2  DELEGATION OF AUTHORITY ............................................. 8

**SECTION 4.  DISTRICT** ...............................................................................**8**
RULE 4.1  MINUTES AND RECORDS OF THE DISTRICT ................... 8
RULE 4.2  CERTIFIED COPIES ................................................................. 8

**SECTION 5.  PERMITS** ................................................................................**8**
RULE 5.1  REGISTRATION OF NEW WELLS ....................................... 8
RULE 5.2  GENERAL PERMITTING POLICIES AND PROCEDURES ..................... 9
RULE 5.3  STANDARD PERMIT PROVISIONS ................................... 12
RULE 5.4  PERMIT AMENDMENTS ...................................................... 13
RULE 5.5  EMERGENCY PERMITS ....................................................... 14
RULE 5.6  FEES AND PAYMENT OF FEES ......................................... 14
RULE 5.7  PERMIT FEE REBATES ....................................................... 15
RULE 5.8  EXCLUSIONS AND EXEMPTIONS .................................... 16

**SECTION 6.  OTHER DISTRICT ACTIONS AND DUTIES**..........................**16**
RULE 6.1  DISTRICT REGULATORY PLAN....................................... 16
RULE 6.2  ANNUAL GROUNDWATER PUMPAGE REPORTS .............................. 16

**SECTION 7.  HEARINGS** ..........................................................................**17**

RULE 7.1  TYPES OF HEARINGS................................................ 17

RULE 7.2  NOTICE AND SCHEDULING OF HEARING ........................................... 18

RULE 7.3  GENERAL PROCEDURES ................................ 19

RULE 7.4  UNCONTESTED PERMIT HEARINGS PROCEDURES ......................... 22

RULE 7.5  CONTESTED PERMIT HEARINGS PROCEDURES ................................. 22

RULE 7.6  CONCLUSION OF THE HEARING; REPORT ......................... 26

RULE 7.7  RULEMAKING HEARINGS PROCEDURES ........................................... 27

RULE 7.8  FINAL DECISION; APPEAL ...................................................... 28

**SECTION 8.  METERING** .........................................................................**28**

RULE 8.1  WATER METER REQUIRED ......................................... 28

RULE 8.2  WATER METER EXCEPTIONS ........................................... 29

RULE 8.3  VERIFICATION OF WELL SIZE ......................................... 29

RULE 8.4  METERING AGGREGATE WITHDRAWAL ........................... 29

RULE 8.5  ACCURACY VERIFICATION........................................... 29

RULE 8.6  REMOVAL OF METER FOR REPAIRS ................................ 30

RULE 8.7  WATER-METER READINGS................................................ 30

**SECTION 9.  INVESTIGATIONS AND ENFORCEMENT** ...........................**31**

RULE 9.1  NOTICE AND ACCESS TO PROPERTY ...................................... 31

RULE 9.2  CONDUCT OF INVESTIGATION........................................ 31

RULE 9.3  SEALING OF WELLS.......................................................... 31

RULE 9.4  REQUEST FOR INJUNCTIVE RELIEF AND

ASSESSMENT OF PENALTIES..................................................... 32

## SECTION 3.  GENERAL MANAGER

**RULE 3.1  GENERAL MANAGER**:  The person employed by the Board as General Manager is the chief administrative officer of the District, pursuant to Chapter 8834, and has full authority to manage and operate the affairs of the District, subject only to Board orders.  The General Manager is responsible for employing all persons necessary for the proper handling of the business and operation of the District and determining their compensation.  The District may, through an interlocal agreement, contract with another governmental entity to perform the functions of General Manager, and all authority delegated to the General Manager in these rules is delegated to that governmental entity.

**RULE 3.2  DELEGATION OF AUTHORITY:**  The General Manager may delegate duties as may be necessary to effectively and expeditiously accomplish those duties, provided, that no such delegation may ever relieve the General Manager from responsibilities under Chapter 8834 or Board orders.

## SECTION 4.  DISTRICT

**RULE 4.1  MINUTES AND RECORDS OF THE DISTRICT:**  All documents, reports, records, and minutes of the District are available for public inspection and copying in accordance with the Texas Public Information Act.  Upon written application of any person, the District will furnish copies of its public records.  Persons who are furnished copies may be assessed a copying charge, pursuant to policies established by the General Manager.  A list of the charges for copies will be furnished by the District.

**RULE 4.2  CERTIFIED COPIES:**  Requests for certified copies must be in writing.  Certified copies will be made under the direction of the General Manager and will be affixed with the seal of the District.  Persons who are furnished certified copies may be assessed a certification charge, in addition to the copying charge, pursuant to policies established by the General Manager.

## SECTION 5.  PERMITS

**RULE 5.1  REGISTRATION OF NEW WELLS**

    a.  It is a violation of these Rules for a well owner or water well driller to drill any well without the approved registration form filed with the District.

    b.  New well registration may be by mail or telephonic document transfer, on a form provided by the District.  The District staff will review the registration and make a preliminary determination on whether the well meets the exclusions or exemptions provided in Rule 5.8, and inform the registrant of their determination within five

business days.  If the preliminary determination is that the well is excluded or exempt, the registrant may begin drilling immediately upon receiving the approved registration.  All new wells, except leachate wells, monitoring wells, and dewatering wells, must be registered by the well owner or water well driller prior to being drilled.

## RULE 5.2  GENERAL PERMITTING POLICIES AND PROCEDURES

a. **Permit Requirement:**  The well owner or any other person acting on behalf of the well owner, must obtain a permit before a well may be drilled or operated.  A well must be permitted prior to drilling and must remain permitted unless and until the well plumbing and power source are disconnected and the well casing or discharge pipe is capped.

b. **Applications and Application Fees:**  Each original application for a water well permit, emergency permit, permit renewal, or permit amendment requires a separate application.  Application forms will be provided by the District and furnished to the applicant upon request.  For permit renewals, the District will generally forward to the permittee an application for renewal prior to the expiration of the permit term.  However, any failure by the District to forward a renewal application to a permittee will not relieve the permittee of the obligation to renew the permit.  The appropriate application fee, established by Board resolution, must be paid by the applicant at the time the application is submitted to the District.  After the application form and fee have been submitted, the District may request additional information to complete its review of the application.  Any additional information received will become part of the application.  An application is not complete until all requested information is submitted and the application fee paid.

c. **Notice of Permit Hearing:**  Once the District has received a completed original application for a water well permit, or application for a permit renewal or amendment, the General Manager will issue written notice indicating a date and time for a hearing on the application in accordance with these Rules, except that no notice or hearing is required for permit amendments granted by the General Manager in accordance with Rule 5.4, or emergency permits granted in accordance with Rule 5.5.  The General Manager may schedule as many applications at one hearing as the General Manager deems necessary.

d. **Decision and Issuance of Permit:**  In deciding whether or not to issue a permit, and in setting the terms of the permit, the Board shall consider the purpose of Chapter 8834 and all other relevant factors, including, but not limited to, (1) the District Regulatory Plan; (2) the quality, quantity, and availability of alternative water supplies at prices competitive with those charged by suppliers of alternative water supplies within the District; (3) the economic impact on the applicant from grant or denial of the permit, or the terms prescribed by the permit, in relation to the effect on subsidence that would result; (4) the applicant's use of water conservation measures; and (5) the applicant's compliance with the requirements of Chapter 8834 or any rule, permit, or order of the District. The Board may grant an application for a permit to

drill and operate a new well on property inside a platted subdivision if water service from a local retail public utility is available to the lot where the well is to be located, but the permit shall be limited to the amount authorized by the then current Regulatory Plan.

The Board must grant a permit to an applicant whenever it is found upon presentation of adequate proof that there is no other adequate and available substitute or supplemental source of an alternative water supply at prices competitive with those charged by suppliers of alternative water supplies within the District, and that compliance with any provision of Chapter 8834, or any rule of the District, will result in an arbitrary taking of property or in the closing and elimination of any lawful business, occupation, or activity, in either case without sufficient corresponding benefit or advantage to the people.

The Board may condition issuance of a permit on the resolution of a prior or continuing violation. The District may require an applicant to pay a civil penalty or settlement amount, or take other necessary action, to resolve a prior or continuing violation before consideration of an application.

e. **Permit Term and Renewal:** Unless specified otherwise by the Board or these Rules, permits are effective for a term ending one year from the last day of the calendar month of issuance. The permit term will be shown on the permit. The Board may issue a permit for a term not to exceed five years. Permits may be renewed by the Board following application and hearing. Permits do not become vested rights in the permit holder, and there is no automatic right of renewal. Permits will not be renewed unless the well has been drilled at the time of the hearing for the renewal application.

f. **Permit Provisions:** The permit will list the name of the permittee, the name of the owner of the well or wells included in the permit, the amount of groundwater authorized to be withdrawn under the permit and the term of the permit. The permit will contain the standard provisions listed in Rule 5.3 and any other special provisions or exemptions deemed appropriate. The permit may also contain provisions relating to water conservation or accountability.

g. **Revocation or Modification of Permit:** A permit does not become a vested right in the holder, and the Board may revoke or suspend a permit, or modify or amend the terms of a permit, at any time after notice and hearing.

h. **Aggregation of Withdrawal:** In issuing a permit, the authorized withdrawal for a given well may be aggregated, at the discretion of the District, with the authorized withdrawal from other permitted wells designated by the District. Geographic location of wells, operational or legal control of the wells, ownership or legal control of property where the wells are located, use of the wells for a common purpose, whether the wells are included in a regional water supplier's groundwater reduction plan, and integrated distribution systems will be considered in determining whether or

not to require or allow aggregation of withdrawal. For the purpose of categorizing wells by the amount of groundwater production, where wells are permitted with an aggregate withdrawal, the total authorized withdrawal will be assigned to the wells in aggregate, rather than allocating to each well a pro rata share or estimated production. Although all wells included within an aggregate permit are subject to the groundwater reduction requirements set forth in the District Regulatory Plan, as long as the amount of alternative water supply utilized in connection with the aggregate permit is in compliance with such groundwater reduction requirements, then the wells within the aggregate permit are deemed to be in compliance with such groundwater reduction requirements.

i. **Payment of Permit Fee:**

1. The validity of any permit issued by the District is contingent upon payment by the permittee of the applicable permit fee. Payment must be made upon receipt of a permit fee statement.

2. If the permit fee is not received by the District within 45 calendar days of the date of the permit fee statement, the permit is null and void, and the District may proceed with enforcement action as provided in these Rules.

3. For permittees subject to payment of a disincentive permit fee, the Board may allow the permittee to pay the disincentive permit fee through a promissory note or other legally binding agreement. The permittee must execute a promissory note or other agreement and pay 25 percent of the full amount within 45 calendar days of the date of the disincentive permit fee statement. The promissory note or other agreement must provide for the remaining 75 percent of the disincentive permit fee to be paid in three equal installments as follows: 25 percent due and payable within 90 days of the beginning date of the permit, 25 percent due and payable within 180 days of the beginning date of the permit, and the final 25 percent due and payable within 270 days of the beginning date of the permit. If a permittee fails to abide by the terms of the promissory note or other payment agreement, the permit shall be null and void, and the District may proceed with enforcement action as provided in these Rules. Furthermore, failure to abide by the terms of the promissory note or other payment agreement shall be grounds for denial of future permits and shall be grounds for denial of this payment arrangement on future permits. This payment arrangement is not available for amendments.

j. **Effect of Acceptance of Permit:** Acceptance of the permit by the person to whom it is issued constitutes 1) acknowledgement of, and 2) agreement to comply with all of the terms, provisions, conditions, limitations, and restrictions embodied in Chapter 8834, the permit, these Rules, the District Regulatory Plan and other Board orders. Failure to timely file a motion for rehearing constitutes acceptance of the permit.

**RULE 5.3  STANDARD PERMIT PROVISIONS:**  All permits are granted subject to Chapter 8834, these Rules and orders of the Board, and the laws of the State of Texas.  In addition to any special provisions or other requirements incorporated into the permit, each permit issued must contain the following standard permit provisions:

a.  This permit is granted in accordance with the provisions of Chapter 8834, and the rules and orders of the District, and acceptance of this permit constitutes an acknowledgment and agreement that the permittee will comply with Chapter 8834, all the terms, provisions, conditions, requirements, limitations, and restrictions embodied in this permit and with the rules, regulations, and orders of the District.

b.  This permit confers no vested rights in the holder, and it may be revoked or suspended, or its terms may be modified or amended pursuant to the provisions of Chapter 8834.  Any person who becomes the owner of a permitted well must notify the District of the name and contact information for the new owner within 90 calendar days from the date of the change in ownership.

c.  The operation of the well for the authorized withdrawal must be conducted in a non-wasteful manner.

d.  Except as provided in Rule 8.2, a water meter must be installed and operated in accordance with Section Eight of the District's Rules.

e.  The permittee must keep accurate records, on a monthly basis, of the amount of groundwater withdrawn and the purpose of the withdrawal, and such records must be provided to the District and available for inspection by District representatives.  If a meter is required, the meter must be read, and the meter reading and actual amount of pumpage recorded each month in accordance with Rule 8.7 of the District's rules.  Immediate written notice must be given to the District in the event a withdrawal exceeds the quantity authorized by this permit.

f.  The well site must be accessible to District representatives for inspection, and the permittee agrees to cooperate fully in any reasonable inspection of the well and well site by the District representatives.

g.  The application pursuant to which this permit has been issued is incorporated in this permit, and this permit is granted on the basis of and contingent upon the accuracy of the information supplied in that application and in any amendments to the application.  A finding that false information has been supplied is grounds for immediate revocation of the permit.  In the event of conflict between the provisions of this permit and the contents of the application, the provisions of this permit shall control.

h.  Violation of this permit's terms, conditions, requirements, or special provisions, including pumping amounts in excess of authorized withdrawal, is punishable by civil penalties as provided by Section 8834.252, Special District Local Laws Code.

i.   Wherever special provisions are inconsistent with other provisions or rules of the District, the special provisions shall prevail.

## RULE 5.4  PERMIT AMENDMENTS

a.   **Permit Amendment Increasing Authorized Withdrawal:**  It is a violation of these Rules to pump any amount of water over the amount authorized by permit.  Permit amendments to increase the authorized withdrawal must be filed before withdrawals exceed the permit limits.

1.   **Submission of Application:**  An application by a permit holder for a permit amendment increasing maximum authorized withdrawal must be submitted prior to the withdrawal of the groundwater in excess of the amount currently permitted.

2.   **Basis for Amendment:**  An applicant for a permit amendment increasing authorized withdrawal must present sufficient evidence that: (i) due to circumstances beyond the control of the applicant, the amount of withdrawal originally authorized is inadequate; and (ii) there is no available alternative water supply.

3.   **Action on Request:**  The General Manager may rule on any application for increased withdrawal in an amount up to but not exceeding 20 million gallons or 25 percent of the initially authorized withdrawal, whichever is greater, without notice, hearing, or further action by the Board.  Once a ruling is made by the General Manager, notice of the ruling shall be served upon the applicant.  Any applicant may appeal the General Manager's ruling by filing a written request for hearing within ten business days of the date of service of the General Manager's decision.  If a written request for hearing is filed, or if the application for increased withdrawal is for an amount greater than 20 million gallons and 25 percent of the initially authorized withdrawal, notice shall be issued and a hearing conducted in the manner prescribed for permit issuance.

4.   **Permit Fee:**  The permit fee to be assessed for any additional withdrawal granted will be at the permit fee rate in effect at the time of issuance of the amended permit multiplied by the additional withdrawal amount granted.

b.   **Permit Amendment Decreasing Authorized Withdrawal:**  An application by a permit holder for a permit amendment decreasing the authorized withdrawal must be made prior to payment, or to the due date for payment, of the current permit fee, whichever is earlier.  The General Manager may grant such an amendment without notice, hearing, or further action by the Board.

c.  **Permit Amendment to Transfer Ownership of the Permit:**  An application to amend the permit to change the name of the permittee must be made within 90 calendar days of the change in ownership of the permitted well.  The General Manager may grant such an amendment without notice, hearing, or further action by the Board.

## RULE 5.5  EMERGENCY PERMITS

a.  **Basis for Emergency Permit:**  Upon application, the General Manager may grant an Emergency Permit that authorizes the withdrawal of water from a well not currently drilled or permitted. An applicant for an Emergency Permit must present sufficient evidence that: (i) there is no available alternative water supply; and (ii) an emergency need for the groundwater exists.

b.  **Action on Requests:**  The General Manager may rule on any application for an Emergency Permit authorizing the withdrawal of water without notice, hearing, or further action by the Board, or with such notice and hearing as the General Manager deems practical and necessary under the circumstances.  The General Manager may deny an application for an Emergency Permit on any reasonable ground including, but not limited to, a determination that the applicant is currently in violation of Chapter 8834 or these Rules, or that the applicant has a previous unresolved violation on record with the District.  Notice of the ruling will be served upon the applicant. The applicant may appeal the General Manager's ruling by filing, within ten business days of the General Manager's ruling, a written request for a hearing before the Board.  The Board will hear the appeal at the next available regular Board meeting. The General Manager will inform the Board of any Emergency Permits granted.  On the motion of any Board member, and a majority concurrence in the motion, the Board may overrule the action of the General Manager.

c.  **Permit Fee:**  The Permit Fee assessed for an Emergency Permit under this Rule is the same as a permit issued under Rule 5.2.

d.  **Term of Emergency Permit:**  No Emergency Permit may be issued unless an application for a permit issued under Rule 5.2 has been filed with the District.  The term of any Emergency Permit granted by the General Manager under this Rule extends only until the Board makes a final decision on the application for the permit under Rule 5.2.

## RULE 5.6  FEES AND PAYMENT OF FEES

a.  **Application, Registration, and other Administrative Fees:**  The Board may establish a schedule of administrative fees.  The Board will attempt to set fees at an amount that does not unreasonably exceed the cost to the District of performing the function for which the fees are charged. Payment of the appropriate fee according to the fee schedule is required before any administrative action is performed by the District.

b. **Permit Fees:** The Board may establish a fee based on the term of the permit and the maximum amount of groundwater that the Board authorizes to be withdrawn from the well under a permit issued by the District. Permit fees shall be paid within 45 days of the receipt of a fee statement from the District. Failure to pay the permit fees by the due date may result in suspension or revocation of the permit.

c. **Disincentive Permit Fee:** The Board may establish a fee creating a disincentive to continued over-reliance on groundwater. In addition to the permit fee authorized by Rule 5.6(b), the disincentive permit fee shall be applied to groundwater withdrawals that exceed the applicable percentage of total water demand for the Regulatory Area where the well is located. The disincentive permit fee may not be assessed against groundwater withdrawn pursuant to permits included in and in compliance with a certified groundwater reduction plan. The disincentive permit fee is assessed for each year that groundwater reduction requirements are not met or will not be met in the permit as issued.

d. **Returned Check Fee:** The Board may establish a fee rate for checks returned to the District for insufficient funds, account closed, signature missing, or any other problem causing a check to be returned by the District's depository.

## RULE 5.7  PERMIT FEE REBATES

a. **Submission of Application:** An application for a permit fee rebate must be filed within 90 calendar days of permit termination and must be for an amount equal to or greater than $100.00.  Any application filed later than 90 calendar days after permit termination, or for a rebate of less than $100.00, will not be considered or granted. Rebate application forms will be provided by the District upon request.  The appropriate application fee, established by the Board, shall be paid by the applicant at the time the application is submitted to the District.

b. **Basis for Rebate:** An applicant for a permit fee rebate must present sufficient evidence that: (1) a water meter was installed and operating during the entire permit term; (2) the amount of actual withdrawal during the permit term was less than the amount of authorized withdrawal; (3) the permit fee originally paid for the amount by which authorized withdrawal exceeded actual withdrawal is equal to or greater than $100.00; and (4) if the well is a public supply well, the ratio of water sold or otherwise accounted for to the total water produced is at least 85 percent.  A rebate may also be granted if the well owner presents sufficient evidence that the well was never drilled.

c. **Action on Application:** The General Manager may rule on applications for permit fee rebates without notice, hearing, or further action by the Board.  Once a ruling is made by the General Manager, notice of the ruling shall be served upon the applicant. An applicant may appeal the General Manager's ruling by filing, within ten business days of the date of service of the General Manager's ruling, a written request for a

hearing before the Board. The Board will hear the applicant's appeal at the next regular Board meeting.

## RULE 5.8  EXCLUSIONS AND EXEMPTIONS

a.  **Single-Family Small Wells Excluded:**  A well with a casing diameter of less than five inches that serves only a single-family dwelling is excluded from the permit requirements of these Rules. Serving only a single-family dwelling means the well supplies groundwater for domestic use inside one home located on property that does not have an available alternative water supply. Domestic use includes water used inside the home for any purpose and may also include use outside the home for landscape irrigation, irrigating a garden, or providing water to domestic livestock. A new well to be located on property that has an available alternative water supply and is located inside a platted subdivision does not qualify for this exemption and must obtain a drilling and operating permit in accordance with Rule 5.2.

b.  **Exemptions:**  The permit requirements do not apply to  a shallow well that:
    1.  is not used to provide water for:
        i.  human consumption;
        ii.  agriculture;
        iii.  manufacturing or industry; or
        iv.  water injection; and
    2.  withdraws water solely:
        i.  to prevent hazardous sand boils, dewater surface construction sites, or relieve hydrostatic uplift on permanent structures;
        ii.  for groundwater quality analysis and for monitoring migration of subsurface contaminants or pollution; or
        iii.  for recovery of contamination or pollution.

c.  **Exemptions:**  The permit requirements do not apply to windmills with a casing diameter of five inches nominal or less.

d.  **Injection Wells Excluded**: The permit requirements do not apply to  a well regulated under Chapter 27, Water Code.

# SECTION 6.  OTHER DISTRICT ACTIONS AND DUTIES

**RULE 6.1  DISTRICT REGULATORY PLAN:**  The District Regulatory Plan specifies the acts, procedures, performance, and avoidance necessary to prevent subsidence, and forms the basis of permitting decisions and permit requirements imposed by the Board.  If the Board considers a new plan necessary or desirable, based on evidence presented at hearing, a new plan will be adopted.  A plan, once adopted, remains in effect until the adoption of a new plan.

**RULE 6.2  ANNUAL GROUNDWATER PUMPAGE REPORTS:**  Before January 31 of each year, each well owner required to have a permit shall submit to the District or to the

# Tab 3

NFBWA Rate Study and Long-Term Financial Forecast (AR 97)



# NORTH FORT BEND WATER AUTHORITY

## 2016 RATE STUDY
## AND
## LONG-TERM FINANCIAL FORECAST

*November 2016*

**Prepared by:**



*Dallas Office Address:*
5500 Democracy Drive, Ste. 130
Plano, Texas 75024
(972) 378-6588
(972) 378-6988 fax

Project Manager: Dan V. Jackson
djackson@willdan.com

NORTH FORT BEND WATER AUTHORITY
2016 RATE STUDY AND FINANCIAL FORECAST


TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| | **Executive Summary** | **3** |
| I | **Introduction** | **8** |
| | Project Scope | 8 |
| | Report Organization | 9 |
| | Background on Authority | 10 |
| | Authority Board of Directors | 11 |
| | Historical and Current Charges | 11 |
| II | **Forecast Billing Units and Revenue Requirement** | **12** |
| | Billing Units | 13 |
| | Forecast – Operating Expenses and Capital Outlays | 15 |
| | Forecast – Debt Service | 18 |
| | Forecast – Total Expenses | 20 |
| III | **Rate Recommendations** | **22** |
| | Rate Recommendation | 23 |
| | Forecast Fund Balance and Debt Coverage | 24 |
| | Notes on Rate Recommendations | 25 |
| Appendix A | **Water Rate Model** | |

# Executive Summary



The North Fort Bend Water Authority ("the Authority") engaged **Willdan Financial Services/Economists.com** to prepare a water rate study and long-term financial forecast. The purpose of this study is to calculate the economic and financial impact of the region's groundwater reduction and infrastructure construction plan on the Authority and its members. The objective is to develop a long-term rate and financial plan that will enable the Authority to fund all its operating and capital obligations; and to ensure the Authority's continuing financial viability. As part of this study the project team has prepared a comprehensive rate model to forecast costs and rates over the next decade. This model is presented in Appendix A to this report.

## Historical and Current Charges

The primary reason the Authority was created was to facilitate compliance with the Fort Bend Subsidence District's groundwater reduction mandates by creating a viable single entity to acquire, develop and deliver a long term supply of potable surface water and other alternative water supplies to water users within the Authority's boundaries. The Authority and its members must meet the following goals for conversion from ground water to alternative water sources:

- **30%** overall reduction in groundwater usage immediately

- **60%** overall reduction in groundwater usage by 2025

The Authority's current Groundwater Pumping Rate (for 2016) is $2.75 per 1,000 gallons and the Surface Water rate is $3.10 per 1,000 gallons.

## Forecast Billing Units

Like most typical water and wastewater rate studies, one of the core components in developing a rate for service is to determine the appropriate billing units, both for the current year and the forecast period. For the North Fort Bend Water Authority, billing units are composed of two separate and distinct elements: total groundwater pumped by Authority members and total surface water sold to members.

Brown and Gay Engineers, Inc. ("BGE"), the Authority's professional engineering advisors, has completed a comprehensive forecast of surface water consumption and ground water pumpage by the Authority's members. This forecast may be subject to revision in the future as new developments occur. This reflects the conservation assumptions agreed to by the team.

**Table ES-1** presents the Authority's forecast for surface water and ground water usage for the period 2016 -- 2055. Surface water usage is forecast to increase significantly in 2025 when the new requirements are assumed to be placed into effect. However, the changing mix of surface and ground water is self-evident.

**Table ES-1**

NORTH FORT BEND WATER AUTHORITY
FORECAST SURFACE AND GROUND WATER BILLING UNITS
2016 11 16 - 2016 Rate Study Final

| Year | Budget Demand | Surface/Ground Water Allocation | | | | Total Gallons | | |
| | | Percent Surface | Percent Ground | MGD Surface | MGD Ground | Surface Water | Ground Water | Total |
|---|---|---|---|---|---|---|---|---|
| 2016 | 33.56 | 46.5% | 53.5% | 15.60 | 17.96 | 5,694,000,000 | 6,556,241,818 | 12,250,241,818 |
| 2017 | 36.30 | 43.0% | 57.0% | 15.29 | 20.26 | 5,582,137,239 | 7,395,412,647 | 12,977,549,885 |
| 2018 | 39.11 | 40.0% | 60.0% | 15.03 | 22.58 | 5,486,137,940 | 8,241,607,757 | 13,727,745,697 |
| 2019 | 41.69 | 37.5% | 62.5% | 15.07 | 25.12 | 5,499,024,001 | 9,170,370,523 | 14,669,394,524 |
| 2020 | 44.62 | 35.0% | 65.0% | 15.10 | 28.02 | 5,511,849,087 | 10,227,026,233 | 15,738,875,321 |
| 2021 | 46.89 | 33.3% | 66.7% | 15.13 | 30.26 | 5,520,662,246 | 11,044,883,234 | 16,565,545,480 |
| 2022 | 49.18 | 31.8% | 68.2% | 15.15 | 32.53 | 5,528,755,151 | 11,873,565,024 | 17,402,320,175 |
| 2023 | 52.58 | 31.0% | 69.0% | 15.84 | 35.25 | 5,779,950,641 | 12,865,051,426 | 18,645,002,067 |
| 2024 | 56.05 | 31.0% | 69.0% | 16.91 | 37.64 | 6,172,458,627 | 13,738,698,235 | 19,911,156,862 |
| 2025 | 59.62 | 65.0% | 35.0% | 37.78 | 20.34 | 13,789,700,000 | 7,425,413,468 | 21,215,113,468 |
| 2030 | 76.10 | 65.0% | 35.0% | 48.49 | 26.11 | 17,698,850,000 | 9,529,212,510 | 27,228,062,510 |
| 2035 | 85.69 | 65.0% | 35.0% | 54.73 | 29.46 | 19,976,450,000 | 10,754,682,958 | 30,731,132,958 |
| 2045 | 97.06 | 65.0% | 35.0% | 62.11 | 33.45 | 22,670,150,000 | 12,209,525,583 | 34,879,675,583 |
| 2055 | 103.31 | 65.0% | 35.0% | 66.17 | 35.64 | 24,152,050,000 | 13,007,479,064 | 37,159,529,064 |

SOURCE: Brown and Gay Engineers, Inc.

## Forecast Revenue Requirement

As is typical for publicly owned utilities, the Authority's system revenue requirement was developed using the cash basis of ratemaking. **Table ES-2** presents a summary of the Authority's forecast revenue requirement in the test year 2016 and over the next decade. Details behind these calculations can be found in the model contained in Appendix A. The following is noteworthy about this forecast:

- At the present time the Authority has no headquarters or General Manager. The Board has no definitive timetable for hiring a General Manager or permanent staff.

- Most expenses are forecast to increase at annual rates of approximately 3.0%, as this is the assumed general rate of inflation.

- Electricity and chemicals are forecast to cost $0.08 per 1,000 gallons of surface water transported through the distribution system. These costs are assumed to increase at a rate of 5.0% annually, due to the fact that these costs have historically been rising at a rate greater than inflation.

- Engineering and professional fees are forecast to continue to be significant expenses as the Authority's system develops and the Authority continues to rely on outside consultants for assistance.

- The Authority is charged by Houston in two components. The first is the Raw Water and O&M Cost. This cost is reflected in the Authority's operating expenses. The second component is the Rehabilitation Rate. This second component is reflected in the Authority's capital outlays. Costs are forecast to increase at a rate of 5.0% per year.

- The Authority has embarked upon an aggressive program of capital construction required for it to meet its statutory obligations to provide surface water to its members necessary to meet the Fort Bend Subsidence District conversion requirements. The Authority's engineers, BGE, have assisted the Authority in prioritizing those projects that will enable it to meet the Fort Bend Subsidence District conversion requirements.

- The capital improvement plan has required the Authority to issue debt in 2009, 2010, 2011, 2015 and 2016, and will require the Authority to issue significant additional debt in future years. The Authority's Board, consultants, bond advisors and engineers have developed a schedule of forecast bond issues that are designed to fully fund the capital improvement plan. The outstanding and forecast bond financings are presented in **Table ES-2.**

**Table ES-3** presents the Authority's total annual cash expenses, non-rate revenues and net revenue requirement to be raised from rates. As shown, the Authority's total annual net revenue requirement under the Cash Basis of ratemaking is forecast to increase from **$31,180,243** in 2016 to **$84,778,603** in 2025.

Table ES-2

**NORTH FORT BEND WATER AUTHORITY**
**EXISTING AND FORECAST BOND ISSUES**

|  | Existing | Senior Lien | Junior Lien | Total |
|---|---|---|---|---|
| 2009 | $ 142,500,000 | $ - | $ - | $ 142,500,000 |
| 2010 | 61,010,000 |  | - | 61,010,000 |
| 2011 | 81,100,000 | - | - | 81,100,000 |
| 2012 | - | - | - | - |
| 2013 | - | - | - | - |
| 2014 | - | - | - | - |
| 2015 | 8,670,000 | - | - | 8,670,000 |
| 2016 * | 18,873,586 | - | - | 18,873,586 |
| **Total Existing** | **312,153,586** | **-** | **-** | **312,153,586** |
| 2017 | - | - | 80,623,262 | 80,623,262 |
| 2018 | - | 198,000,000 | 111,706,040 | 309,706,040 |
| 2019 | - | - | 225,285,538 | 225,285,538 |
| 2020 | - | 88,000,000 | 36,537,030 | 124,537,030 |
| 2021 | - | 9,000,000 | 19,325,219 | 28,325,219 |
| 2022 | - | 26,000,000 | 21,327,880 | 47,327,880 |
| 2023 | - | - | - | - |
| 2024 | - | - | - | - |
| 2025 | - | - | - | - |
| 2026 | - | - | - | - |
| **Total Forecast** | **-** | **321,000,000** | **494,804,969** | **815,804,969** |
| **Total** | **312,153,586** | **321,000,000** | **494,804,969** | **1,127,958,555** |

* Includes Series 2016A SRF and Series 2016B SWIFT Junior Lien issues

Table ES-3

**NORTH FORT BEND WATER AUTHORITY**
**FORECAST EXPENSES AND NON-RATE REVENUES**

|  | Operating Expenses | Cap Outlays/ Replace Reserve | Debt Service | Debt Rebates Refunds | Total Expenses | Non- Rate Revenues | Net Revenue Requirement |
|---|---|---|---|---|---|---|---|
| | | | 2016 11 16 - 2016 Rate Study Final | | | | |
| 2016 | $ 8,589,153 | $ 1,378,123 | $ 22,144,503 | $ (365,006) | $ 31,746,773 | $ (566,530) | $ 31,180,243 |
| 2017 | 9,025,951 | 970,622 | 22,517,048 | (365,006) | 32,148,616 | (1,398,864) | 30,749,752 |
| 2018 | 11,840,536 | 1,001,626 | 25,732,625 | (365,006) | 38,209,781 | (2,133,371) | 36,076,410 |
| 2019 | 12,231,298 | 1,054,178 | 40,309,324 | (365,006) | 53,229,794 | (2,155,088) | 51,074,706 |
| 2020 | 12,658,815 | 1,109,468 | 50,766,238 | (1,941,456) | 62,593,065 | (2,176,267) | 60,416,798 |
| 2021 | 13,088,323 | 1,166,804 | 61,324,126 | (9,168,753) | 66,410,501 | (2,193,956) | 64,216,545 |
| 2022 | 13,538,188 | 1,226,940 | 63,264,257 | (8,708,181) | 69,321,204 | (2,204,867) | 67,116,337 |
| 2023 | 14,252,642 | 1,346,820 | 65,575,075 | (5,954,009) | 75,220,529 | (2,214,900) | 73,005,629 |
| 2024 | 15,146,001 | 1,510,195 | 66,081,094 | (2,014,847) | 80,722,443 | (2,221,380) | 78,501,063 |
| 2025 | 23,189,113 | 3,542,573 | 66,141,722 | (5,870,048) | 87,003,361 | (2,224,758) | 84,778,603 |

## Rate Recommendation

**Table ES-4** presents the recommended and forecast rate structure for the Authority over the period 2016– 2021.  The table reveals the following:

- **It is recommended that the Authority implement a series of annual rate adjustments for its surface water and ground water rates for each of the next five years.**

- It is further recommended that the Authority continue to maintain the differential between surface and ground water fees of $0.35 per 1,000 gallons.

- By 2021, the Authority's ground water fee is recommended to be $3.95 per 1,000 gallons and its surface water fee is recommended to be $4.30 per 1,000 gallons.

- The Authority's annual revenue recovered under this rate plan is forecast to increase from **$35,681,065** in 2016 to **$67,366,136** by 2021.

- Should the Authority issue additional long-term debt beyond that outlined in this report to finance system construction, these forecast rates may be subject to significant revision.

- Periodically the Authority will require additional rate adjustments beyond 2021.

- Finally, it should be noted that this forecast is based upon the achievement by the Authority of all the assumptions listed in the previous section.  Should any of these assumptions be changed or revised, it could lead to significant changes in the forecast results outlined above.

Table ES-4

**NORTH FORT BEND WATER AUTHORITY**
**RATES AND RATE REVENUES**

| | Ground Water GRP Rate | Surface Water Rate | Ground Water GRP Revenues | Surface Water Revenues | Total Rate Revenues |
|---|---|---|---|---|---|
| | 2016 11 16 - 2016 Rate Study Final | | | | |
| 2016 | $  2.75 | $  3.10 | $  18,029,665 | $  17,651,400 | $  35,681,065 |
| 2017 | 3.05 | 3.40 | 22,556,009 | 18,979,267 | 41,535,275 |
| 2018 | 3.35 | 3.70 | 27,609,386 | 20,298,710 | 47,908,096 |
| 2019 | 3.65 | 4.00 | 33,471,852 | 21,996,096 | 55,467,948 |
| 2020 | 3.95 | 4.30 | 40,396,754 | 23,700,951 | 64,097,705 |
| 2021 | 3.95 | 4.30 | 43,627,289 | 23,738,848 | 67,366,136 |

SECTION 1

# Introduction

## Project Scope

The North Fort Bend Water Authority ("the Authority") engaged **Willdan Financial Services/Economists.com** to prepare a water rate study and long-term financial forecast. The purpose of this study is to calculate the economic and financial impact of the region's groundwater reduction and infrastructure construction plan on the Authority and its members. The objective is to develop a long-term rate and financial plan that will enable the Authority to fund all its operating and capital obligations; and to ensure the Authority's continuing financial viability.

During the course of this engagement, the project team has participated in several work sessions with representatives of the Authority and its advisors. Numerous additional telephone conferences and considerable data sharing took place during the course of this study. At all times, the Authority and its advisors have proven to be diligent and reliable in producing the information requested by the project team.

Throughout this engagement, all interested parties were kept continuously apprised of the project team's progress. The scope of services requested by the Authority for this update included the following:

1) Review the Authority's water system operating and capital costs for the current year and its upcoming fiscal year. Forecast these costs for a period ten years into the future, taking in to account the significant anticipated operating and capital cost changes associated with the Authority's distribution system construction requirements and future water acquired from the City of Houston.

2)

3)     , as delineated by such organizations as the American Water Works Association and the Texas Commission on Environmental Quality. The rates must be just and reasonable, in line with the Authority's operating and capital costs, and applied in a fair and equitable manner to all the Authority's members.

4) Develop a comprehensive rate model that calculates recommended ground and surface water rates for the current year and forecast period.

## Background on Authority



The North Fort Bend Water Authority ("The Authority") was created by the 79th Texas Legislature with the passage of Senate Bill 1798 in May 2005. The act established Chapter 8813 of the Special District Local Laws Code. As stated on the Authority's Web Site (www.nfbwa.com), the Authority's mission includes the following:

- Acquiring and providing water for residential, commercial, industrial, agricultural and other uses;

- Reducing groundwater withdrawals;

- Conserving, preserving, protecting and recharging of groundwater and of groundwater reservoirs or their subdivisions;

- Preventing waste of groundwater; and

- Controlling subsidence caused by the withdrawal of water from groundwater reservoirs.

The website further states that the mandates are intended to wean the area off its dependence on groundwater in a phased reduction plan, to minimize the risk of future subsidence, and to enable the aquifers to recharge.

The Authority and its members must meet the following goals for conversion from ground water to alternative water sources:

- **30%** overall reduction in groundwater usage immediately

- **60%** overall reduction in groundwater usage by 2025

The Authority has an existing long-term water supply contract with the City of Houston (see Section III of this report for the financial implications of this contract on the Authority and its members). Further, the Authority has commenced construction of an extensive transmission line infrastructure system throughout its boundaries to distribute the surface water it acquires from Houston to replace members' groundwater sources.

SECTION II

# Forecast Billing Units and Revenue Requirement

In this section of the Water Rate Study, the Authority's current and future revenue requirements as well as the billing units on which the rates will be based are examined in detail. The billing units for the current year and the forecast period are developed first. For the North Fort Bend Water Authority, billing units are composed of two separate and distinct elements: total groundwater pumped by Authority members, and total surface water sold to members.

The test year on which the Authority's revenue requirements are forecast consists of the Authority's adopted budget for the current fiscal year, January 1 through December 31, 2016. To this budget is added the expected debt service and coverage requirements from the District's current outstanding bond issues as well as water purchases from the City of Houston.

The calculation of a revenue requirement differs from a utility's budget in that it represents only that amount that must be raised through the Authority's rates and fees. This means that non-rate revenue (such as interest income) must be subtracted from the budgeted operating and capital expenditures to determine the net revenue requirement to be raised from rates. For the Authority these non-rate revenues are fairly nominal, but nonetheless must be factored into the rate calculation.

As is typical for publicly owned utilities, the Authority's system revenue requirement was developed using the cash basis of ratemaking. Under the cash basis, as defined by the AWWA Manual M-1, the system revenue requirements consist of cash expenditures and other financial commitments (such as debt service coverage or reserves) that must be met through system operating revenues and other revenue sources. While this is a common methodology for calculating rates, it does represent a distinct calculation from the Income Statement accrual basis of accounting. **Table II-1** presents a comparison of the two methodologies.

### Table II-1

**NORTH FORT BEND WATER AUTHORITY**
**AWWA CASH BASIS vs. INCOME STATEMENT**

| Expense Item | AWWA Cash Basis | Income Statement |
|---|:---:|:---:|
| Operating Expenses | ✔ | ✔ |
| Capital Outlays | ✔ | |
| Debt Principal | ✔ | |
| Debt Interest | ✔ | ✔ |
| Depreciation | | ✔ |

All data used in the development of the revenue requirement was obtained from the financial statements, budgets and other information provided by the Authority's staff and professional advisors.

## Billing Units

Like most typical water and wastewater rate studies, one of the core components in developing a rate for service is to determine the appropriate billing units, both for the current year and the forecast period. For the North Fort Bend Water Authority, billing units are composed of two separate and distinct elements: total groundwater pumped by Authority members, and total surface water sold to members.

Brown and Gay Engineers, Inc. ("BGE"), the Authority's professional engineering advisors, has completed a comprehensive forecast of surface water consumed and ground water pumped by the Authority's members. This forecast may be subject to revision in the future as new developments occur.

The original BGE forecast has been used primarily for planning purposes. For purposes of forecasting future revenues and expenses, the project team made a series of adjustments to the original forecast. All adjustments were reviewed and considered reasonable by BGE representatives. The adjustments were as follows:

- The first adjustment was to reduce the total demand by between 10% and 20% depending on the year, to reflect a lower volume of sales.

- The second adjustment was to reflect an expected nominally higher percentage of surface water sales than those used for planning purposes.

Two additional factors weigh heavily on the Authority's usage forecast. The first is that the Authority is mandated to increase surface water sales to 60% by 2025. The second factor is that members are expected to achieve significant growth in customers and usage in the next several decades. Therefore, the total water consumed will increase while the mix of surface and ground water will be changing to meet regulatory mandates.

Table II-2 and Chart II-3 present the Authority's revised forecast for surface water and ground water billing units for the period 2016 -- 2054. As the exhibit reveals, surface water billing units are forecast to increase significantly by 2025 when the new requirements are assumed to be placed into effect. The exhibits show that usage gradually increases over the time period of the forecast. However, the changing mix of surface and ground water is self-evident. The forecast differs from the original Brown and Gay forecast due to the adjustments noted above.

Table II-2

### NORTH FORT BEND WATER AUTHORITY
### FORECAST SURFACE AND GROUND WATER BILLING UNITS

| Year | Budget Demand | Surface/Ground Water Allocation | | | | Total Gallons | | |
| | | Percent Surface | Percent Ground | MGD Surface | MGD Ground | Surface Water | Ground Water | Total |
|---|---|---|---|---|---|---|---|---|
| 2016 | 33.56 | 46.5% | 53.5% | 15.60 | 17.96 | 5,694,000,000 | 6,556,241,818 | 12,250,241,818 |
| 2017 | 36.30 | 43.0% | 57.0% | 15.29 | 20.26 | 5,582,137,239 | 7,395,412,647 | 12,977,549,885 |
| 2018 | 39.11 | 40.0% | 60.0% | 15.03 | 22.58 | 5,486,137,940 | 8,241,607,757 | 13,727,745,697 |
| 2019 | 41.69 | 37.5% | 62.5% | 15.07 | 25.12 | 5,499,024,001 | 9,170,370,523 | 14,669,394,524 |
| 2020 | 44.62 | 35.0% | 65.0% | 15.10 | 28.02 | 5,511,849,087 | 10,227,026,233 | 15,738,875,321 |
| 2021 | 46.89 | 33.3% | 66.7% | 15.13 | 30.26 | 5,520,662,246 | 11,044,883,234 | 16,565,545,480 |
| 2022 | 49.18 | 31.8% | 68.2% | 15.15 | 32.53 | 5,528,755,151 | 11,873,565,024 | 17,402,320,175 |
| 2023 | 52.58 | 31.0% | 69.0% | 15.84 | 35.25 | 5,779,950,641 | 12,865,051,426 | 18,645,002,067 |
| 2024 | 56.05 | 31.0% | 69.0% | 16.91 | 37.64 | 6,172,458,627 | 13,738,698,235 | 19,911,156,862 |
| 2025 | 59.62 | 65.0% | 35.0% | 37.78 | 20.34 | 13,789,700,000 | 7,425,413,468 | 21,215,113,468 |
| 2026 | 62.79 | 65.0% | 35.0% | 39.84 | 21.45 | 14,541,600,000 | 7,828,978,422 | 22,370,578,422 |
| 2027 | 66.00 | 65.0% | 35.0% | 41.93 | 22.57 | 15,304,450,000 | 8,238,576,369 | 23,543,026,369 |
| 2028 | 69.27 | 65.0% | 35.0% | 44.05 | 23.72 | 16,078,250,000 | 8,658,741,448 | 24,736,991,448 |
| 2029 | 72.65 | 65.0% | 35.0% | 46.25 | 24.90 | 16,881,250,000 | 9,088,265,221 | 25,969,515,221 |
| 2030 | 76.10 | 65.0% | 35.0% | 48.49 | 26.11 | 17,698,850,000 | 9,529,212,510 | 27,228,062,510 |
| 2031 | 79.17 | 65.0% | 35.0% | 50.48 | 27.19 | 18,425,200,000 | 9,922,603,718 | 28,347,803,718 |
| 2032 | 80.85 | 65.0% | 35.0% | 51.58 | 27.77 | 18,826,700,000 | 10,135,518,991 | 28,962,218,991 |
| 2033 | 82.50 | 65.0% | 35.0% | 52.65 | 28.35 | 19,217,250,000 | 10,347,231,212 | 29,564,481,212 |
| 2034 | 84.12 | 65.0% | 35.0% | 53.70 | 28.92 | 19,600,500,000 | 10,554,090,409 | 30,154,590,409 |
| 2035 | 85.69 | 65.0% | 35.0% | 54.73 | 29.46 | 19,976,450,000 | 10,754,682,958 | 30,731,132,958 |
| 2036 | 87.10 | 65.0% | 35.0% | 55.64 | 29.96 | 20,308,600,000 | 10,935,850,016 | 31,244,450,016 |
| 2037 | 88.48 | 65.0% | 35.0% | 56.53 | 30.45 | 20,633,450,000 | 11,112,937,703 | 31,746,387,703 |
| 2038 | 89.82 | 65.0% | 35.0% | 57.41 | 30.91 | 20,954,650,000 | 11,282,296,209 | 32,236,946,209 |
| 2039 | 91.13 | 65.0% | 35.0% | 58.26 | 31.37 | 21,264,900,000 | 11,451,225,734 | 32,716,125,734 |
| 2040 | 92.42 | 65.0% | 35.0% | 59.10 | 31.82 | 21,571,500,000 | 11,613,590,651 | 33,185,090,651 |
| 2041 | 93.83 | 65.0% | 35.0% | 60.01 | 32.32 | 21,903,650,000 | 11,796,553,409 | 33,700,203,409 |
| 2042 | 94.64 | 65.0% | 35.0% | 60.54 | 32.60 | 22,097,100,000 | 11,897,975,348 | 33,995,075,348 |
| 2043 | 95.45 | 65.0% | 35.0% | 61.06 | 32.89 | 22,286,900,000 | 12,003,033,604 | 34,289,933,604 |
| 2044 | 96.25 | 65.0% | 35.0% | 61.59 | 33.16 | 22,480,350,000 | 12,104,428,041 | 34,584,778,041 |
| 2045 | 97.06 | 65.0% | 35.0% | 62.11 | 33.45 | 22,670,150,000 | 12,209,525,583 | 34,879,675,583 |
| 2046 | 97.87 | 65.0% | 35.0% | 62.64 | 33.73 | 22,863,600,000 | 12,310,972,016 | 35,174,572,016 |
| 2047 | 98.68 | 65.0% | 35.0% | 63.16 | 34.02 | 23,053,400,000 | 12,416,055,546 | 35,469,455,546 |
| 2048 | 99.48 | 65.0% | 35.0% | 63.69 | 34.29 | 23,246,850,000 | 12,517,476,048 | 35,764,326,048 |
| 2049 | 100.29 | 65.0% | 35.0% | 64.21 | 34.58 | 23,436,650,000 | 12,622,533,399 | 36,059,183,399 |
| 2050 | 101.10 | 65.0% | 35.0% | 64.74 | 34.86 | 23,630,100,000 | 12,724,604,669 | 36,354,704,669 |
| 2051 | 101.54 | 65.0% | 35.0% | 65.03 | 35.01 | 23,735,950,000 | 12,779,723,178 | 36,515,673,178 |
| 2052 | 101.98 | 65.0% | 35.0% | 65.31 | 35.17 | 23,838,150,000 | 12,838,488,109 | 36,676,638,109 |
| 2053 | 102.42 | 65.0% | 35.0% | 65.60 | 35.32 | 23,944,000,000 | 12,893,599,445 | 36,837,599,445 |
| 2054 | 102.87 | 65.0% | 35.0% | 65.89 | 35.48 | 24,049,850,000 | 12,948,707,169 | 36,998,557,169 |
| 2055 | 103.31 | 65.0% | 35.0% | 66.17 | 35.64 | 24,152,050,000 | 13,007,479,064 | 37,159,529,064 |

SOURCE: Brown and Gay Engineers, Inc.



Chart II-3



## Forecast – Operating Expenses and Capital Outlays

As expected, operating expenses have increased as the system has expanded and volumes have increased. However, there are no personnel costs or corresponding positions at this time as outside consultants continue to provide most required services and the Authority has no full time employees. This may be revised as the Authority grows.

**Table II-4** presents the Authority's FY 2016 through FY 2020 operating expense and capital outlay budget by major category. **Table II-5** presents a ten-year forecast of operating expenses and capital outlays.

Table II-4

NORTH FORT BEND WATER AUTHORITY
OPERATING EXPENSES
2016 11 16 - 2016 Rate Study Final

| | Budget 2016 | Forecast 2017 | Forecast 2018 | Forecast 2019 | Forecast 2020 |
|---|---|---|---|---|---|
| Operations/Maint | $ 1,017,901 | $ 1,104,950 | $ 3,684,819 | $ 3,754,956 | $ 3,837,835 |
| Electricity/Chemicals | 351,353 | 305,901 | 305,523 | 311,379 | 327,711 |
| Administrative Expenses | 2,925,400 | 3,013,162 | 3,103,557 | 3,196,664 | 3,292,563 |
| Administrative Services | 1,148,616 | 1,183,074 | 1,218,567 | 1,255,124 | 1,292,777 |
| Houston Water Costs | 3,145,883 | 3,418,864 | 3,528,071 | 3,713,176 | 3,907,927 |
| TOTAL OPERATING EXPENSES | 8,589,153 | 9,025,951 | 11,840,536 | 12,231,298 | 12,658,815 |

Table II-5

NORTH FORT BEND WATER AUTHORITY
FORECAST OPERATING EXPENSES AND CAPITAL OUTLAYS

| | Operating | Electricity/ Chemicals | Admin | Admin Services | Surface Water | Total Operating | Capital Outlays | Rehab/ Replace Reserve | Total Oper/Capital |
|---|---|---|---|---|---|---|---|---|---|
| | | | 2016 11 16 - 2016 Rate Study Final | | | | | | |
| 2016 | $ 1,017,901 | $ 351,353 | $ 2,925,400 | $ 1,148,616 | $ 3,145,883 | $ 8,589,153 | $ 1,378,123 | $ - | $ 9,967,276 |
| 2017 | 1,104,950 | 305,901 | 3,013,162 | 1,183,074 | 3,418,864 | 9,025,951 | 970,622 | - | 9,996,573 |
| 2018 | 3,684,819 | 305,523 | 3,103,557 | 1,218,567 | 3,528,071 | 11,840,536 | 1,001,626 | - | 12,842,162 |
| 2019 | 3,754,956 | 311,379 | 3,196,664 | 1,255,124 | 3,713,176 | 12,231,298 | 1,054,178 | - | 13,285,476 |
| 2020 | 3,837,835 | 327,711 | 3,292,563 | 1,292,777 | 3,907,927 | 12,658,815 | 1,109,468 | - | 13,768,283 |
| 2021 | 3,910,891 | 344,647 | 3,391,340 | 1,331,561 | 4,109,885 | 13,088,323 | 1,166,804 | - | 14,255,128 |
| 2022 | 3,989,485 | 362,410 | 3,493,081 | 1,371,508 | 4,321,705 | 13,538,188 | 1,226,940 | - | 14,765,128 |
| 2023 | 4,100,336 | 397,819 | 3,597,873 | 1,412,653 | 4,743,962 | 14,252,642 | 1,346,820 | - | 15,599,462 |
| 2024 | 4,219,660 | 446,076 | 3,705,809 | 1,455,032 | 5,319,423 | 15,146,001 | 1,510,195 | - | 16,656,196 |
| 2025 | 4,348,895 | 1,046,393 | 3,816,983 | 1,498,683 | 12,478,158 | 23,189,113 | 3,542,573 | - | 26,731,686 |

The following is noteworthy about this forecast:

## Operating Expenses

- At the present time the Authority has no headquarters or General Manager. The Board has no definitive timetable for hiring a General Manager or permanent staff.

- Repairs and maintenance expenses are expected to increase as more pipes and distribution lines are constructed.

- Most expenses are forecast to increase at annual rates of approximately 3.0%, which is equivalent to the general assumed rate of inflation.

- Certain expenses such as insurance are expected to increase at greater levels.

- Certain expenses are expected to increase proportionately with the increase in billing units. This includes such expenses as lab fees and right of way maintenance.

## Chemicals and Electricity

- Electricity and chemicals are forecast to cost $0.08 per 1,000 gallons of surface water transported through the distribution system. These costs are assumed to increase at a rate of 5.0% annually, due to the fact that these costs have historically been rising at a rate greater than inflation.

## Administrative Expenses

- This category consists primarily of engineering and professional fees. Both categories will continue to incur significant expenses as the system develops and the Authority continues to rely on outside contractors for assistance.

- These fees are mostly forecast to increase at rates of 3.0% per year, which is the approximate forecast rate of inflation.

## Administrative Services

- This category consists primarily of management services, publications, notices, supplies, dues and contingencies.

- An annual inflation rate of 3% is assumed for these expenses, most of which are based on the FY 2016 budget.

## Surface Water Purchases

- The Authority has executed a contract for treated water acquisitions from the City of Houston. The contract provides the Authority the right to purchase increasing levels of water, based on actual and forecast demand, up to a limited contracted amount and subject to the Authority paying its share of capital costs.

- Forecast amounts to be purchased are based on the BGE demand projections presented in Table II-2.

- The Authority is charged by Houston in two components. The first is the Raw Water and O&M Cost. This cost is reflected in the Authority's operating expenses. The second component is the Rehabilitation Rate. This second component is reflected in the Authority's capital outlays.

- Due to the increasing cost of water in Texas and throughout the southwest, the City of Houston's water charges are estimated to increase by an average rate of 5.0% per year over the forecast period.

- Detailed annual calculations are contained in the rate model presented in Appendix A of this report.

## Forecast – Debt Service

As stated earlier in this study, the Authority has embarked upon an aggressive program of capital construction required for it to meet its statutory obligations to provide surface water to its members necessary to comply with the conversion requirements of the Fort Bend Subsidence District. The Authority's engineers, Brown and Gay Engineers, Inc., have assisted the Authority in prioritizing those projects that will enable it to meet the conversion requirements of the Fort Bend Subsidence District.

The current and forecast capital improvement plan has required the Authority to issue debt in 2009, 2010, 2011, 2015 and 2016, and will require the Authority to issue significant additional debt in future years. The Authority's Board, bond advisors and engineers have developed a schedule of forecast bond issues that are designed to fully fund the capital improvement plan. The current and forecast bond issues are presented in **Table II-6** and **Chart II-7**.

Table II-6

### NORTH FORT BEND WATER AUTHORITY
### EXISTING AND FORECAST BOND ISSUES

| | Existing | Senior Lien | Junior Lien | Total |
|---|---|---|---|---|
| 2009 | $ 142,500,000 | $ - | $ - | $ 142,500,000 |
| 2010 | 61,010,000 | | - | 61,010,000 |
| 2011 | 81,100,000 | - | - | 81,100,000 |
| 2012 | - | - | - | - |
| 2013 | - | - | - | - |
| 2014 | - | - | - | - |
| 2015 | 8,670,000 | - | - | 8,670,000 |
| 2016 * | 18,873,586 | - | - | 18,873,586 |
| **Total Existing** | 312,153,586 | - | - | 312,153,586 |
| | | | | |
| 2017 | - | - | 80,623,262 | 80,623,262 |
| 2018 | - | 198,000,000 | 111,706,040 | 309,706,040 |
| 2019 | - | - | 225,285,538 | 225,285,538 |
| 2020 | - | 88,000,000 | 36,537,030 | 124,537,030 |
| 2021 | - | 9,000,000 | 19,325,219 | 28,325,219 |
| 2022 | - | 26,000,000 | 21,327,880 | 47,327,880 |
| 2023 | - | - | - | - |
| 2024 | - | - | - | - |
| 2025 | - | - | - | - |
| 2026 | - | - | - | - |
| **Total Forecast** | - | 321,000,000 | 494,804,969 | 815,804,969 |
| | | | | |
| **Total** | 312,153,586 | 321,000,000 | 494,804,969 | 1,127,958,555 |

* Includes Series 2016A SRF and Series 2016B SWIFT Junior Lien issues

Chart II-7



North Fort Bend Water Authority
Existing and Forecast Bond Issues

**Table II-8** presents the current and forecast annual debt service principal and interest. The forecast separates future debt into senior lien and junior lien categories. The senior lien debt is forecast to have 30 year terms with interest only payments for the first four years and annual interest rates of 5.0%. The junior lien debt service generally also has 30 year terms with interest only payments for the first four years, however interest rates vary from 2.16% to 3.00%.

The table reveals that under Scenario 1, annual debt service is expected to increase from **$22,144,503** in 2016 to a maximum of **$66,213,497** by 2026.

Table II-8

**NORTH FORT BEND WATER AUTHORITY**
**DEBT SERVICE**
**2016 11 16 - 2016 Rate Study Final**

| | | Budget 2016 | Forecast 2017 | Forecast 2018 | Forecast 2019 | Forecast 2020 | Forecast 2021 | Forecast 2022 | Forecast 2023 | Forecast 2024 | Forecast 2025 | Forecast 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current Debt Service** | | | | | | | | | | | | |
| Series | 2009 | $ 10,715,026 | $ 10,719,626 | $ 10,717,226 | $ 10,716,301 | $ 10,714,881 | $ 10,715,475 | $ 10,718,725 | $ 10,718,725 | $ 10,714,975 | $ 10,716,975 | $ 10,717,813 |
| Series | 2010 | 4,149,890 | 4,152,490 | 4,159,815 | 4,158,865 | 4,158,403 | 4,158,190 | 4,157,990 | 4,157,565 | 4,156,678 | 4,160,090 | 4,157,327 |
| Series | 2011 | 6,003,137 | 6,003,388 | 6,003,636 | 6,006,600 | 6,007,474 | 6,002,974 | 6,006,724 | 6,003,350 | 6,003,900 | 6,002,924 | 6,007,724 |
| Series | 2012 | 1,094,152 | 1,094,152 | 1,094,152 | 1,092,842 | 1,094,523 | 1,094,216 | 1,094,335 | 1,092,979 | 1,094,234 | 1,094,403 | 1,093,757 |
| Series | 2015 | 518,359 | 522,663 | 521,200 | 524,044 | 521,326 | 522,843 | 523,853 | 524,213 | 528,948 | 528,180 | 527,006 |
| Series | Luce Bayou | 32,701 | 40,877 | 57,227 | 105,019 | 560,852 | 585,597 | 610,006 | 622,124 | 622,009 | 686,644 | 752,546 |
| Series | Interest Subsidy | (368,763) | (368,763) | (368,763) | (368,763) | (368,763) | (368,763) | (368,763) | (368,763) | (382,215) | (395,668) | (395,668) |
| Series | 2016 * | - | 352,615 | 927,331 | 930,478 | 933,544 | 940,838 | 943,128 | 950,243 | 956,855 | 962,465 | 967,282 |
| **Future Debt Service -- Senior Lien** | | | | | | | | | | | | |
| Series | 2018 | - | - | - | 8,960,000 | 8,960,000 | 8,960,000 | 8,960,000 | 8,960,000 | 8,960,000 | 8,960,000 | 8,960,000 |
| Series | 2020 | - | - | - | - | - | 3,942,646 | 3,942,646 | 3,942,646 | 3,942,646 | 3,942,646 | 3,942,646 |
| Series | 2021 | - | - | - | - | - | - | 401,783 | 401,783 | 401,783 | 401,783 | 401,783 |
| Series | 2022 | - | - | - | - | - | - | - | 1,140,000 | 1,140,000 | 1,140,000 | 1,140,000 |
| **Future Debt Service -- Junior Lien** | | | | | | | | | | | | |
| Series | 2017 | - | - | 2,620,800 | 4,552,738 | 4,552,738 | 4,552,738 | 4,552,738 | 4,552,738 | 4,552,738 | 4,552,738 | 4,552,738 |
| Series | 2018 | - | - | - | 3,631,200 | 6,307,960 | 6,307,960 | 6,307,960 | 6,307,960 | 6,307,960 | 6,307,960 | 6,307,960 |
| Series | 2019 | - | - | - | - | 7,323,300 | 12,721,712 | 12,721,712 | 12,721,712 | 12,721,712 | 12,721,712 | 12,721,712 |
| Series | 2020 | - | - | - | - | - | 1,187,700 | 2,063,220 | 2,063,220 | 2,063,220 | 2,063,220 | 2,063,220 |
| Series | 2021 | - | - | - | - | - | - | 628,200 | 1,091,281 | 1,091,281 | 1,091,281 | 1,091,281 |
| Series | 2022 | - | - | - | - | - | - | - | 693,300 | 1,204,370 | 1,204,370 | 1,204,370 |
| **TOTAL DEBT SERVICE** | | **22,144,503** | **22,517,048** | **25,732,625** | **40,309,324** | **50,766,238** | **61,324,126** | **63,264,257** | **65,575,075** | **66,081,094** | **66,141,722** | **66,213,497** |

* Includes Series 2016A SRF and Series 2016B SWIFT Junior Lien issues

However, readers must be aware that **to the extent that additional debt is issued beyond the levels outlined in this study, it will likely result in a higher cost of service and higher rates than indicated in this study.**

Further, it should be noted that this forecast is based on the conservative assumption that all capital construction is financed through the issuance of debt. **Should the Authority begin to accrue a significant unrestricted fund balance (as will be outlined in Section III), the Authority may use a portion of this to fund capital construction.** This will reduce interest costs and debt balances, and may be beneficial to the ratepayers.

## Forecast – Total Expenses

**Table II-9** and **Chart II-10** present the Authority's total annual cash expenses, non-rate revenues and net revenue requirement to be raised from rates. As shown, the Authority's total annual net revenue requirement under the Cash Basis of ratemaking is forecast to increase from **$31,180,243** in 2016 to **$84,778,603** in 2025.

Table II-9

NORTH FORT BEND WATER AUTHORITY
FORECAST EXPENSES AND NON-RATE REVENUES

| | Operating Expenses | Cap Outlays/ Replace Reserve | Debt Service | Debt Rebates Refunds | Total Expenses | Non-Rate Revenues | Net Revenue Requirement |
|---|---|---|---|---|---|---|---|
| | | | **2016 11 16 - 2016 Rate Study Final** | | | | |
| 2016 | $ 8,589,153 | $ 1,378,123 | $ 22,144,503 | $ (365,006) | $ 31,746,773 | $ (566,530) | $ 31,180,243 |
| 2017 | 9,025,951 | 970,622 | 22,517,048 | (365,006) | 32,148,616 | (1,398,864) | 30,749,752 |
| 2018 | 11,840,536 | 1,001,626 | 25,732,625 | (365,006) | 38,209,781 | (2,133,371) | 36,076,410 |
| 2019 | 12,231,298 | 1,054,178 | 40,309,324 | (365,006) | 53,229,794 | (2,155,088) | 51,074,706 |
| 2020 | 12,658,815 | 1,109,468 | 50,766,238 | (1,941,456) | 62,593,065 | (2,176,267) | 60,416,798 |
| 2021 | 13,088,323 | 1,166,804 | 61,324,126 | (9,168,753) | 66,410,501 | (2,193,956) | 64,216,545 |
| 2022 | 13,538,188 | 1,226,940 | 63,264,257 | (8,708,181) | 69,321,204 | (2,204,867) | 67,116,337 |
| 2023 | 14,252,642 | 1,346,820 | 65,575,075 | (5,954,009) | 75,220,529 | (2,214,900) | 73,005,629 |
| 2024 | 15,146,001 | 1,510,195 | 66,081,094 | (2,014,847) | 80,722,443 | (2,221,380) | 78,501,063 |
| 2025 | 23,189,113 | 3,542,573 | 66,141,722 | (5,870,048) | 87,003,361 | (2,224,758) | 84,778,603 |

Chart II-10



North Fort Bend Water Authority
Forecast Cost of Service

**SECTION III**

# Rate Recommendations



Rate design involves determining charges for customers that will generate a desired level of revenue. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

As stated in Section I, the Authority has implemented two types of rates. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The fees are intended not only to enable the Authority to recover its total costs, but also to achieve conservation and recover operating costs. **The recommendations provided in this section are intended to promote these objectives while meeting generally accepted requirements for setting rates under the cash basis of ratemaking.**

During the course of this study, revenue requirements for several scenarios were developed and presented to the Authority for consideration. In this section, rate and fee recommendations are presented for the conservation scenario resulting from this process. Additionally, the cash flow, forecast fund balance, standard debt coverage and additional bonds test discussions are presented for this scenario.

All calculations and recommendations are based on the rate model presented in Appendix A of this rate study and financial forecast. The first several pages of the model summarize the rate recommendations while the remaining pages present the detail behind the forecast.

## Rate Recommendation

Table III-1 presents the recommended and forecast rate structure for the Authority over the period 2016– 2021. The table reveals the following:

- **It is recommended that the Authority implement a series of annual rate adjustments for its surface water and ground water rates for each of the next five years.**

- It is further recommended that the Authority continue to maintain the differential between surface and ground water fees of $0.35 per 1,000 gallons.

- By 2021, the Authority's ground water fee is recommended to be $3.95 per 1,000 gallons and its surface water fee is recommended to be $4.30 per 1,000 gallons. Rate adjustments per year are outlined in Table III-1.

- The Authority's annual revenue recovered under this rate plan is forecast to increase from **$35,681,065** in 2016 to **$67,366,136** by 2021.

- Should the Authority issue additional long-term debt beyond that outlined in this report to finance system construction, these forecast rates may be subject to significant revision.

- Finally, it should be noted that this forecast is based upon the achievement by the Authority of all the assumptions listed in the previous section. Should any of these assumptions be changed or revised, it could lead to significant changes in the forecast results outlined above.

**Table III-1**

NORTH FORT BEND WATER AUTHORITY
RATES AND RATE REVENUES

| | Ground Water GRP Rate | Surface Water Rate | Ground Water GRP Revenues | Surface Water Revenues | Total Rate Revenues |
|---|---|---|---|---|---|
| | 2016 11 16 - 2016 Rate Study Final | | | | |
| 2016 | $ 2.75 | $ 3.10 | $ 18,029,665 | $ 17,651,400 | $ 35,681,065 |
| 2017 | 3.05 | 3.40 | 22,556,009 | 18,979,267 | 41,535,275 |
| 2018 | 3.35 | 3.70 | 27,609,386 | 20,298,710 | 47,908,096 |
| 2019 | 3.65 | 4.00 | 33,471,852 | 21,996,096 | 55,467,948 |
| 2020 | 3.95 | 4.30 | 40,396,754 | 23,700,951 | 64,097,705 |
| 2021 | 3.95 | 4.30 | 43,627,289 | 23,738,848 | 67,366,136 |

SECTION 1

# Introduction

## Project Scope

The North Fort Bend Water Authority ("the Authority") engaged **Willdan Financial Services/Economists.com** to prepare a water rate study and long-term financial forecast. The purpose of this study is to calculate the economic and financial impact of the region's groundwater reduction and infrastructure construction plan on the Authority and its members.  The objective is to develop a long-term rate and financial plan that will enable the Authority to fund all its operating and capital obligations; and to ensure the Authority's continuing financial viability.

During the course of this engagement, the project team has participated in several work sessions with representatives of the Authority and its advisors.  Numerous additional telephone conferences and considerable data sharing took place during the course of this study.  At all times, the Authority and its advisors have proven to be diligent and reliable in producing the information requested by the project team.

Throughout this engagement, all interested parties were kept continuously apprised of the project team's progress.  The scope of services requested by the Authority for this update included the following:

1) Review the Authority's water system operating and capital costs for the current year and its upcoming fiscal year. Forecast these costs for a period ten years into the future, taking in to account the significant anticipated operating and capital cost changes associated with the Authority's distribution system construction requirements and future water acquired from the City of Houston.

2) Provide a recommended unit rate (i.e. fee) for ground water pumpage and surface water, for the forecast period.  This rate should ensure that sufficient revenue is recovered to properly maintain and operate the newly-constructed distribution system, service current and future debt, sustain debt and O&M reserve requirements, meet debt coverage requirements, and fund repair and replacement reserves.

3) Ensure that the recommended unit rates meet generally accepted ratemaking standards, as delineated by such organizations as the American Water Works Association and the Texas Commission on Environmental Quality.  The rates must be just and reasonable, in line with the Authority's operating and capital costs, and applied in a fair and equitable manner to all the Authority's members.

4) Develop a comprehensive rate model that calculates recommended ground and surface water rates for the current year and forecast period.

## Background on Authority



The North Fort Bend Water Authority ("The Authority") was created by the 79th Texas Legislature with the passage of Senate Bill 1798 in May 2005. The act established Chapter 8813 of the Special District Local Laws Code. As stated on the Authority's Web Site (www.nfbwa.com), the Authority's mission includes the following:

- Acquiring and providing water for residential, commercial, industrial, agricultural and other uses;

- Reducing groundwater withdrawals;

- Conserving, preserving, protecting and recharging of groundwater and of groundwater reservoirs or their subdivisions;

- Preventing waste of groundwater; and

- Controlling subsidence caused by the withdrawal of water from groundwater reservoirs.

According to its web site, the primary reason the Authority was created was to facilitate compliance with the Fort Bend Subsidence District's groundwater reduction mandates by creating a viable single entity to acquire, develop and deliver a long term supply of potable surface water to water users within the Authority's boundaries. The website further states that the mandates are intended to wean the area off its dependence on groundwater in a phased reduction plan, to minimize the risk of future subsidence, and to enable the aquifers to recharge.

The Authority and its members must meet the following goals for conversion from ground water to alternative water sources:

- **30%** overall reduction in groundwater usage immediately

- **60%** overall reduction in groundwater usage by 2025

The Authority has an existing long-term water supply contract with the City of Houston (see Section III of this report for the financial implications of this contract on the Authority and its members). Further, the Authority has commenced construction of an extensive transmission line infrastructure system throughout its boundaries to distribute the surface water it acquires from Houston to replace members' groundwater sources.

SECTION III

# Rate Recommendations



Rate design involves determining charges for customers that will generate a desired level of revenue. The rates (i.e. user fees) developed in this section are designed to recover the revenue requirements presented for the test year and generate revenues that fund the operating and capital cost obligations of the Authority.

As stated in Section I, the Authority has implemented two types of rates. The first type is the groundwater reduction plan fee ("GRP Fee") for water and pumpage, and the second is a charge for surface water delivered to the member. The fees are intended not only to enable the Authority to recover its total costs, but also to achieve conservation and recover operating costs. **The recommendations provided in this section are intended to promote these objectives while meeting generally accepted requirements for setting rates under the cash basis of ratemaking.**

During the course of this study, revenue requirements for several scenarios were developed and presented to the Authority for consideration. In this section, rate and fee recommendations are presented for the conservation scenario resulting from this process. Additionally, the cash flow, forecast fund balance, standard debt coverage and additional bonds test discussions are presented for this scenario.

All calculations and recommendations are based on the rate model presented in Appendix A of this rate study and financial forecast. The first several pages of the model summarize the rate recommendations while the remaining pages present the detail behind the forecast.

# Tab 4

NFBWA Response to Fulshear's Second RFI (AR 99)

| | | |
|---|---|---|
| PETITION BY THE CITY OF | § | BEFORE THE PUBLIC UTILITY |
| FULSHEAR APPEALING THE | § | |
| DECISION OF NORTH FORT BEND | § | COMMISSION OF TEXAS |
| WATER AUTHORITY AFFECTING | § | |
| THE AMOUNT PAID FOR WATER | § | |
| SERVICE | § | |

## NORTH FORT BEND WATER AUTHORITY'S RESPONSE TO CITY OF FULSHEAR'S SECOND REQUEST FOR INFORMATION

To:   City of Fulshear, by and through its attorney of record, C. Joe Freeland, Mathews and Freeland, LLP, 8140 N. Mopac Expy., Suite 4-240, Austin, Texas 78759.

North Fort Bend Water Authority ("NFBWA" or "Authority") serves this response to the City of Fulshear's Second Request for Information.

On October 21, 2022, the City of Fulshear ("Fulshear") served it Second Request for Information on NFBWA. On October 31, 2022, NFBWA filed objection to Fulshear's Second Request for Information, and on November 7, 2022, Fulshear filed a motion to compel NFBWA to respond to its discovery. Thereafter, on November 14, 2022, NFBWA filed its Response to Fulshear's Motion to Compel, stating that, as to Requests for Information ("RFIs") Fulshear 2-1, 2-2, 2-3, 2-5, 2-6, 2-7, 2-8 and 2-9, NFBWA had decided to not oppose Fulshear's assertion that information requested is relevant to this proceeding, and that NFBWA would file a response with respect to those RFIs by no later than December 12, 2022.[1] Accordingly, this response is timely.

Pursuant to 16 Tex. Admin. Code § 22.144(c)(2)(F), NFBWA stipulates that its responses may be treated by all parties as if they were made under oath.

---

[1] Since filing its Response to Fulshear's Motion to Compel, NFBWA has also decided to not oppose Fulshear's assertion that information requested by RFI Fulshear 2-4 is relevant to this proceeding, and that NFBWA would file a response with respect to that RFI as well.

NFBWA reserves the right to supplement, amend, or modify the responses and objections stated herein. A response to any request is not a waiver of that right or of any objection raised herein.

Respectfully submitted,

KEMP SMITH LLP
2905 San Gabriel Street, Suite 205
Austin, Texas 78705
(512) 320-5466
(512) 320-5431 (fax)

By: _____
ANDREW S. "DREW" MILLER
State Bar No. 00786857
Drew.Miller@Kempsmith.com
SERGIO M. ESTRADA
State Bar No. 24080886
Sergio.Estrada@kempsmith.com
ANCEL ESCOBAR
Ancel.Escobar@kempsmith.com
State Bar No. 24101171

**ATTORNEYS FOR NORTH FORT
BEND WATER AUTHORITY**

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing document via electronic mail to counsel of record in this proceeding on this the 12th of December, 2022:

_____
Andrew S. "Drew" Miller

2

**Fulshear 2-1:**   Admit or deny.  Authority is the permittee on the permits issued by the Fort Bend Subsidence District authorizing withdrawals of groundwater from Fulshear's water well . If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response, and produce all permits issued by Fort Bend Subsidence District to Authority.

**Response:**   **NFBWA is listed as the permittee on the permits issued by the Fort Bend Subsidence District ("FBSD") authorizing withdrawals of groundwater from Fulshear's wells. The permits make clear, however, that Fulshear is the owner of the wells that are the subject of each of those permits.**

**Documents:   Permits Issued by FBSD (copy attached at Tab A) (NFBWA000267-NFBWA000867)**

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE


**Fulshear 2-2:**   Admit or deny.  Authority is the permittee on all of the water well permits issued by the Fort Bend Subsidence District to participants in the Authority's Groundwater Reduction Plan. If your response is anything other than an unqualified admit, provide a detailed  explanation of your response, including all documents that support the response

**Response:**   **NFBWA is listed as the permittee on permits issued by FBSD to participants in NFBWA's GRP. The permits make clear, however, that the respective GRP participants are the owners of the wells that are the subject of each of those permits.**

**Documents:  Permits produced in response to Fulshear 2-1**

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE


**Fulshear 2-3:**   Admit or deny.  Fulshear is obligated to pay the Authority for all water produced from Fulshear's water wells. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:**   **NFBWA denies that Fulshear is obligated to pay the Authority for all water produced from Fulshear's water wells. Fulshear pays NFBWA a GRP Fee which is based on monthly pumpage of groundwater by Fulshear. Fulshear does not pay NFBWA for the water produced from Fulshear's water wells.**

3

**Documents: North Fort Bend Water Authority Groundwater Reduction Plan (March 2008) (with appendices) (copy previously provided in response to discovery as NFBWA000001–NFBWA000266); North Fort Bend Water Authority Amended Rate Order (Dec. 16, 2021) ("Amended Rate Order") (cop included with Fulshear's Original Petition); Chapter 8813, Special District Local Laws Code.**

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 2-4**   Admit or deny. Authority's water transmission pipelines are sized to include Fulshear's projected future demands for water. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:**   **NFBWA denies that its water transmission pipelines are sized to include Fulshear's total future demand for water. Although NFBWA intends to provide surface water to Fulshear in the future, Fulshear will likely continue to pump groundwater to meet a portion of its water needs. NFBWA's water transmission pipelines will be sized in such a way that they will be able to transport water to Fulshear. However, no existing pipelines or other facilities are currently committed to serving Fulshear.**

**Documents: North Fort Bend Water Authority Groundwater Reduction Plan (March 2008); NFBWA Minimum Well Capacity Policy (copy attached at Tab B) (NFBWA000868-NFBWA000870); Spreadsheet (copy attached at Tab C) (NFBW000871-NFBWA000877).**

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 2-5:**   Explain the basis for the methodology used by the Authority in establishing the GRP Fee as set out in the Authority's Amended Rate Order adopted on December 16, 2021.

**Response:**   **NFBWA utilized the Cash Basis of ratemaking to develop the GRP Fee set out in NFBWA's Amended Rate Order. The Cash Basis is defined in the American Water Works Association Manual M-1, and is the methodology employed by thousands of publicly-owned utilities across the USA. Under the Cash Basis, system revenue requirements consist of operating expenses, capital outlays, and debt principal and interest payments.**

4

Preparer: Andrew S. "Drew" Miller
Sponsor: Dan Jackson


**Fulshear 2-6**: Explain the basis for the methodology used by the Authority in establishing the Imported Water Fee as set out in the Authority's Amended Rate Order adopted on December 16, 2021.

**Response:** **The Imported Water Fee is (i) equal to the current GRP Fee applied on all Imported Water if the Water Importer is not a Converted Customer; or (ii) equal to the current Surface Water Fee applied on all Imported Water, if the Water Importer is a Converted Customer.**

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE


**Fulshear 2-7**: Explain the basis for the methodology used by the Authority in establishing the Surface Water Fee as set out in the Authority's Amended Rate Order adopted on December 16, 2021.

**Response:** **NFBWA utilized the Cash Basis of ratemaking to develop the Surface Water Fee set out in NFBWA's Amended Rate Order. The Cash Basis is defined in the American Water Works Association Manual M-1, and is the methodology employed by thousands of publicly-owned utilities across the USA. Under the Cash Basis, system revenue requirements consist of operating expenses, capital outlays and debt principal and interest payments.**

Preparer: Andrew S. "Drew" Miller
Sponsor: Dan Jackson


**Fulshear 2-8**: Describe all components of the Authority's surface water supply system, including the joint Surface Water Supply project with West Harris County Regional Water Authority that were designed, in whole or in part, to meet Fulshear's projected water demands.

**Response**: **The following components of NFBWA's system are expected to be used (in the future) to supply Fulshear with surface water:**

**Existing:**
   **- Over 50 miles of 8-inch to 48-inch surface water transmission line;**
   **- 40 MGD Bellaire Pump Station; and**

> - Luce Bayou Interbasin Transfer Project (a regional project that NFBWA is a partner in consisting of a pump station, 3 miles of dual 96-inch line and 23 miles of canal).
>
> **Under design or construction:**
> - **Northeast Water Purification Plant Expansion (a regional project that NFBWA is a partner in that will increase this plant's capacity from 80 MGD to 400 MGD);**
> - **Surface Water Supply Project (a regional project that NFBWA is partnering with West Harris County Regional Water Authority on consisting of over 54 miles of 42-inch to 96-inch water line and two pump stations).**
> - **½ mile of 30-inch, 2 miles of 16-inch, 1.5 miles of 36-inch waterline for NFBWA's internal transmission system**
>
> **Future:**
> - **Approximately 26 miles of 12-inch to 60-inch waterline for NFBWA's internal transmission system.**

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE


**Fulshear 2-9:** Provide copies of documents concerning the Authority's current plan for meeting the Fort Bend Subsidence District's District Regulatory Plan requirements for reductions in groundwater withdrawals by Groundwater Reduction Plan participants, including documents showing estimated surface water availability dates for Groundwater Reduction Plan participants

**Response:** **North Fort Bend Water Authority Groundwater Reduction Plan (March 2008); Map entitled: North Fort Bend Water Authority System (August 2022) (copy attached at Tab D) (NFBWA000878); NFBWA 2025 System Schedule (copy attached at Tab E) (NFBWA000879-000866).**

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

# Tab 5

NFBWA Response to Fulshear's First RFI (AR 98)

| | | |
|---|---|---|
| PETITION BY THE CITY OF | § | BEFORE THE PUBLIC UTILITY |
| FULSHEAR APPEALING THE | § | |
| DECISION OF NORTH FORT BEND | § | COMMISSION OF TEXAS |
| WATER AUTHORITY AFFECTING | § | |
| THE AMOUNT PAID FOR WATER | § | |
| SERVICE | § | |

## NORTH FORT BEND WATER AUTHORITY'S RESPONSE TO CITY OF FULSHEAR'S FIRST REQUEST FOR INFORMATION

To:   City of Fulshear, by and through its attorney of record, C. Joe Freeland, Mathews and Freeland, LLP, 8140 N. Mopac Expy., Suite 4-240, Austin, Texas 78759.

North Fort Bend Water Authority ("NFBWA" or "Authority") serves this response to the City of Fulshear's First Request for Information.

On August 29, 2022, the City of Fulshear served it First Request for Information on NFBWA. As set forth in a notice filed in this docket on September 16, 2022, the deadline for responding to this request was extended from September 19, 2022, to October 3, 2022. Accordingly, this response is timely.

Pursuant to 16 Tex. Admin. Code § 22.144(c)(2)(F), NFBWA stipulates that its responses may be treated by all parties as if they were made under oath.

NFBWA reserves the right to supplement, amend, or modify the responses and objections stated herein. A response to any request is not a waiver of that right or of any objection raised herein.

Respectfully submitted,

KEMP SMITH LLP
2905 San Gabriel Street, Suite 205
Austin, Texas 78705
(512) 320-5466
(512) 320-5431 (fax)

42T614204

By: _____
     ANDREW S. "DREW" MILLER
     State Bar No. 00786857
     Drew.Miller@Kempsmith.com
     SERGIO M. ESTRADA
     State Bar No. 24080886
     Sergio.Estrada@kempsmith.com
     AMY RODRIGUEZ
     State Bar No. 24103107

**ATTORNEYS FOR NORTH FORT
BEND WATER AUTHORITY**

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a true and correct copy of the foregoing document via

electronic mail to following on this the 3rd of October, 2022:

C. Joe Freeland
jfreeland@mandf.com
Benjamin Matthews
bmatthews@mandf.com
**Mathews & Freeland, LLP**
8140 N. MoPac Expy, Ste. 4-240
Austin, Texas 78759
Tel. 512-404-7800
Fax 512-703-2785

_____
     Andrew S. "Drew" Miller

Page 2 of 8

42T614204

## RESPONSES

**Fulshear 1-1:** Admit or deny. Authority is a retail public utility under TWC § 13.002(19) and 16 TAC § 24.3(31). If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:** NFBWA denies that it is a retail public utility. The utility does not provide water to any ultimate consumers.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 1-2:** Admit or deny. Authority furnishes potable water for compensation. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:** NFBWA objects to this Request for Information ("RFI") on the ground of relevance. Subject to and without waiving that objection, NFBWA admits that it furnishes potable water for compensation.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 1-3:** Admit or deny. Authority furnishes raw water for compensation. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:** NFBWA objects to this RFI on the ground of relevance. Subject to and without waiving that objection, the Authority denies that it furnishes raw water for compensation. NFBWA provides treated water. *See* North Fort Bend Water Authority Groundwater Reduction Plan (March 2008) (copy provided with this response – NFBWA000001-000265). NFBWA also provides reclaimed water to certain water utilities. *See id.*

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 1-4:** Admit or deny. Authority has provided for the conservation, preservation, protection, recharge, or prevention of waste of groundwater, or for the reduction of groundwater withdrawals as necessary to develop, implement, and enforce its groundwater reduction plan. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

42T614204

**Response:**    NFBWA objects to the compound and confusing nature of this Request for Information. Subject to and without waiving that objection, NFBWA admits that it encourages and promotes (and thus provides for) the conservation, preservation, protection, recharge, and prevention of waste of groundwater, and the reduction of groundwater withdrawals as necessary to implement its groundwater reduction plan.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE


**Fulshear 1-5:**    If you admit to Fulshear 1-4. Admit or deny. Authority's actions in providing for the conservation, preservation, protection, recharge, or prevention of waste of groundwater, or for the reduction of groundwater withdrawals as necessary to develop, implement, and enforce its groundwater reduction plan, amount to the provision of water service under chapter 13 of the Texas Water Code. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:**    NFBWA denies that its actions referenced in its response to RFI Fulshear 1-4 amount to the provision of water service under Chapter 13 of the Texas Water Code. The provision of water service under Chapter 13 would involve the actual providing of water.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE


**Fulshear 1-6:**    Admit or deny. Authority has acquired or developed surface water and groundwater supplies from sources inside or outside its boundaries, or conserved, stored, transported, treated, purified, sold, or delivered water to or among persons inside and outside its boundaries, or allocated water among persons participating in Authority's groundwater reduction plan whether they are located inside or outside of its boundaries.

**Response:**    NFBWA objects to the compound nature of this RFI. Subject to and without waiving those objections, NFBWA admits that it has: acquired surface water supplies from sources outside its boundaries; stored, transported, treated, sold or delivered water to persons inside its boundaries; and allocated water among certain persons participating in NFBWA's groundwater reduction plan inside its boundaries.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

42T614204

**Fulshear 1-7**:   If you admit to Fulshear 1-6. Admit or deny. Authority's actions in acquiring or developing surface water and groundwater supplies from sources inside or outside its boundaries, or conserving, storing, transporting, treating, purifying, selling, or delivering water to or among persons inside and outside its boundaries, or allocating water among persons participating in Authority's groundwater reduction plan, amounts to the provision of water service under chapter 13 of the Texas Water Code. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response**:   NFBWA admits that its sale and delivery of water to persons inside of its boundaries amount to the provision of water service. NFBWA denies that any other actions that it has taken amount to the provision of water service.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 1-8**:   Admit or deny. Authority is a political subdivision of the State of Texas under TWC § 12.013. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response**:   NFBWA objects to this RFI on the grounds of relevance. Subject to and without waiving that objection, NFBWA admits that it is a political subdivision of the State of Texas.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 1-9:**   Admit or deny. Authority furnishes water to Fulshear on a wholesale basis under TWC § 12.013(d). If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response**:   NFBWA objects to this RFI on the grounds of relevance. Subject to and without waiving that objection, NFBWA, denies that it furnishes water to Fulshear on a wholesale basis under TWC § 12.013(d).

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

42T614204

**Fulshear 1-10:** Admit or deny. Fulshear receives water service under TWC § 13.043(f) from Authority. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:** NFBWA denies that Fulshear receives water service under TWC 13.043(f) from the Authority. *See* List of Water Service Recipients (copy provided with this response – NFBWA000266).

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 1-11:** Admit or deny. Authority's decision on December 16, 2021, to increase its groundwater reduction-plan and surface-water fees affected the amount Fulshear pays for water service. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:** NFBWA denies that its decision on December 16, 2021, to increase its groundwater reduction-plan and surface-water fees affected the amount Fulshear pays for water service. Because Fulshear does not receive water service from NFBWA, NFBWA's decision on December 16, 2021 did not affect any amount Fulshear pays for its water service. *See* List of Water Service Recipients.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 1-12:** Admit or deny. Fulshear filed its petition initiating this appeal within 90 days of the date it received notice of Authority's December 16, 2021 rate decision. If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:** NFBWA admits that Fulshear initiated this appeal within 90 days of the date that Fulshear received notice of NFBWA's December 16, 2021 decision.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

**Fulshear 1-13:** List all of the services and goods provided by Authority to Fulshear in exchange for Fulshear paying the Groundwater Reduction Plan fee.

**Response:** NFBWA does not provide any services or goods to Fulshear, in exchange for Fulshear paying the Groundwater Reduction Plan fee. That said, a benefit that

42T614204

Fulshear receives from paying the Groundwater Reduction Plan fee is that by doing so, Fulshear is able to meet the alternative water conversion requirements of the Fort Bend Subsidence District ("FBSD") and this avoid the imposition of disincentive fees by FBSD. *See* North Fort Bend Water Authority Groundwater Reduction Plan (March 2008).

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE


**Fulshear 1-14:** List all users or customers to whom the Authority provides wholesale or retail water services and indicate the service provided to each.

**Response:** NFBWA provides wholesale water service to:

Big Oaks Municipal Utility District
Cinco Southwest Municipal Utility District No. 1
Cinco Southwest Municipal Utility District No. 2
Cinco Southwest Municipal Utility District No. 3
Cinco Southwest Municipal Utility District No. 4
Fort Bend County Fresh Water Supply District No. 2
Fort Bend County Irrigation District No. 24
Fort Bend County Municipal Utility District No. 002
Fort Bend County Municipal Utility District No. 030
Fort Bend County Municipal Utility District No. 034
Fort Bend County Municipal Utility District No. 035
Fort Bend County Municipal Utility District No. 041
Fort Bend County Municipal Utility District No. 050
Fort Bend County Municipal Utility District No. 057
Fort Bend County Municipal Utility District No. 058
Fort Bend County Municipal Utility District No. 118
Fort Bend County Municipal Utility District No. 119
Fort Bend County Municipal Utility District No. 122
Fort Bend County Municipal Utility District No. 123
Fort Bend County Municipal Utility District No. 132
Fort Bend County Municipal Utility District No. 133
Fort Bend County Municipal Utility District No. 134A
Fort Bend County Municipal Utility District No. 134B
Fort Bend County Municipal Utility District No. 134C
Fort Bend County Municipal Utility District No. 142
Fort Bend County Municipal Utility District No. 143
Fort Bend County Municipal Utility District No. 146
Fort Bend County Municipal Utility District No. 156
Fort Bend County Municipal Utility District No. 165
Fort Bend County Municipal Utility District No. 190
Fort Bend County Municipal Utility District No. 194

42T614204

Fort Bend County Municipal Utility District No. 206
Grand Lakes Municipal Utility District No. 1
Grand Lakes Municipal Utility District No. 2
Grand Lakes Municipal Utility District No. 4
Grand Mission Municipal Utility District No. 1
Grand Mission Municipal Utility District No. 2
Kingsbridge Municipal Utility District
North Mission Glen Municipal Utility District

NFBWA does not provide retail water service.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE


**Fulshear 1-15:** Explain when Fulshear will be required to connect to Authority's surface water system and the process for such connection.

**Response:** It is not clear when (or whether) Fulshear will be required to connect to NFBWA's surface water system.

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE


**Fulshear 1-16:** Admit or deny. Revenues received by Authority from the Surface Water Fee are less than the costs incurred by Authority in providing surface water to Converted Customers (as that term is used in Authority's 2022 Rate Order). If your response is anything other than an unqualified admit, provide a detailed explanation of your response, including all documents that support the response.

**Response:** NFBWA admits that revenues received by NFBWA from its Surface Water Fee alone are less than the total costs (which include bond coverage) that will be incurred by NFBWA in providing surface water to Converted Customers (as that term is used in NFBWA's 2022 Rate Order).

Preparer: Andrew S. "Drew" Miller
Sponsor: Matt Froehlich, PE

42T614204

# Tab 6

NFBWA Financial Report 12-31-2021 (AR 103)

# NORTH FORT BEND WATER AUTHORITY

# FORT BEND COUNTY, TEXAS

# FINANCIAL REPORT

## December 31, 2021

# Table of Contents

**Page**

Independent Auditor's Report                                                  1

Management's Discussion and Analysis                                          7

**BASIC FINANCIAL STATEMENTS**
Statement of Net Position                                                    14
Statement of Revenues, Expenses and Changes in Net Position                  15
Statement of Cash Flows                                                      16
Notes to Financial Statements                                               17

**SUPPLEMENTARY INFORMATION**
Schedule of Expenditures of Federal Awards                                   41
Notes to Schedule of Expenditures of Federal Awards                          42

**SINGLE AUDIT SECTION**
Independent Auditor's Report on Internal Control Over Financial Reporting     45
    and on Compliance and Other Matters Based on an Audit of Financial
    Statements Performed in Accordance with *Government Auditing Standards*
Independent Auditor's Report on Compliance for Each Major Federal             47
    Program and on Internal Control Over Compliance Required by the
    Uniform Guidance
Schedule of Findings and Questioned Costs
    I.    Summary of Auditor's Reports                                 50
    II.   Financial Statement Findings                                 51
    III.  Federal Award Findings and Questioned Costs                  51

December 31, 2021, the Authority has sold $825,840,000 in bonds to TWDB, of which $33,975,000 was sold during the current fiscal year.

The Authority has established a short-term note purchase program to address timing differences between the Authority's obligations to the City of Houston (see Note 13), financing approved by the TWDB, and planned open market bond financing. This program permits the Authority to enter into note purchase agreements secured by liens on future bond proceeds or other available funds in an aggregate amount not to exceed $150,000,000. The notes are issued in increments of $100,000 with maturity dates of less than 364 days. Interest rates are calculated as 70% of LIBOR plus an additional percentage based on the Authority's underlying credit rating. As of December 31, 2021, the Authority does not have any outstanding revenue notes. See Note 6 for additional information.

Total long-term obligations as of December 31, 2021, and 2020, are as follows:

| | 2021 | 2020 |
|---|---|---|
| Revenue Bonds | | |
| Water System Revenue Bonds, Series 2011 | $ 3,075,000 | $ 66,425,000 |
| Water System Junior Lien Revenue Bonds, Series 2015 | 6,355,000 | 6,750,000 |
| Water System Junior Lien Revenue Bonds, Series 2016A | 8,045,000 | 8,395,000 |
| Water System Junior Lien Revenue Bonds, Series 2016B | 9,865,000 | 10,160,000 |
| Water System Junior Lien Revenue Bonds, Series 2017 | 87,360,000 | 87,360,000 |
| Water System Junior Lien Revenue Bonds, Series 2018A | 1,890,000 | 1,980,000 |
| Water System Junior Lien Revenue Bonds, Series 2018B | 120,040,000 | 120,540,000 |
| Water System Revenue Bonds, Series 2018C | 67,845,000 | 68,345,000 |
| Water System Revenue and Revenue Refunding Bonds, Series 2019A | 168,625,000 | 168,625,000 |
| Water System Junior Lien Revenue Bonds, Series 2019B | 240,110,000 | 242,110,000 |
| Water System Revenue Bonds, Series 2019C | 53,660,000 | 55,205,000 |
| Water System Junior Lien Revenue Bonds, Series 2020 | 38,530,000 | 39,590,000 |
| Water System Revenue Bonds, Series 2020A | 139,290,000 | 143,125,000 |
| Water System Revenue Refunding Bonds, Series 2020B | 38,950,000 | 41,530,000 |
| Water System Revenue and Revenue Refunding Bonds, Series 2021 | 115,335,000 | |
| Water System Junior Lien Revenue Bonds, Series 2021A | 20,940,000 | |
| Water System Revenue Bonds, Series 2021B | 13,035,000 | |
| Unamortized premium | 44,417,905 | 25,065,135 |
| Subtotal Revenue Bonds | 1,177,367,905 | 1,085,205,135 |
| Share of Water Infrastructure Fund Bonds, Series 2012 | 10,044,130 | 10,989,275 |
| Capital Contributions | 2,066,559 | 2,158,988 |
| Total long term obligations | $ 1,189,478,594 | $ 1,098,353,398 |

The Water Infrastructure Fund Bonds, Series 2012 in the preceding table are for the Authority's pro rata share of annual debt service on bonds issued by West Harris County Regional Water Authority

**North Fort Bend Water Authority**
**Statement of Net Position**
**December 31, 2021**

**Assets**
  **Current assets**

| | | |
|---|---|---|
| Cash | $ | 1,050,400 |
| Investments | | 37,981,348 |
| Accounts receivable | | 8,263,564 |
| Other receivables | | 1,510,888 |
| Accrued interest receivable | | 46,515 |
| Prepaid expenses | | 20,500 |
| Operating reserve - joint facilities | | 8,585 |
| **Total current assets** | | 48,881,800 |
| **Noncurrent assets** | | |
| Restricted cash | | 1,093,330 |
| Restricted investments | | 515,372,092 |
| Water conservation credits | | 1,133,660 |
| Capital assets | | |
|   Land, easements and rights-of- way | | 115,723,301 |
|   Construction in progress | | 183,261,831 |
|   Capital assets, net | | 423,411,848 |
| **Total noncurrent assets** | | 1,239,996,062 |
| **Total assets** | | 1,288,877,862 |

**Deferred Outflows of Resources**

| | | |
|---|---|---|
| Deferred difference on refunding | | 3,712,014 |

**Liabilities**
  **Current liabilities**

| | | |
|---|---|---|
| Accounts payable | | 1,185,460 |
| Retainage payable from restricted assets | | 523,758 |
| Accrued interest payable | | 1,465,509 |
| Capital contributions, due within one year | | 97,270 |
| Joint facilities WIF bonds share obligation, due within one year | | 951,880 |
| Bonds payable, due within one year | | 17,535,000 |
| **Total current liabilities** | | 21,758,877 |
| **Noncurrent liabilities** | | |
| Capital contributions, due in more than one year | | 1,969,289 |
| Joint facilities WIF bonds share obligation, due in more than one year | | 9,092,250 |
| Bonds payable, due in more than one year | | 1,159,832,905 |
| Total noncurrent liabilities | | 1,170,894,444 |
| **Total liabilities** | | 1,192,653,321 |

**Net position**

| | | |
|---|---|---|
| Net investment in capital assets | | (30,624,484) |
| Restricted for debt service | | 75,340,902 |
| Restricted  for water conservation credits | | 1,133,660 |
| Restricted for operations and maintenance reserve per bond resolutions | | 1,849,260 |
| Unrestricted | | 52,237,217 |
| **Total net position** | $ | 99,936,555 |

See Notes to Financial Statements.

**North Fort Bend Water Authority**
**Statement of Revenues, Expenses and Changes in Net Position**
**For the Year Ended December 31, 2021**

| | | |
|---|---|---:|
| **Operating revenues** | | |
| Pumpage fees | $ | 33,149,315 |
| Surface water | | 25,755,547 |
| Other | | 748,747 |
| Total operating revenues | | 59,653,609 |
| | | |
| **Operating expenses** | | |
| Professional fees | | 1,955,773 |
| Contracted services | | 1,171,610 |
| Operations and maintenance | | 2,469,367 |
| Purchased water | | 3,630,240 |
| Water conservation program | | 1,061,483 |
| Depreciation and amortization | | 8,816,823 |
| Other | | 1,065,255 |
| Total operating expenses | | 20,170,551 |
| Net operating income | | 39,483,058 |
| | | |
| **Non-operating revenues (expenses)** | | |
| Investment income | | 777,775 |
| Build America Bonds rebate | | 2,073 |
| Debt issuance costs | | (2,319,847) |
| Professional fees | | (488,596) |
| Interest expense | | (29,201,597) |
| Luce Bayou debt service contribution | | (1,126,150) |
| Other | | (647,823) |
| **Net non-operating expense** | | (33,004,165) |
| | | |
| **Change in net position** | | 6,478,893 |
| | | |
| **Beginning net position** | | 93,457,662 |
| **Ending net position** | $ | 99,936,555 |

See Notes to Financial Statements.

***North Fort Bend Water Authority***
***Statement of Cash Flows***
***For the Year Ended December 31, 2021***

**Cash flows from operating activities**

| | | |
|---|---|---:|
| Receipts from participants | $ | 57,429,067 |
| Payments to contractors and vendors | | (9,809,284) |
| Net cash provided by operating activities | | 47,619,783 |

**Cash flows from capital and related financing activities**

| | |
|---|---:|
| Paid for acquisition and construction of capital assets | (252,714,018) |
| Payment of interest on bonds | (31,489,676) |
| Payment of bond principal | (16,075,000) |
| Payment of WIF bond share obligation | (1,068,404) |
| Build America Bonds interest rebate | 2,073 |
| Net bond proceeds | 110,653,660 |
| Payments to contractors and vendors | (787,152) |
| Paid to City of Houston for Luce Bayou debt service | (1,126,150) |
| Revenue note payment | (1,000,000) |
| Debt issuance costs | (2,319,847) |
| Net cash used by capital and related financing activities | (195,924,514) |

**Cash flows from investing activities**

| | |
|---|---:|
| Interest received | 1,007,179 |
| Purchases of investment securities | (221,839,590) |
| Receipts from investment maturities | 231,000,000 |
| Net cash provided by investing activities | 10,167,589 |
| | |
| Net decrease in cash and cash equivalents | (138,137,142) |
| **Cash and cash equivalents - beginning of year** | 616,217,804 |
| **Cash and cash equivalents - end of year** | $ 478,080,662 |

**Reconciliation of operating income to net cash provided by operating activities:**

| | | |
|---|---|---:|
| Operating income | $ | 39,483,058 |
| Adjustments to reconcile operating income to net cash used by operating activities: | | |
| Depreciation and amortization expense | | 8,816,823 |
| Non-cash revenue from capital contribution credits | | (200,280) |
| Change in assets and liabilities: | | |
| Increase in accounts receivable | | (169,984) |
| Increase in prepaid expense | | (20,500) |
| Decrease in accounts payable | | (289,334) |
| Total adjustments | | 8,136,725 |
| **Net cash provided by operating activities** | $ | 47,619,783 |

**Cash and cash equivalents per Statement of Net Position:**

| | | |
|---|---|---:|
| Cash | $ | 1,050,400 |
| Cash Equivalents Reported as Investments | | 37,981,348 |
| Restricted Cash | | 1,093,330 |
| Cash Equivalents Reported as Restricted Investments | | 437,955,584 |
| | $ | 478,080,662 |

**Noncash capital and related financing activities**

The Authority issued refunding bonds. Payment of $61,830,920 was remitted to the bond escrow account directly from bond proceeds and related premium.

See Notes to Financial Statements.

# Tab 7

Affidavit of Nelisa Heddin (AR 108)

| | | |
|---|---|---|
| PETITION BY THE CITY OF | § | BEFORE THE STATE OFFICE |
| FULSHEAR APPEALING THE | § | |
| DECISION OF NORTH FORT BEND | § | OF |
| WATER AUTHORITY TO INCREASE | § | |
| GROUNDWATER REDUCTION PLAN | § | ADMINISTRATIVE HEARINGS |
| AND SURFACE WATER FEES | § | |

## AFFIDAVIT OF NELISA HEDDIN

STATE OF TEXAS     )
COUNTY OF FORT BEND  )

BEFORE ME, the undersigned authority, on this day personally appeared Nelisa Heddin who, after being duly sworn on his oath, said and deposed as follows:

1.    My name is Nelisa Heddin. I am over 21 years of age, of sound mind, and in all respects qualified to make this affidavit. I have personal knowledge of the facts stated in this affidavit.

2.    I have over 23 years of experience in management consulting for water utilities in the state of Texas. During that time I have performed cost of service and rate design studies for water, wastewater, solid waste, and electric utilities throughout the country.

3.    I am very familiar with the utility regulatory provisions of Chapter 13 of the Texas Water Code. I have prepared rate change applications for water and sewer utilities, and I have provided expert testimony for both utilities and ratepayers in numerous contested rate case proceedings.

4.    I have specific and relevant experience with Groundwater Reduction Plans (GRPs) in Fort Bend County, including experience with GRP pumpage fees and surface water fees. I assisted the City of Missouri City in the development of a plan to assist the city and over 20 municipal utility districts within the Missouri City corporate limits and ETJ to meet the ground water reduction requirements of the Fort Bend Subsidence District (FBSD), including the development of their GRP fees.

5.    I have reviewed the pleadings in PUC Docket No. 53363, including the City of Fulshear's appeal, the discovery responses provided by Fulshear and North Fort Bend Water Authority (NFBWA), and NFBWA's Motion to Dismiss.

6.    Based on my review of the docket and the applicable statutes and rules, it is my opinion that Fulshear receives "water service," as that term is used in Texas Water Code § 13.043(f), from NFBWA and that the GRP Fee charged by the North Fort Bend Water Authority is a "rate" as defined in Texas Water Code § 13.002(17).

7.    GRPs are used in Fort Bend County to allow a group of well owners to collectively comply with the groundwater pumping reductions required by FBSD, which require well owners to ultimately reduce and maintain their groundwater withdrawals to comprise of no more

than 40% of the total water demand by 2027. Because of the high cost of water treatment and transmission of treated water, GRPs allow for a cost-effective means to achieve groundwater reduction by fully converting some GRP Participants from groundwater to surface water (usually those located closest to the surface water source), while allowing other GRP Participants to continue to use only groundwater, to collectively reduce pumping to no more than 40% of total demand. To make this GRP cost equitable, all of the GRP Participants pay for all of the costs of the GRP, even if the participant is not receiving the expensive surface water. Without the sharing of costs, GRPs would not be practical because the GRP Participants receiving water would pay high rates for surface water while the those that continued to use wells would pay essentially nothing.

8.   Under a GRP, one entity serves as the managing entity that is responsible for providing all GRP Participants with an alternative source of water (other than groundwater) and ensuring that all GRP Participants meet FBSD's regulatory requirements. To accomplish this role, the managing entity takes control over all water supplies used by the GRP Participants and constructs and operates the surface water supply and transmission system used to provide the GRP Participants with the alternative source of water. The managing entity becomes the exclusive provider of water to the GRP Participants, who cannot obtain water from any source without having to pay the managing entity for the water. Also, the managing entity decides when GRP Participants will be converted from groundwater to surface water. A GRP Plan is commitment from the managing entity that it will provide water service to the GRP Participants sufficient to allow the participants to meet FBSD's requirements.

9.   NFBWA is the managing entity for the GRP that includes Fulshear and the other participants within the NFBWA's boundaries. NFBWA provides water service to Fulshear and to all of the other GRP Participants. NFBWA is the permittee on Fulshear's wells and NFBWA is constructing a surface water transmission system to convert Fulshear from groundwater to surface water. Fulshear and all of the other GRP Participants have to pay NFBWA for water service regardless of the source of the water – groundwater, surface water, or imported water. Through the GRP, NFBWA is committing its infrastructure and water contracts to provide the GRP Participants with sufficient water service to meet FBSD's pumping reduction requirements.

10.   NFBWA acknowledges that it is providing water service to the GRP Participants collectively. As NFBWA explains in its responses to discovery requests, the GRP Fee and the Surface Water Fee were determined using the American Water Works Association Manual M-1 (M-1 Manual). The M-1 Manual states that "cost-based rates that generate revenue from each class of customer in proportion to the cost to serve each class of customer. Water rates are considered fair and equitable when each customer class pays the costs allocated to the class and thus cross-class subsidies are avoided." The Manual further states that a typical objective in establishing cost-based rates is "Fairness in the apportionment of total costs of service among the different ratepayers." NFBWA admits that it relied on the M-1 Manual for establishing its rates, including the same costs, to set the GRP Fee and the Surface Water Fee. This clearly demonstrates that the "water service" received by the GRP Participants paying the GRP Fee is essentially the same as the "water service" received by the participants paying the Surface Water Fee. The only difference in the rates is that the GRP Fee is reduced slightly to account for well costs borne by those GRP Participants that have not been converted to surface water.

11.     NFBWA also acknowledges that the GRP Fee is for the "sale of water." NFBWA's GRP, clearly identifies revenues from both the GRP Fee and Surface Water Fee as "TOTAL ANNUAL REVENUE from Sale of Water" emphasis added (Table 13, Page 34). Additionally, the billing determinant for NFBWA "fees" also are based on 1,000 gallons of water pumped (GRP Fee) or received from the surface water system (Surface Water Fee). This demonstrates that the GRP Fee is a rate charged by NFBWA for providing water service.

12.     Based on my review of NFBWA's December 31, 2021 Financial Report, the vast majority of NFBWA's expenses in 2021 were related to the construction and operation of the surface water system. The majority of NFBWA's revenues, however, came from its GRP Fee. According to the Authority's December 31, 2021, Financial Report, in 2021, the Authority recovered approximately $33.149M in revenues from groundwater pumpage fees, and $25.756M in surface water fees, plus an additional $749,000 in other revenues. The fact that the majority of NFBWA's revenues are from GRP Fee and the majority of its expenses are for expenses related to its surface water system demonstrates that all GRP Participants are paying for the same water service.

FURTHER AFFIANT SAYETH NAUGHT

By: _____
       Nelisa Heddin

Subscribed and Sworn before me by Nelisa Heddin, on this 16th day of January 2023, to certify which witness my hand and seal of office.

_____
Notary Public in and for the State of Texas

SHARON KERBY
Notary ID #133666068
My Commission Expires
April 7, 2026

SHARON KERBY
Print or type name of Notary Public
Commission Expires April 7, 2026

AFFIDAVIT OF
NELISA HEDDIN

Page 3

# Tab 8

Order Remanding Proceeding (AR 58)



| PETITION OF THE CITY OF | § | PUBLIC UTILITY COMMISSION |
| FULSHEAR APPEALING THE | § | |
| DECISION OF NORTH FORT BEND | § | OF TEXAS |
| WATER AUTHORITY TO INCREASE | § | |
| GROUNDWATER REDUCTION PLAN | § | |
| AND SURFACE WATER FEES | § | |

## ORDER REMANDING PROCEEDING

This Order addresses the petition of the City of Fulshear appealing North Fort Bend Water Authority's decision to increase its groundwater-reduction-plan fee and surface-water fee under Texas Water Code (TWC) §§ 12.013 and 13.043(f). The water authority filed a motion asserting Fulshear's appeals should be dismissed with prejudice for lack of jurisdiction and failure to state a claim for which relief may be granted. The State Office of Administrative Hearings (SOAH) administrative law judge (ALJ) filed a proposal for decision recommending the Commission dismiss Fulshear's appeal under both statutes. For the reasons discussed in this Order, the Commission adopts the proposal for decision to the extent it dismisses Fulshear's appeal under TWC § 12.013, rejects the proposal for decision to the extent it dismisses Fulshear's appeal under TWC § 13.043(f), and remands this docket to SOAH for further processing.

## I. Background

The North Fort Bend Water Authority is a regional water authority in Fort Bend and Harris Counties.[1] The water authority enforces a groundwater reduction plan designed to meet the groundwater preservation goals of the Fort Bend Subsistence District, whose regulations limit the groundwater consumption of non-exempt well owners to a percentage of their total water demand.[2] The groundwater reduction plan details the water authority's decision to develop, construct, and manage a surface-water supply system to reduce groundwater consumption within its boundaries by 30% in 2013 and by 60% in 2025.[3] In-boundary districts and municipalities are slated to begin

---

[1] Tex. Special Dist. Local Laws Code § 8813.002.

[2] Motion to Dismiss of North Fort Bend Water Authority, Groundwater Reduction Plan (Dec. 15, 2022).

[3] *Id.* at 1–4.

receiving wholesale water service from the water authority in two phases. Most entities began receiving water under phase one in 2013; the remainder—including Fulshear—will begin receiving service under phase two. Phase two was originally planned for 2025 but is currently delayed indefinitely.[4]

The water authority estimated the cost of capital for phase one to be $337 million and the cost of capital for phase two to be $588 million.[5] To recover the cost of this infrastructure, the water authority implemented a groundwater-reduction-plan fee (GRP fee) of $0.30 per 1,000 gallons beginning in February 2008.[6] After the water authority began providing wholesale water service to select customers, it began charging a surface-water fees to customers receiving actual water service (i.e., customers receiving surface water from the water authority).

The City of Fulshear is located within the water authority's boundaries and will begin receiving surface water from the water authority when phase two begins.[7] Fulshear owns and operates seven wells used to provide retail water utility service.[8] Withdrawals from these wells are subject to the water authority's GRP fee.[9] Fulshear does not receive raw or treated water from the water authority and does not pay surface-water fees to the water authority.[10]

On December 16, 2021, the water authority's board of directors approved an increase to the water authority's GRP and surface-water fees effective January 1, 2022. On March 16, 2022, Fulshear filed a petition appealing the rate increases under TWC §§ 12.013 and 13.043(f). On December 15, 2022, the water authority filed a motion to dismiss Fulshear's appeals under both statutes on December 15, 2022. The SOAH ALJ filed a proposal for decision on June 23, 2023 recommending that the Commission grant the motion to dismiss.

---

[4] *See id.*, Groundwater Reduction Plan at 19–21.

[5] *Id.*, Groundwater Reduction Plan at 24.

[6] *Id.*, Groundwater Reduction Plan at 28; *id.*, Groundwater Reduction Plan at Appendix G.

[7] *Id.*, Groundwater Reduction Plan at 20.

[8] *Id.* at 3.

[9] *Id.*

[10] *Id.*

## II. Discussion

### A. Jurisdiction under TWC § 13.043(f)

Under TWC § 13.043(f), a retail public utility[11] that *receives water or sewer service* from another retail public utility may appeal to the Commission a decision of the provider of water or sewer service affecting the amount paid for water or sewer service.[12] The water authority asserts Fulshear is not receiving *service* (as that term is statutorily defined)[13] and, therefore, does not meet the jurisdictional requirements necessary to file an appeal under section 13.043(f). The water authority and, later, the SOAH ALJ, reached this conclusion by applying the *Crystal Clear* standard—a legal standard created by the Austin Court of Appeals to determine if a tract of land is receiving service for the purpose of a streamlined expedited under TWC § 13.2541.[14] That standard requires consideration of "whether the retail public utility has facilities or lines committed to providing water *to the particular tract* or has performed acts or supplied anything *to the particular tract* in furtherance of its obligation to provide water to that tract pursuant to its [certificate of convenience and necessity]."[15]

The Commission disagrees the *Crystal Clear* is the standard for determining if a retail public utility is receiving service for a rate appeal under TWC § 13.043(f). Streamlined expedited release proceedings facilitate the release of a tract of and from a certificated service area. To obtain release, a petitioner must show their tract of land is not receiving service from the entity certificated to provide service to their tract.[16] In contrast, an appeal under TWC § 13.043(f) allows a retail public utility to obtain Commission review of a water or sewer service rate they believe to be

---

[11] TWC § 13.002(19) (defining *retail public utility* as "any person, corporation, public utility, water supply or sewer service corporation, municipality, political subdivision or agency operating, maintaining, or controlling in [Texas] facilities for providing potable water service or sewer service, or both, for compensation.").

[12] *Id.* § 13.043(f) (emphasis added).

[13] TWC § 13.002(21) (defining *service* as "any act performed, anything furnished or supplied, and any facilities or lines committee or used by a retail public utility in the performance of its duties under this chapter to its patrons, employees, other retail public utilities, and the public, as well as the interchange of facilities between two or more retail public utilities.").

[14] *See Tex. Gen. Land Office v. Crystal Clear Water Supply Corp.*, 449 S.W.3d 130 (Tex. App.—Austin 2014, pet. denied).

[15] *Id.* at 140 (emphasis in original).

[16] TWC § 13.2541(b).

unreasonable. To obtain review, the petitioner must show they are receiving service from the retail public utility being challenged.

A key difference is the presence of a rate. The *Crystal Clear* standard focuses on facilities and lines committed, actions taken, and things supplied by a retail public utility to a specific tract of land. It does not contemplate a review of the rates charged by a retail public utility to a landowner. Therefore, it is not reasonable to apply the *Crystal Clear* standard to a rate appeal.

An appeal under TWC § 13.043(f) is an appeal of a decision by a retail public utility affecting the amount a petitioner is paying for water or sewer service. If the Commission cannot review amounts paid by the petitioner to the retail public utility, it cannot determine whether the amounts charged to Fulshear are reasonable. Applying the *Crystal Clear* standard would foreclose any analysis of the amounts Fulshear has paid North Fort Bend Water Authority through the groundwater-reduction-plan (GRP) fee. It would also foreclose any analysis of the water authority's use of the amounts paid by Fulshear to perform acts, furnish or supply things, and commit facilities and lines to Fulshear in the performance of its duties under the Water Code.[17]

The Commission determines there is sufficient guidance from the Water Code's broad definition of the term *service* alone for the ALJ to determine whether Fulshear is receiving water service from the water authority.

## B.  Jurisdiction under TWC § 12.013

The Commission's appellate jurisdiction under TWC § 12.013 is limited to rates paid by a political subdivision to another political subdivision for the "furnishing of raw or treated water" on a wholesale basis.[18] The term *furnish* is not defined in the statute and therefore is defined according to its plain and common meaning.[19] The SOAH ALJ found the plain meaning of *furnish*

---

[17] *See* TWC § 13.002(21).

[18] TWC § 12.013(a), (d).

[19] *City of Rockwell v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008) ("In construing statutes, we ascertain and give effect to the Legislature's intent as expressed by the language of the statute. We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired. Otherwise, we construe the statute's words according to their plain and common meaning, unless a contrary intention is apparent from the context, or unless such a construction leads to absurd results.").

is to *supply* or *provide*.[20] Applying this definition, the SOAH ALJ concluded the water authority furnishes potable water for compensation within its service territory, but not to Fulshear.[21]

The Commission agrees with the SOAH ALJ that the water authority does not furnish water to Fulshear.

### III.  Conclusion

For the reasons discussed in this Order, the Commission adopts the proposal for decision to the extent it dismisses Fulshear's appeal under TWC § 12.013, rejects the proposal for decision to the extent it dismisses Fulshear's appeal under TWC § 13.043(f), and remands this docket to SOAH for further processing.

Signed at Austin, Texas the ___*1st*___ day of ___*November*___ 2023.

PUBLIC UTILITY COMMISSION OF TEXAS

KATHLEEN JACKSON, INTERIM CHAIR

WILL MCADAMS, COMMISSIONER

LORI COBOS, COMMISSIONER

JIMMY GLOTFELTY, COMMISSIONER

Office 16
q:\cadm\orders\interim\53000\53363 ro.docx

---

[20] Proposal for Decision at 12 (Jun. 23, 2023).

[21] Proposal for Decision at 13.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

C. Freeland on behalf of Clarence Freeland
Bar No. 7417500
jfreeland@mandf.com
Envelope ID: 107818869
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Brief of Appellee City of Fulshear
Status as of 11/7/2025 4:51 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Andrew Miller | 786857 | Drew.Miller@kempsmith.com | 11/7/2025 3:56:31 PM | SENT |
| Clarence Freeland | 7417500 | jfreeland@mandf.com | 11/7/2025 3:56:31 PM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 11/7/2025 3:56:31 PM | SENT |
| Sharnezia Mitchell | | sharnezia.mitchell@kempsmith.com | 11/7/2025 3:56:31 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 11/7/2025 3:56:31 PM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 11/7/2025 3:56:31 PM | SENT |
| Greta Duran | | greta.duran@kempsmith.com | 11/7/2025 3:56:31 PM | SENT |